## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | | |
|---|---|---|
| **JADEN RASHADA,** | § | |
| | § | |
| **Plaintiff,** | § | **Civil Action No. 3:24-cv-219** |
| **v.** | § | |
| | § | |
| **HUGH HATHCOCK;** | § | |
| **WILLIAM "BILLY" NAPIER;** | § | |
| **MARCUS CASTRO-WALKER; and** | § | **JURY TRIAL DEMANDED** |
| **VELOCITY AUTOMOTIVE** | § | |
| **SOLUTIONS, LLC,** | § | |
| | § | |
| **Defendants.** | § | |

### PLAINTIFF JADEN RASHADA'S ORIGINAL COMPLAINT

Plaintiff Jaden Rashada ("Jaden"), by and through counsel, hereby files this Original Complaint against Defendants Hugh Hathcock ("Hathcock"), William "Billy" Napier ("Napier"), Marcus Castro-Walker ("Castro-Walker"), and Velocity Automotive Solutions LLC ("Velocity Automotive") (collectively, "Defendants").

### I.   INTRODUCTION

1.     The unsuccessful recruitment of star high school quarterback Jaden Rashada to the University of Florida ("UF" or "Florida") is emblematic of the abuses running rampant in the world of big-time college football. Student-athletes can now be paid for the use of their name, image and likeness, more commonly known as NIL. Jaden's miserable experience reveals in stark and dramatic detail what can

happen to young student-athletes when wealthy, win-at-all-cost alumni insert themselves into college football's recruiting process.

2.      At the time of the events in this Complaint, Jaden was a 19-year-old college football prospect.  He grew up in a football family in working-class Pittsburg, California. Upon graduating from Pittsburg High in 2022 with a 4.0 GPA, Jaden was ranked seventh nationally in the Class of 2023 college-bound quarterbacks. As such, he was recruited by several of the country's elite college football programs, including Louisiana State University, Texas A&M University, University of Oregon, University of Mississippi, University of Miami, and UF.

3.      UF has been at the helm in pushing the limits of the ever-evolving NIL landscape. Its football program and head football coach, Defendant Coach Napier, are central figures in this story.  The NIL game starts with the relationship between a university's sports program and its alumni, boosters, and funding organizations known as "collectives." These entities, which are new to college athletics, play a crucial role in making NIL opportunities possible and in aiding in recruitment.  This is the reality that led to the involvement of Defendant Hugh Hathcock.

4.      Hathcock, a long-time UF booster, has used his money in significant ways to pledge his allegiance to UF.  In 2022, Hathcock displayed his commitment and loyalty to UF athletics with an eight-figure donation to the athletic association— the largest donation in the program's history. To show its gratitude, UF approved the

naming of the Hugh Hathcock Suite Tower at Ben Hill Griffin Stadium and the Hugh

Hathcock Basketball Complex at the UF Basketball Practice Facility.



The 64-year-old entrepreneur has clearly been successful—and public—about his

business endeavors with various media reports estimating his net worth at $500

million.

5.      Given such lofty status, Hathcock, along with alumni, boosters, and

staff with ties to the UF athletics program, used their collective power, influence,

and wealth to fraudulently induce Jaden to commit to UF.  They sold Jaden on the

idea that by flipping his commitment from Miami to UF, not only could he play for

a top offensive program, but he also could also receive significantly more money.

6.      Edward Rojas ("Rojas"), the CEO of The Gator Collective, LLC

("Gator Collective"), was also deeply involved throughout the effort to flip Jaden.

Once Jaden committed to UF, Rojas continued to convey false and empty promises

to Jaden:

- "Tell Jaden we look forward to setting him up for life."

- "Need to set up [Jaden's] brokerage accounts asap."

- "Dude is rich and we just got started."

7.    Deceitful promises such as these did indeed convince Jaden to flip and sign a $13.85 million NIL deal with the Gator Collective. But once Jaden committed to UF, rather than make Jaden "rich" as promised, these people—with Hathcock leading the charge—changed their tune and went back on their word.   The amount of UF-affiliated NIL money available for Jaden decreased drastically.

8.    In an effort to further deprive Jaden of any other possible NIL opportunities, Defendants continued to manipulate Jaden until he signed a letter of intent with UF. These actions culminated with Coach Napier himself vouching that UF alumni were good on their promise that Jaden would receive $1 million if he signed with UF on National Signing Day. Defendant Castro-Walker leveraged the Coach's promise that Napier would "get it done," and threatened—on National Signing Day—that, if Jaden did not sign a national letter of intent with UF, Coach Napier might walk away from Jaden entirely.

9.    Despite the threats and promises, neither Coach Napier, nor wealthy boosters like Hathcock ever "got it done" for Jaden. Instead, after inducing Jaden through false promises to forgo NIL deals from other programs—including $9.5

million from Miami—Defendants attempted to strong-arm Jaden into an NIL contract worth a fraction of what they promised.

10.     Here, Defendants used lies to secure Jaden's commitment to UF, only to try to re-trade the deal once Jaden had given up the other multi-million-dollar NIL opportunities available to him. The legal terms for what happened to Jaden are: "fraud" and "fraudulent inducement."

11.     Sadly, unethical and illegal tactics like this are more and more commonplace in the Wild West that is today's college football landscape. As the first scholar-athlete to take a stand against such egregious behavior by adults who should know better, Jaden seeks to hold Defendants accountable for their actions and to expose the unchecked abuse of power that they shamelessly wielded.

## II.    <u>JURISDICTION AND VENUE</u>

12.     This Court has jurisdiction over this proceeding under 28 U.S.C. § 1332, because the case arises between citizens of different States and the matter in controversy exceeds the sum or value of $10,000,000.

13.     Venue is proper in the Northern District of Florida pursuant to 28 U.S.C. § 1391(a)(1) because this is the judicial district in which Defendant Hugh Hathcock resides.  The Pensacola Division of the Northern District of Florida is the proper division in the Northern District of Florida because Defendant Hugh Hathcock resides in the Okaloosa County, and therefore, venue would be proper in

the Pensacola Division if the division was a stand-alone district.  *See* N.D. F<span>LA.</span> L<span>OC.</span>

R. 3.1(A)(1), (B).

## III.   <u>PARTIES</u>

14.    Plaintiff Jaden Rashada is a citizen of the State of Georgia and a resident of Clarke County, Georgia. At the time of the events that are central to the claims in this case, Jaden was a resident of California.

15.    Defendant Hugh Hathcock is a resident of Okaloosa County, Florida. Hathcock is a successful entrepreneur and dedicated UF athletics booster. Hathcock claimed to have established his own NIL collective called the Gator Guard Marketing, LLC ("Gator Guard") for the purpose of financing large NIL deals for Florida athletes.  Hathcock's self-professed primary aim for his own collective was to attract high-profile athletes by offering substantial sums of money.  Defendant Hathcock may be served at 618 Gulf Shore Dr., Destin, Florida 32541 or wherever he may be found.

16.    Defendant Coach Billy Napier is the head football coach at the University of Florida.  Defendant Napier may be served at 623 S.W. 93rd Street, Gainesville, Florida 32607 or wherever he may be found.

17.     Defendant Marcus Castro-Walker served as Director of Player Engagement & NIL for the University of Florida.  Castro-Walker reported to Coach Napier and participated in efforts to recruit Jaden to UF. Defendant Castro-Walker

may be served at 19750 Weathervane Way, Loxahatchee, Florida 33470 or wherever he may be found.

18.    Defendant    Velocity    Automotive    Solutions    LLC    ("Velocity Automotive") is a Florida limited liability company with its principal address in Destin, Florida. Velocity Automotive may be served by serving its registered agent, Corporation Service Company at 1201 Hays Street, Suite 200, Destin, Florida, or wherever it may be found.

## IV.  FACTS

**A.    Jaden Was a Highly Sought After Quarterback in the 2023 Recruiting Class**.

19.    Jaden grew up in a football family. His father, Harlen Rashada, was a standout football player for Arizona State University, and his two older brothers played college football as well.

20.    When Jaden began looking at colleges, Jaden looked for a program with an offensive-minded head coach and a solid offensive coordinator.

**B.    The New World of NIL Compensation Becomes a Key Factor in Jaden's College Recruitment**.

21.    When Jaden entered the 2023 college recruitment season, the NCAA had only recently adopted rules allowing compensation to student athletes for the use of their name, image, and likeness. This new NIL regime opened the door to the formation of so-called "collectives"—groups of donors who agreed to fund NIL

contracts with athletes in exchange for the athletes' de facto commitment to a particular university. With the emergence of collectives, NIL contracts became a major component of college athletic recruiting.

22.    Jaden's recruitment season involved universities and its boosters not only selling their football program but also discussing lucrative NIL proposals. The recruitment ultimately boiled down to two famed Florida football schools: UF and Miami.

**C.    Hugh Hathcock Sets His Eyes on Jaden.**

23.    Defendant Hathcock participated in Jaden's recruitment from the very beginning. Specifically, in June of 2022, when Jaden made a recruitment visit to UF, Hathcock was there. During the visit, Hathcock spoke with Jaden and told him that, whatever Jaden needed to come to UF, Hathcock would make happen. Hathcock also suggested that he could secure employment for Jaden's father, Harlen, in the security industry. All of these promises ultimately proved to be lies.

24.    Later that summer, Hathcock offered Jaden an approximately $11 million UF-affiliated NIL deal. This offer was to be funded partially through Defendant Velocity Automotive and partially through the Gator Guard.

25.    By the time Jaden received this offer, he had already verbally committed to University of Miami's coach. Ultimately, on June 26, 2022, Jaden

publicly committed to play football at the University of Miami. Jaden also agreed to a $9.5 million NIL deal.

**D.     UF Conspired to "Flip" Jaden from his Commitment with Miami to UF.**

26.     Despite Jaden committing to Miami, UF and its boosters persisted in their recruitment efforts. This pressure campaign culminated with an NIL offer exceeding Miami's by more than $4 million, which ultimately led to Jaden's committing to UF. Texts in October 2022 from Defendant Castro-Walker, UF's director of NIL and player engagement, exemplified these renewed efforts.

31.     Specifically, Castro-Walker approached Jaden's NIL agents Jackson Zager ("Zager") and Thomas Thomsen ("Thomsen") about Jaden flipping his commitment from Miami to UF.  On or around October 27, 2022, Castro-Walker sent a text message to Zager stating:

> You already know what we need to do over the next few days!! Get us the QB 👀 🤣 .

Defendants knew that "flipping" would require Jaden to abandon his commitment to Miami—and with it the widely publicized $9.5 million NIL agreement to which he had agreed.  Ultimately, Hathcock conspired with Castro-Walker, Coach Napier, and others to fraudulently induce Jaden to abandon his $9.5 million Miami deal. Together, Defendants agreed to represent their willingness and ability to exceed Miami's $9.5 million NIL agreement if Jaden flipped to UF.  As evidenced by the complete lack of funds to support this commitment, however, the Defendants made

these representations and promises to Jaden knowing that they lacked both the intention and the ability to fulfill them.

32.   Working alongside Defendant Hathcock, Castro-Walker communicated to Zager and Thomsen what UF would pay if Jaden decommitted from Miami and committed to play football for UF.  On or around October 30, 2022, a few days after Castro-Walker told Zager to "Get us the QB," Castro-Walker sent another text to Zager:

> We need to lock down Jaden!

Castro-Walker further conveyed the high sense of urgency, stating:

> [UF would] want [Jaden] to flip this week.

33.   In early November 2022, Hathcock and Castro-Walker worked closely and concertedly to pressure Jaden with extravagant NIL offers. The ultimate proposal promised Jaden $13.85 million over four years at UF. The offer, which was $4 million or 42% more than the Miami deal—was to be funded through two sources. First, Hathcock would pay $5.35 million—including a $500,000 "signing bonus," through Hathcock's company Velocity Automotive.[1]

---

[1]At all times relevant to this complaint, Hathcock was an officer of Velocity Automotive with actual and apparent authority to act on Velocity Automotive's behalf.

The remainder of the $13.85 million would be paid through Hathcock's NIL collective, Gator Guard.[2]

34.     On or around November 9, 2022, Zager reported to Jaden's father, Harlen, conversations that he had with Castro-Walker and Hathcock relating to the structure of the UF NIL deal.  Zager told Jaden and Harlen:

> Have the contract w Velocity being ironed out now, Hugh wanted to discuss again in the am. Should just be plugging in at that point and be done with.  Collective side is done with, just need to finish this part.

Throughout these discussions, Hathcock's representations led Jaden to believe that Castro-Walker, Coach Napier, and others had authority to negotiate the NIL agreement that Hathcock and Velocity Automotive would fund.   As such, Defendants Castro-Walker and Coach Napier acted with actual and apparent authority with respect to their representations on behalf of Hathcock. Hathcock clearly was an agent of Velocity Automotive, with actual and apparent authority regarding the NIL agreement.

---

[2] Though Hathcock reportedly formed the Gator Guard—and reportedly raised $5 million for the Guard to fund UF student-athlete NIL contracts—no entity called "Gator Guard Marketing" appears to have ever registered with the Florida Secretary of State. Although a non-profit entity called Gator Guard Charity, Inc. was formed in May of 2022 and shares an address with Velocity Automotive—an entity Hathcock owns and controls—it is unclear how this entity could have supported guaranteed payments to the extent contemplated by Hathcock and Castro-Walker's representations to Jaden.

35.     Hathcock felt so confident that his fraudulent promises would persuade

Jaden to commit to UF that Hathcock tweeted:



36.     On November 10, 2022, during the early morning, Zager reported the

status of negotiations to Harlen:

> Contract drafted. Reviewing this am. Will lock in value with Hugh here.
> I think Jaden will be able to sign this thing by tonight if y'all are ready
> then. I'll keep you in the loop with updates.

This report was based on promises made by Hathcock through Castro-Walker.

37.     Before the deal was finalized, however, Hathcock balked. Citing plans

to sell Velocity Automotive, Hathcock declined to use his company or the Gator

Guard to directly fund the promised NIL payments. Castro-Walker and Hathcock

therefore suggested that the funds from Hathcock and his company pass through the

Gator Collective.

38.     Castro-Walker and Hathcock then partnered with Rojas, the CEO of the

Gator Collective. They all assured Jaden and his agents that the deal would still be

fully funded. For example, after Thomsen and Zager learned about Hathcock's plans

to sell his company, Jennifer Grosso, the Gator Collective lawyer drafting the UF NIL agreement, confirmed during a phone call with Thomsen and Zager that Hathcock would wire money monthly so that all necessary payments could be made to Jaden.

39.   Ms. Grosso specifically stated that Hathcock would fund the first $500,000 owed to Jaden. She wanted Jaden and his family to know that UF was "serious" about securing Jaden's commitment. She made these representations with actual and apparent authority to negotiate the contract on behalf of Rojas and Hathcock.

40.   Rojas, the CEO of Gator Collective, was also heavily involved in the efforts to flip Jaden's commitment. During the evening of November 10, 2022, Rojas text messaged Zager: "Heard we are working together. Doing big things brother." Rojas confirmed his involvement stating:

> Let me finish the paperwork and get his flip tonight. Excited about this for all of us.

Rojas also emphasized the unique significance of Jaden flipping from UF's rival Miami, texting:

> We are going to have to dodge the freaks in Miami[.] I hate Miami. This is going to be fun to watch.

41.   Rojas crowed about the life-changing impact the falsely promised NIL compensation would have, saying:

Tell Jaden we look forward to setting him up for life. Need to set up his brokerage accounts asap.  Dude is rich and we just got started.

42.     As the parties exchanged draft agreements, Hathcock continued to show his involvement in the imminent "flip" by tweeting, "All good!!! Just a little longer!!!"



43.     Ms. Grosso additionally pressured Jaden to make sure he publicly announced his commitment to UF on November 10, 2022.  At around 10 p.m., when Jaden had still not announced his commitment, Grosso impatiently text messaged Zager:

I might go to sleep if I had $500K headed my way in two weeks . . . But we need a commitment to get there!!!

**E.     Relying on Defendants' False Promises, Jaden Decommitted from Miami and Left the $9.5 Million Agreement.**

44.     Late on the night of November 10, 2022, Jaden agreed to a $13.85 million NIL deal and publicly flipped his commitment from Miami to UF.



45.     Hathcock, Castro-Walker, and Coach Napier knew that once Jaden publicly "flipped" to UF, this would end his commitment to Miami and cost him his $9.5 million NIL agreement.

46.     Defendants' false and fraudulent promises materially induced Jaden to engage in conduct he would not have engaged in otherwise. Namely, Defendants' fraudulent promises caused Jaden to forgo a $9.5 million NIL deal and other potential NIL packages. Jaden relied upon Defendants' misrepresentations to his

detriment because Defendants had neither the ability nor the intention of honoring their promise to pay him $13.85 million.

47.     All representations regarding the $13.85 million NIL deal leading up to this inducement were made by Defendants Hathcock, Castro-Walker, and Coach Napier, either individually or as agents with actual and apparent authority:

> a.     knowing that the representations were false;
>
> b.     without knowledge of their truth or falsity; or,
>
> c.     under circumstances in which these Defendants ought to have known—if they did not know—that the representations and promises were false.

## F.     Defendants Failed to Honor their Financial Commitments to Jaden.

48.     The agreement was finalized and signed on November 10, 2022.  Then, less than a month later without any warning, the Gator Collective abruptly and unilaterally terminated it.

49.     The deadline for the first $500,000 payment owed to Jaden pursuant to the agreement was December 5, 2022. As the deadline drew near, Ms. Grosso informed Jaden's representatives that David Penney, an officer of Velocity Automotive, would coordinate Hathcock's payments. Penney, in turn, informed Jaden's agents that he was waiting on Hathcock's direction before paying.  Castro-Walker also represented that he was communicating with Hathcock about the payment, and that Hathcock was finalizing the logistics of the payment.  Thus,

leading up to the initial payment deadline, Defendants' words and actions continued to communicate an intent to honor their promises.

50.     Despite Defendants' many representations to the contrary, however, it ultimately became clear that the Defendants never intended to pay Jaden the $500,000 that was promised as an initial payment.

51.     In furtherance of their fraud, on December 4, 2022, Hathcock, through Castro-Walker, again confirmed that the $500,000 payment would be coming the next day.  Zager and Thomsen asked Castro-Walker for assurance that the payment would be made on December 5, 2022 stating:

> You're connecting with Hugh [Hathcock] later today on that first payment, correct?

Castro-Walker responded, "Yes," and later:

> Yes. I spoke to him the other day, was working something out with his accountants.

52.     But Hathcock, Castro-Walker, and Coach Napier all knew something that Jaden did not—no one had any intention of enforcing Hathcock's promise to pay $500,000. Nor did they have any way of enforcing it. And, as Jaden would later learn, Hathcock had no intention of performing as he had promised.

53.     Instead, after failing to pay the agreed $500,000 initial payment on its due date, the very next day, the Gator Collective sent Jaden a letter purporting to terminate the $13.85 million NIL contract. Indeed, less than a month prior, Jaden

had been persuaded by Defendants to abandon his $9.5 million NIL agreement with Miami in favor of a promise of significantly more from UF. And now on December 6, 2022, Jaden was left with no NIL assurances at all.

**G.    Defendants Continue to Make False Promises.**

54.    Unfortunately, Defendants' fraudulent activity did not stop there. In violation of Florida law, Castro-Walker (initially) and Coach Napier (later) made extraordinary efforts to persuade Jaden that they would make good on the promised NIL compensation despite the termination of the Gator Collective's contract.   Defendants continued to lie and make material misrepresentations to Jaden, Harlen, and Jaden's NIL agents. Defendants' goals were two-fold: (1) to ensure Jaden remained committed to UF; and (2) to avoid paying the promised NIL funds. Defendants knew that for most college athletes the prospect of NIL earnings is life changing. Defendants exploited this fact for their own personal advantage.

55.    Specifically, on December 7, 2022, Castro-Walker told Jaden's agents that Hathcock's Gator Guard collective would accept assignment of the $13.85 million NIL deal promised to Jaden.   Castro-Walker also relayed that Hathcock, through the Gator Guard, would personally guarantee the $13.85 million obligation himself. To facilitate this new arrangement, Defendants represented that the Gator Collective would retract its unfounded termination, and once the agreement was "un-

cancelled," the $13.85 million obligation would be assigned to the Gator Guard collective.

56.     In accordance with this proposal, on December 9, 2022, Hathcock wired an initial $150,000 payment to Jaden.  Hathcock provided this $150,000 payment so that Jaden could avoid possible litigation with Miami booster John Ruiz, who was seeking repayment from the $9.5 million NIL deal after Jaden flipped his commitment from Miami to UF.

57.     Castro-Walker said he was working with Hathcock to finalize the contractual assignment. However, despite repeated inquiries, by December 19, 2022, Hathcock still had not executed the assignment.

**H.     Defendants Fraudulently Induced Jaden to Sign a National Letter of Intent with UF.**

58.     December 21, 2022 was signing day for 2023 NCAA Division I football early-commitment students.  By this date—two weeks after Defendants assured Jaden that Hathcock would assume the $13.85 million deal—Hathcock still had not done so. Jaden also had not received the promised $500,000 signing bonus.

59.     Jaden tolerated this delay, believing that Hathcock—who had made promises to induce him to flip to UF, all the while bragging about it on Twitter— would keep his promises.

60.     As the hour approached for Jaden to sign his National Letter of Intent, Jaden asked his agents Zager and Thomsen, and his dad Harlen "Can I sign?"

knowing he still had not received any payments for committing to UF. Zager responded "not yet" hoping that Defendants would wire the payments owed to Jaden. Meanwhile, Zager and Thomsen discussed the money owed to Jaden with Castro-Walker and Hathcock. Castro-Walker called Harlen to give assurance that Jaden would receive $500,000 and all promised payments going forward.

61.     In response to Jaden delaying the signing of his National Letter of Intent, Coach Napier personally called Jaden and Harlen to convince Jaden to sign. During his phone call with Harlen, Coach Napier relayed that Jaden would be receiving $1 million from Hathcock as a partial payment towards the promised $13.85 million once Jaden formally signed his National Letter of Intent with UF that day.

62.     Relying on Napier's promise, Jaden was induced to go ahead and sign his Letter of Intent before the Defendants made good on any of their commitments. Harlen reported this conversation to Zager and Thomsen stating:

> Coach Napier said [Hathcock's] on a plane and that he will wire 1 Mil. He wants the paper work and I'm sending it if you are good.

63.     In addition, Castro-Walker emphasized Coach Napier's promises, telling Jaden's agent that Napier would "get it done" and emphasizing Napier's power as head coach. Castro-Walker also increased pressure on Jaden to sign by telling him if he did not do it right away Coach Napier might pull back his scholarship offer. Of course, Castro-Walker, Napier, and Hathcock all knew that

Jaden signing the National Letter of Intent on signing day would commit Jaden to UF and significantly and adversely affect his ability to secure other recruiting opportunities and related NIL deals.

64.    On December 21, 2022, less than an hour after Coach Napier assured Jaden's father that $1 million would be wired from Hathcock, Jaden signed his National Letter of Intent with UF.

**I.    Jaden Withdraws His Commitment to UF.**

65.    After inducing Jaden to sign his National Letter of Intent on signing day, the next few weeks consisted of a series of new promises of NIL agreements that consistently remained unfulfilled. Ultimately, Jaden was left with no faith in the UF football team's leadership and the individuals who had constantly lied to him.

66.    On January 18, 2023, Jaden withdrew his National Letter of Intent to play for UF. After exploring several other colleges, Jaden chose to begin his college career where his father played football, Arizona State University. Interestingly, Jaden neither sought nor was promised any type of NIL commitment from Arizona State.

67.    Recently, on April 19, 2024, Jaden entered the transfer portal and selected the University of Georgia as the school he would attend beginning in the 2024-2025 school year. Similarly to his decision to attend Arizona State, Jaden's

decision to attend Georgia this year was not in response to any promises, assurances, or offers connected to NIL money. He had learned his lesson.

## V.  CLAIMS FOR RELIEF

68.    Each of the paragraphs of this complaint is incorporated by reference as if restated fully in each of the counts listed below.

### Count I
### Fraudulent Misrepresentation and Fraudulent Inducement Against William "Billy" Napier, Marcus Castro-Walker, Hugh Hathcock, and Velocity Automotive Solutions LLC

69.    Under Florida law, the elements of fraudulent misrepresentation and fraudulent inducement are:  (a) a false statement concerning a material fact; (b) the representor's knowledge that the representation is false; (c) an intention that the representation induce another to act on it; and (d) consequent injury by the party acting in reliance on the representation.[3]  For the second element, actual knowledge of falsity is not required.  That element can also be established where Defendants acted:  (1) with actual knowledge of the falsity of the representation; (2) without knowledge either of the representation's truth or falsity; or (3) under circumstances in which the person making the representation ought to have known, if the person

---

[3] *Brier v. De Cay*, No. 3:16-cv-142-MCR-CJK, 2017 WL 1164724 at *5 (N.D. Fla. Mar. 1, 2017), *adopted by*, 2017 WL 1147471 (N.D. Fla. Mar. 24, 2017); *In re Harris*, 3 F.4th 1339, 1349 (11th Cir. 2021) (quoting *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010)).

did not know, of its falsity.[4] Collectively, these three mental states are referred to herein as "scienter."

70.    Acting with scienter, Hathcock (on behalf of himself and Velocity Automotive), Castro Walker, and Coach Napier defrauded Jaden initially by falsely promising $13.85 million when such promise could not be fulfilled and neither they nor Hathcock had any intention of fulfilling it.

71.    In addition, acting with scienter, Defendants defrauded Jaden by promising to honor the terms of the initial NIL deal—even after purporting to terminate it—in a continued effort to persuade Jaden to sign a National Letter of Intent with UF and to thereafter maintain his commitment to play football at UF.

72.    For instance, as alleged above and acting with scienter, Defendants continued to defraud Jaden by fraudulently misrepresenting that he would be paid $1 million towards the $13.85 million NIL contract once he signed his National Letter of Intent.

73.    Acting with scienter, Defendants further defrauded Jaden by promising that Hathcock's collective, Gator Guard Marketing LLC, would accept assignment of the $13.85 million contract with The Gator Collective, when Defendants knew or

---

[4] *In re Harris*, 3 F.4th at 1349 (quoting *Joiner v. McCullers*, 28 So.2d 823, 824 (1947)).

should have known that Gator Guard Marketing LLC either was not a real entity or it had no ability or intent to accept an assignment of Jaden's NIL deal.

74.    Acting with scienter, the Defendants made additional false statements of material fact, to induce Jaden's reliance.

75.    Jaden justifiably relied on Defendants representations to his detriment by decommitting from Miami and abandoning the $9.5 million NIL deal, as well as forgoing other recruitment opportunities and related NIL deals.

76.    Defendants concealed their strategy and intentions to defraud Jaden with the $13.85 million NIL deal.  In fact, Jaden did not discover Defendants' true intentions until 2023, after Defendants attempted to re-trade the NIL deal after their months of coordinated lies, manipulation, and deceit. Jaden did not know or have reason to know about Defendants fraudulent conduct until after he withdrew his National Letter of Intent from UF.

77.    As a result of Defendants' actions, Jaden has suffered damages.

**Count II**

**Aiding and Abetting Fraud Against William "Billy" Napier, Marcus Castro-Walker, Hugh Hathcock, and Velocity Automotive Solutions LLC**

78.     Under Florida law, the elements of aiding and abetting fraud are: (a) the existence of an underlying fraud; (b) that the defendant had knowledge of the fraud, and (c) that the defendant provided substantial assistance to advance the commission of the fraud.[5]

79.     Hathcock (on behalf of himself and Velocity Automotive), Castro-Walker, and Coach Napier orchestrated and executed a fraud upon Jaden and were substantially and knowingly assisted by one another in carrying out the fraud. Each of their individual schemes would not have succeeded without assistance from one another.

80.     Each Defendant knew of the other's false and fraudulent misrepresentations that induced Jaden to "flip" from Miami and forgo his $9.5 million deal. These misrepresentations principally included Defendants' offer to Jaden of the $13.85 million in exchange for his attendance at UF. Defendants' misrepresentation included additional false assurances conveyed to Jaden after December 5, 2022 when the NIL deal was purportedly terminated. Defendants acted

---

[5] *Caledonian Bank & Tr. Ltd. V. Fifth Third Bank*, No. 8:13-cv-1470-T-30TGW, 2013 WL 5272807, at *3 (M.D. Fla. Sept. 17, 2013).

with scienter as to the fact that Defendants lacked any plans or any ability to honor this promise.

81.    Despite being aware of the fraudulent misrepresentations, each Defendant consistently provided false assurances to Jaden and his agents regarding the legitimacy of the NIL deal and their own commitments.  For instance, Coach Napier and Castro-Walker relayed to Jaden that he would be receiving $1 million from Hathcock as a partial payment towards the promised NIL funds, once he formally signed his National Letter of Intent with UF.

82.    Hathcock also held himself out publicly as capable and intending to meet his end of the bargain through social media posts indicating that a successful deal was in the works.

83.    Defendants further aided and abetted the fraud against Jaden by promising to honor the terms of the initial NIL deal—even after purporting to terminate it. Defendants claimed that Hathcock's Gator Guard collective would accept assignment of the contract. In a continued effort to convince Jaden and his agents that he would receive NIL compensation if he stayed committed to UF, Defendants made these false assurances to persuade Jaden to sign the National Letter of Intent with UF.

84.    As a result, of Defendants' aiding and abetting the fraud against Jaden, he has suffered considerable damages.  These damages included the loss of the $9.5

million Miami-affiliated NIL deal, the loss of other collective-sponsored NIL packages, and such other damages as may be proved at trial.

**Count III**
**Civil Conspiracy to Commit Fraud Against William "Billy" Napier,**
**Marcus Castro-Walker, Hugh Hathcock, and**
**Velocity Automotive Solutions LLC**

85.    Under Florida law, the elements of a civil conspiracy are: (a) an agreement between two or more parties; (b) to do an unlawful act or to do a lawful act by unlawful means; (c) the doing of some overt act in pursuance of the conspiracy; and (d) damage to the plaintiff as a result of the acts done under the conspiracy.[6]

86.    Acting with scienter, Hathcock (on behalf of himself and Velocity Automotive), Coach Napier and Castro-Walker engaged in a civil conspiracy to defraud Jaden by agreeing between and amongst one another to fraudulently induce him to forgo his NIL opportunity at Miami and, to instead, flip his commitment to UF.  This conspiracy caused Jaden to incur significant damages.

87.    Defendants engaged in a civil conspiracy because, as discussed in detail below, Defendants had as their objective the commission of the underlying tort of fraud.[8]

---

[6] *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009).

88.     Acting with scienter, Defendants—between and amongst themselves—agreed initially to promise Jaden $13.85 million in exchange for his attendance at UF when Defendants lacked the intention or ability to pay this sum. Indeed, Defendants' failure to make even the first payment indicates that they lacked the financial resources and the intention to pay any of substantial sums they promised to Jaden.

89.     The agreement amongst Defendants is evidenced by Defendants' working together to fraudulently induce Jaden to attend UF and later to execute the National Letter of Intent.

90.     Specifically, with respect to Jaden's initial announcement that he was "flipping" from Miami to UF, Castro-Walker, Coach Napier, and Hathcock made false promises that Jaden would receive $13.85 million in exchange for his attending UF.

91.     The purpose of these promises was obviously—and indisputably—to induce Jaden to change universities and football programs. Indeed, almost immediately after agreeing to the promised $13.85 million and in direct response to pressure to do so, Jaden announced that he would be switching his commitment to UF.

92.     The involvement and fraudulent intent of Hathcock is further evidenced by Hathcock's social media posts shortly before Jaden's announcement. Hathcock—

both directly and through his agents—specifically, successfully, and fraudulently induced Jaden to abandon his $9.5 million NIL agreement that was conditioned on his attending Miami.

93.    Castro-Walker and Coach Napier told Jaden that Hathcock would fund the NIL payments.  The combined efforts of Castro-Walker, Coach Napier, and Hathcock with respect to the many false representations surrounding Jaden's NIL deal demonstrated the group's agreement to work together to defraud Jaden.

94.    Defendants thus agreed together to make the many and various fraudulent representations described in this complaint for the unlawful purpose of defrauding Jaden.

95.    Furthermore, acting with scienter, after purporting to terminate the contract, Defendants—between and amongst themselves—claimed that they agreed to assign the contract to Hathcock's collective, Gator Guard Marketing LLC when Gator Guard Marketing LLC either was not a real entity or when Defendants lacked the intention to do so.  Moreover, Defendants lacked not only the intention, but also the ability to convey the alleged assignment to Hathcock's collective.

96.    The agreement amongst Defendants is evidenced by a draft instrument titled "Assignment," purportedly between Hathcock's collective, Gator Guard Marketing LLC, and The Gator Collective, LLC. This draft document further shows the continued effort to convince Jaden and his agents that the terms of the NIL deal

would be honored only to prevent Jaden from backing out of the commitment before signing his Letter of Intent.

97.    Numerous overt acts, including verbal and written representations by each and every member of the conspiracy, and those acting on their behalf, were performed as described in this complaint.  Jaden suffered damages as a result of Defendants' false representations made throughout the course of the conspiracy.

**Count IV**
**Negligent Misrepresentations Against William "Billy" Napier, Marcus Castro-Walker, Hugh Hathcock, and Velocity Automotive Solutions LLC**

98.    Under Florida law, the elements of negligent misrepresentation are:  (a) a misrepresentation of a material fact; (b) lack of knowledge by the representor as to the truth or falsity of the representation, or circumstances under which he ought to have known of its falsity; (c) intent by the representor that the representation induce another to act on it; and (4) injury to the plaintiff as a result of acting in justifiable reliance on the misrepresentation.[7]

99.    To the extent the many misrepresentations alleged do not rise to the level of fraud, Jaden alternatively sues Defendants Napier, Castro-Walker, Hathcock, and Velocity Automotive for negligent misrepresentation.

---

[7] *Oakwood Ins. Co. v. N. Am. Risk Servs., Inc.*, No. 6:19-cv-437-Orl-31KRS, 2018 WL 3381284, at *2 (M.D. Fla. July 11, 2018).

100.   Specifically, each of these Defendants negligently supplied false information in the course of their business, profession, employment, or alternatively, in a transaction in which they had a pecuniary interest. Defendants provided this false information to induce Jaden to forego a business deal with a Miami-affiliated NIL and to instead enter into a business transaction with Defendants. In providing this false information, Defendants failed to exercise reasonable care or competence.

101.   Jaden justifiably relied upon these negligent misrepresentations, and as a result, he suffered pecuniary loss.

**Count V**
**Tortious Interference With a Business Relationship or Contract Against William "Billy" Napier, Marcus Castro-Walker, Hugh Hathcock, and Velocity Automotive Solutions LLC**

102.   Under Florida law, the elements of tortious interference with a business relationship or contract are: (a) the existence of a business relationship, not necessarily evidence by an enforceable contract; (b) knowledge of the relationship on the part of the defendant; (c) an intentional and unjustified interference with the relationship by the defendant; and (d) damage to the plaintiff as a result of the breach of the relationship.[8]

103.   Hathcock (on behalf of himself and Velocity Automotive), Castro-Walker, and Coach Napier tortiously interfered with Jaden's $9.5 million NIL

---

[8] *Landmark Bank, N.A. v. Cmty. Choice Fin., Inc.*, No. 17-60974-CIV-ALTONAGA/Goodman, 2017 WL 4310754, at *20 (S.D. Fla. Sept. 28, 2017).

agreement and business relationship with Miami. As explained above, Jaden had an existing $9.5 million agreement with a Miami-affiliated NIL, and at the very least, Jaden's NIL deal with Miami's collective constituted an existing business relationship. Defendants knew about Jaden's NIL deal and relationship with Miami because it was widely publicized in the media and because it was specifically communicated to Hathcock during the summer of 2022 in the midst of their initial recruitment efforts.

104.   Despite Defendants' knowledge of this existing agreement and business relationship, Defendants fraudulently induced Jaden to abandon that agreement and relationship to secure a commitment from Jaden to play football for UF. Defendants induced Jaden by offering him a superior $13.85 million NIL agreement with UF's collective for the use of his NIL.  That is, Defendants falsely promised to exceed Jaden's Miami deal by nearly $4 million, or more than 40%. Defendants did so knowing such a promise could not be fulfilled, without knowledge of whether or not such a promise could be fulfilled, or under circumstances in which one ought to have known that such a promise could not be fulfilled. Defendants knew that their false promises would cause Jaden to lose his opportunity to earn the funds promised by Miami. Defendants specifically intended to end Jaden's agreement and business relationship with Miami for their own personal benefit and to Jaden's detriment.

105.   As a result of Defendants' tortious interference with Jaden's agreement and business relationship with the Miami collective, Jaden suffered a pecuniary loss.

**Count VI**
**Aiding and Abetting Tortious Interference Against William "Billy" Napier,**
**Marcus Castro-Walker, Hugh Hathcock,**
**and Velocity Automotive Solutions LLC**

106.   Under Florida law, the elements of aiding and abetting tortious interference are:  (a) the existence of an underlying tortious interference; (b) that the defendant had knowledge of the tortious interference, and (c) that the defendant provided substantial assistance to advance the commission of the tortious interference. Because Florida courts have recognized aiding and abetting the commission of a tort as a standalone claim, aiding and abetting tortious interference is a valid cause of action under Florida law.[9]

107.   Hathcock (on behalf of himself and Velocity Automotive), Castro-Walker, and Coach Napier tortiously interfered with Jaden's $9.5 million NIL deal and business relationship with Miami.

108.   Defendants also provided substantial assistance to one another to advance the tortious interference with Jaden's $9.5 million NIL agreement and business relationship with Miami.

---

[9] *See Angell v. Allergan Sales, LLC*, 2019 WL 3958262, at *8 (M.D. Fla. Aug. 22, 2019); *see also Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012) (applying the above elements to three Florida tort claims).

109.   Each Defendant knew of Jaden's $9.5 million deal with Miami and knew of the other's false misrepresentations that they each made to induce Jaden's commitment to UF.  They each also knew, had no knowledge one way or the other, or ought to have known, that Hathcock and his companies had no intention of paying Jaden the promised funds, that the funds would not be provided from any other entity, and that Jaden would lose the ability to earn the funds promised by Miami.

110.   Despite this knowledge, each Defendant provided substantial assistance to the others with the aim to end Jaden's agreement and business relationship with Miami for their own personal benefit and to Jaden's detriment.

111.   Due to Defendants' aiding and abetting of each other in this tortious interference, Jaden suffered pecuniary damages.

### Count VII
### Vicarious Liability Against Velocity Automotive Solutions LLC

112.   Under Florida law, the elements of vicarious liability are: (a) an employee committed a negligent act; and (b) that act was either [1] within the scope of employment or [2] during the course of employment and to further a purpose or interest of the employer.[10]

---

[10] *Johnson v. EZX, LLC*, No. 3:16-cv-1249-J-PDB, 2017 WL 1386810, at *3 (M.D. Fla. Apr. 18, 2017) (quoting *Valeo v. E. Coast Furniture Co.*, 95 So. 3d 921, 925 (Fla. Dist. Ct. App.2012)).

113.   Hathcock was an officer, employee, agent, and/or servant of Velocity Automotive.

114.   Velocity Automotive is vicariously responsible for the acts, errors, and/or omissions of Hathcock as previously set forth herein.

## VI.  DAMAGES

115.   Plaintiff, Jaden Rashada, incorporates by reference the allegations in paragraphs of Counts I through VII as if restated verbatim herein.

116.   Defendants' actions, both jointly and severally, caused Jaden significant damages.

117.   In particular, as a proximate result of Defendants' actions, among other things, Jaden (1) lost the $9.5 million NIL agreement related to his attendance at Miami; and (2) lost the opportunity to pursue other NIL deals from other collectives after being induced to commit to UF based on fraudulent assurances.

118.   Additionally, to the extent any of Defendants acted with malice, Jaden is entitled to punitive damages. An award of such damages would assist in deterring and preventing similar conduct in the future.

## VII.  CONDITIONS PRECEDENT

119.   All conditions precedent to Jaden's right to recover have occurred, have been waived, or have been performed.

## VIII.  DEMAND FOR TRIAL BY JURY

120.   Jaden hereby demands a trial by jury on all claims for which the law provides a right to a jury trial.

## IX.  CONCLUSION AND PRAYER

121.   Jaden Rashada respectfully prays that all Defendants be cited to appear and answer herein, and for judgment against Defendants, jointly and severally, for compensatory and punitive damages against all Defendants, to the extent permitted by law, as well as pre-and post-judgment interest, and all further relief, both legal and equitable, to which Jaden shows himself justly entitled.

Dated this 21st day of May, 2024.

Respectfully submitted,

**RUSTY HARDIN & ASSOCIATES, LLP**

RUSTY HARDIN, ESQ.
Attorney in Charge
Texas State Bar No. 08972800
*Motion for Pro Hac Vice To Be Filed*
DANIEL DUTKO, ESQ.
Texas State Bar No. 24054206
*Motion for Pro Hac Vice To Be Filed*
JOHN MACVANE, ESQ.
Texas State Bar No. 24085444
*Motion for Pro Hac Vice To Be Filed*
LEAH GRAHAM, ESQ.
Texas State Bar No. 24073454
*Motion for Pro Hac Vice To Be Filed*
JOE RODEN, ESQ.
Texas State Bar No. 00794549
*Motion for Pro Hac Vice To Be Filed*
AISHA DENNIS, ESQ.

Texas State Bar No. 24128655
*Motion for Pro Hac Vice To Be Filed*
KENDALL SPEER, ESQ.
*Motion for Pro Hac Vice To Be Filed*
1401 McKinney Street, Suite 2250
Houston, Texas  77010
Telephone:  (713) 652-9000
Facsimile:  (713) 652-9800
rhardin@rustyhardin.com
ddutko@rustyhardin.com
jmacvane@rustyhardin.com
lgraham@rustyhardin.com
jroden@rustyhardin.com
adennis@rustyhardin.com
kspeer@rustyhardin.com

*and*


**PAUL | KNOPF | BIGGER**

**/s/David A. Paul**
DAVID A. PAUL, ESQ.
Florida Bar No. 21385
JENNELL R. LOPER, ESQ.
Florida Bar No. 125557
1560 N. Orange Avenue, Suite 300
Winter Park, Florida  32789
Telephone:  (407) 622-2111
Facsimile:  (407) 622-2112
Primary:  Dave@pkblawfirm.com
Primary:  Jennell@pkblawfirm.com
Secondary:  abla@pkblawfirm.com