## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

JADEN RASHADA,

     Plaintiff,

v.                           Case No.: 3:24-cv-00219-MCR-HTC

HUGH HATHCOCK, WILLIAM
"BILLY" NAPIER, MARCUS
CASTRO-WALKER, AND VELOCITY
AUTOMOTIVE SOLUTIONS, LLC,

     Defendants.

_____/

## DEFENDANT HUGH HATHCOCK'S
## MOTION TO DISMISS COMPLAINT

Pursuant to Rules 8(a), 9(b), 12(b)(6), and 12(e) of the Federal Rules of Civil Procedure, Defendant, HUGH HATHCOCK, moves to dismiss Plaintiff Jaden Rashada's Complaint, ECF No. 1, and states:

### Summary of the Motion

Plaintiff's Complaint contains extensive legal conclusions and speculation, lacking the allegations of fact necessary for his claims against Hathcock. Some variation of the word "promise" appears at least fifty times in the Complaint, yet there is no breach-of-contract count. That is so because the term "promise" is used colloquially to refer to offers yet to be reduced to executed writing, as well as statements of negotiation, future intent, hope, expectation, or even obvious

hyperbole or puffery—not enforceable promises. Plaintiff's pleading tacitly concedes the point, eschewing contractual counts in favor of theories of fraudulent misrepresentation, fraudulent inducement, negligent misrepresentation, and tortious interference.

Plaintiff's fraud claims against Hathcock should be dismissed without prejudice. Even when read liberally, those counts fail to meet the heightened particularity standard Rule 9(b) requires. The few statements that are pleaded do not identify factual misrepresentations and are indistinguishable from ordinary statements of negotiation. To the extent Plaintiff pleads an agency relationship for attribution and conspiracy purposes, the allegations are insufficient to state a plausible claim, even outside of Rule 9, and they fail to plead necessary elements under Florida law.

The remaining claims against Hathcock should be dismissed with prejudice because Plaintiff cannot establish them as a matter of law and amendment would be futile. The theory of negligent misrepresentation fails because the entire premise of the inducement/misrepresentation theory is that no one intended to pay Plaintiff. There was either an intent to never make payment or there was not—without that intent there are no false statements of fact necessary for a misrepresentation claim, only non-actionable statements of future intent. A party cannot negligently intend to never perform. The theory of tortious interference fails because the tort does not

protect a plaintiff from his own voluntary breaches of contract. The tort generally protects plaintiffs when a defendant wrongfully causes a third party to breach its contract with the plaintiff. Florida has never adopted an alternate version of the tort that applies when defendants cause the plaintiff's breach, but even that version requires elements not alleged in the Complaint. No recognized version of the tort protects a plaintiff that voluntarily breaches his own contract in search of allegedly greener pastures.[1]

## Memorandum of Law

### I.    Applicable legal standards

A complaint should be dismissed under Rule 12 in a case such as this, where, even after drawing all reasonable inferences in the Plaintiff's favor, and accepting all factual allegations as true, the complaint nonetheless "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 n.8 (11th Cir. 1999). The complaint must contain factual allegations that delineate the plausibility of the asserted causes of action. *Ashcroft v.*

---

[1] Paragraph 68 of the Complaint violates Eleventh Circuit pleading rules by incorporating every paragraph of the entire complaint into every count. This creates a problem greater than the traditional shotgun pleading condemned by the Eleventh Circuit in which preceding counts are incorporated into later ones. *See Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1324 (11th Cir. 2015). Here, each count is incorporated into each other count. Because this problem can be solved by inserting "preceding" before "paragraphs" in Paragraph 68, Hathcock will proceed *arguendo* as though that were Plaintiff's intent.

*Iqbal*, 556 U.S. 662 (2009). Plausibility means pleading factual allegations that permit the court to reasonably infer that the defendant is liable for the alleged misconduct. *Id.* at 678. "Bare assertions" amounting "to nothing more than a 'formulaic recitation of the elements' " of a claim must be rejected as "conclusory and not entitled to be assumed true." *Id.* at 681. Legal conclusions are also insufficient—the non-conclusory facts standing alone must state a plausible claim. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010).

Where the complaint pleads fraud, Federal Rule of Civil Procedure 9(b) requires a party to "state with particularity the circumstances constituting fraud." The purpose of this rule is to alert defendants to precise misconduct and to protect against "spurious charges of immoral and fraudulent behavior." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001). Regarding fraudulent inducement claims specifically:

> To plead fraudulent inducement and comply with Rule 9(b), the plaintiff must allege "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Smiley v. Nationstar Mortg. LLC*, 202 F. Supp. 3d 1322, 1324 (M.D. Fla. 2016) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006)); *accord Galstaldi v. Sunvest Cmtys. USA, LLC*, 637 F. Supp. 2d 1045, 1058–59 (S.D.

Fla. 2009) (quoting *Ziemba*). The Eleventh Circuit applies the same standard to claims based on fraudulent omission. *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

## II. The facts identified in the pleadings.

In analyzing the Complaint, it is essential to distinguish between the separate defendants, as well as allegations of actual statements versus bare legal conclusions disguised as statements. The allegations must also be considered in the context of three distinct periods of time: (1) the period before the November 10, 2022, execution of the Gator Collective contract; (2) the period from execution of that contract until its December 6, 2022, termination; and (3) the period from termination until the December 21, 2022, letter of intent was signed. Each period is addressed below.

### a. Pre-Gator Collective contract

Through November 2022, the Complaint alleges a total of four purported statements that are directly attributable to Hathcock. In Paragraph 23, the Complaint alleges general statements of future intent that Hathcock would "make happen" anything "Jaden needed to come to UF" and "suggested" rather than stated that he could secure future employment for Plaintiff's father. It is clear that Plaintiff did not rely on those statements in "publicly committing" to play at a different school and agreeing to the $9.5 million NIL deal with a company affiliated with a Miami booster

(the "Miami NIL deal"). *See* Compl. ¶ 25. In Paragraphs 35 and 42, Plaintiff identifies ambiguous tweets from Hathcock and then purports to creatively explain the tweets, but each tweet on its face merely expresses excitement about the University of Florida ("UF") recruiting class and contain no statements of material fact. There are no factual allegations supporting Plaintiff's self-centered reinterpretation of the tweets.

Every other statement that the Complaint attempts to attribute to Hathcock either reflects statements of negotiation or statements made by third parties that Plaintiff alleges represent Hathcock without the specificity the law in the Eleventh Circuit requires. In Paragraph 39, the only statements alleged are by Ms. Grosso, who made representations that Plaintiff asserts are a statement about Hathcock's intent but could just as easily be a statement of how the contract would be performed logistically. Moreover, some of the statements are generic, undated, and unspecified statements attributed to multiple parties collectively. In Paragraph 38, Plaintiff alleges that "[t]hey all [Castro-Walker, Hathcock, and Rojas] assured Jaden and his agents that the deal would still be fully funded." Sometimes these allegations came by way of secondhand summaries that are allegedly based on unspecified statements from multiple parties with no attempt to distinguish Hathcock from Castro-Walker, such as Paragraphs 34 and 36. The Complaint is devoid of any factual support that

alleged statements by third parties were made with the express or implied authority of Hathcock or any defendant. *See* Compl. ¶¶ 34, 39.

Most of the paragraphs do not even plausibly allege statements of present fact. Paragraphs 31[2] and 32 identify specific texts from Castro-Walker that do not appear to state facts but rather assert UF's desire to secure Plaintiff's commitment. The remainder of the paragraphs summarize and state a legal theory of the case rather than directly allege facts. Paragraph 33 summarizes negotiations as a ruse to allege the bare legal conclusion that "Hathcock and Castro-Walker worked closely and concertedly." There is no factual support for these allegations in the Complaint. Paragraph 37 identifies some suggestion of how to structure the proposed deal without identifying specific statements or distinguishing between statements made by Castro-Walker and Hathcock. Paragraphs 40 and 41 recite Rojas's excitement at the signing and his ideas about Plaintiff's future but do not appear to identify any fact relevant to the case. Finally, Paragraph 43 reflects Ms. Grosso's belief that the announced verbal commitment was a precondition to execution of the contract, which is presumably a true statement that the Complaint gives no cause to disbelieve.

---

[2] This motion will follow the numbering conventions of the Complaint, such as the apparent gap between paragraphs 26 and 31, without renumbering.

### b. Execution to termination of the Gator Collective contract

The Complaint jumps almost immediately from November 10 to December 4, around the first payment deadline under the executed contract. Here, the allegations are barebones but because there was no change in position by Plaintiff during this time, none of the statements are apparently actionable in the first instance.

During this period, Plaintiff alleges no statement directly attributable to Hathcock and has to rely on his own *ipse dixit* assumption that others are speaking on Hathcock's behalf. Again, there is no factual support that Hathcock authorized anyone to speak on his behalf regarding any matter alleged in the Complaint. Paragraph 51 alleges a text exchange from Castro-Walker that does not appear to give any of the assurances the paragraph intimates. In that allegation, Castro-Walker responded affirmatively to a question of whether [Castro-Walker] would "connect[] with [Hathcock] later today on that first payment." Compl. ¶ 51. At no time does the allegation recite the results of that to-be-conducted conversation. The allegation then volunteers a second text where Castro-Walker stated he "spoke to [Hathcock] the other day, was working something out with his accountants." *Id.* This statement is devoid of context and independent meaning—a quintessential non-answer even setting aside the secondhand nature of the comment. Paragraph 49 also alleges various statements by Grosso, Penney, and Castro-Walker on or before December 5; but again, there is no statement of present fact other than that payments, if they

were to be made, would be coordinated with Penney, and Castro-Walker's alleged unspecified communications with Hathcock.

The contract was terminated the next day, and Plaintiff appears to take the position that the contract was never enforceable in the first place. Compl. ¶¶ 52-53.

c. <u>Post-termination through National Signing Day</u>

The minimal conduct alleged after termination of the Gator Collective contract apparently occurred in two brief bursts of activity. The first spate of activity occurs shortly after termination of the contract. In Paragraph 55, Plaintiff alleges that Castro-Walker laid out the plan to "assign" the terminated contract, apparently also including an alleged personal guarantee from Hathcock individually. The allegation follows that unspecified "Defendants" further elaborated on a plan to "uncancel" a contract, apparently rather than negotiating a new one. Paragraph 56 alleges a payment to prevent litigation over the abandoned Miami NIL deal but asserts no representations by any party. Paragraph 57 alleges that Castro-Walker—at some unspecified time—indicated "he was working with Hathcock to finalize the contractual assignment" but provides no other details about any negotiations.

The second burst of activity appears to have occurred on December 21, 2022, however, none of the allegations identify any representation by Hathcock. Paragraph 58 alleges that unspecified "Defendants" had "assured Jaden that Hathcock would

assume the $13.85 million deal" but no deal had been signed by that point. Apparently on that day, four key conversations allegedly occurred:

- Plaintiff's agents "discussed the money owed to Jaden with Castro-Walker and Hathcock." *Id.* ¶ 60. It attributes no statements to Hathcock and identifies no basis for believing that payments were owed without a signed deal.

- At some unspecified time, Castro-Walker called Plaintiff's father "to give assurance that Jaden would receive $500,000 and all promised payments going forward." *Id.*

- Napier called Plaintiff's father and specifically asserted that Hathcock would make a payment once a National Letter of Intent was signed. *Id.* ¶ 61. (describing call to Plaintiff and his father but conversation apparently just with father).

- Castro-Walker again called Plaintiff's agent to reinforce that Napier "would 'get it done' " apparently by "emphasizing Napier's power as head coach." *Id.* ¶ 63.

After Plaintiff signed the letter of intent, the Complaint baldly alleges "a series of new promises of NIL agreements" but does not specify those agreements. *Id.* ¶ 65. As a result of these, Plaintiff alleges damages in the form of the alleged Miami NIL deal, and other unspecified potential NIL deals. *See id.* ¶ 117.

**III. The fraudulent misrepresentation counts against Hathcock are insufficiently specific, fail to plausibly allege an agency relationship needed to attribute co-defendants' statements to him in the context of contract negotiations, and should be dismissed.**

While the Complaint repeatedly claims that "promises" were made in the colloquial sense, the facts recited, even read favorably to Plaintiff, make clear what should be obvious: eight-figure contracts like this are substantially negotiated, often by individuals well-versed and experienced in the subject matter, and not made haphazardly by text-message. Plenty of allegations recite that reality, but everywhere that Plaintiff has a difficult issue of proof, he ignores the context and falls back on descriptions of the potential deal as a promise. In the process, he does not identify statements of material fact necessary to plead a misrepresentation. Ultimately, his theory of the case rests entirely on the principle that the entry into a contract is actionable in fraud if the counterparty had no intent to ever perform.

As this theory relates to Hathcock, it suffers from the fatal and obvious flaw that Hathcock never signed an agreement and never agreed to be bound to any agreement involving Plaintiff. To the extent that a misrepresentation was made in the form of <u>entry</u> into a false agreement, Hathcock did not enter into any such agreement and specifically advised Plaintiff of that fact before Plaintiff verbally committed. *See* Compl. ¶ 37. Plaintiff attempts to deal with this problem by attempting to paint a picture greater than the sum of its parts, but at each critical step of the analysis, the Complaint cannot allege facts and substitutes bare, conclusory

allegations. The allegations, at least with respect to Hathcock, fail to meet the fraud-particularity standard and even fail to plead plausible claims.

    a.  <u>The fraudulent misrepresentation counts fail to identify specific factual statements, supply the relevant context, and explain how those statements caused actions in reliance on the statements.</u>

The Complaint fails to plead allegations of fraud with the requisite particularity. To satisfy Rule 9(b), Plaintiff had to identify: (1) precise statements; (2) the time, place, and person making the statements; (3a) the content of statements; (3b) the manner in which statements misled Plaintiff; and (4) what the defendants obtained. *Garfield*, 466 F.3d at 1262. The latter element is apparently easy, as only two things were obtained—the November verbal commitment and the December letter of intent to play football at UF. What is far less clear is how most of the statements identified led to the things obtained.

    i.  *No statements directly and solely attributable to Hathcock meet the Rule 9(b) standard.*

There are precious few allegations that actually attribute a statement to Hathcock directly and solely, and none identify statements with sufficient particularity. The only statements specifically attributed to Hathcock are two tweets that are plainly not statements of fact, and two purported oral statements at a summer 2022 meeting. Compl. ¶ 23. The latter two are non-specific expressions of future intent, which are generally non-actionable, and in this case are clearly non-actionable because Plaintiff took no action based on the alleged statements. On the

contrary, Plaintiff verbally committed to Miami despite a larger amount of money allegedly having been offered, and thus the Complaint fails to allege the manner in which the statements misled Plaintiff.

      *ii. The balance of statements come from Castro-Walker, Napier, or Ms. Grosso and are wholly dependent on an agency theory.*

A second category of statements are those that conflate Hathcock with a second speaker—often Castro-Walker—and refer to the apparent takeaway from a series of interactions, rather than a specific statement itself. The Eleventh Circuit is clear that in fraud cases with multiple defendants, "generalized allegations 'lumping' multiple defendants together are insufficient." *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008) (citing, *inter alia*, *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997) (collecting cases)); *Prof'l LED Lighting, Ltd. v. AAdyn Tech., LLC*, 88 F. Supp. 3d 1356, 1374 (S.D. Fla. 2015). The allegations in Paragraphs 34 (and note 2), 37, 38, 47, 55, 58, and 60 fail this standard because none of these allegations[3] include specific statements by specific speakers at specific times.

A third category of statements describe something that other parties said about Hathcock that do not actually amount to specific statements at all, let alone

---

[3] To be sure, Paragraph 55 includes in its first two sentences statements directly from Castro-Walker, which are noted in the next paragraph. But the third sentence generically refers to "Defendants" for an explanation of the "uncancelled" contract theory.

statements attributable to Hathcock, except perhaps on an agency theory discussed below. Allegations that fall short under this standard from Castro-Walker include Paragraphs 36, 51, 55, and 57. Allegations regarding Ms. Grosso's statements include Paragraphs 38 and 39. Allegations regarding Napier's statement include Paragraphs 61 and 62. In each of these cases, Plaintiff attempts to use statements of third parties to explain why the "deal" was something other than what was being negotiated into the form of a written agreement. In short, Plaintiff is attempting to circumvent the actual contractual negotiations on the basis of alleged third-party statements—none of which are particularly alleged to have been made by Hathcock.

### iii. Only limited statements identify the manner in which Plaintiff was allegedly misled.

The Complaint identifies only two actions by Plaintiff in relation to reliance: (1) announcing a verbal commitment to UF; and (2) executing the letter of intent. The vast majority of statements discussed in the Complaint did not lead to these actions, as Plaintiff patiently negotiated before acting. With respect to the verbal commitment, the Complaint identifies a number of statements and then broadly concludes that all of the statements caused Plaintiff's reliance. With respect to the letter of intent, the Complaint identifies two phone calls that actually undermine Plaintiff's theory. The Complaint lacks the particularity required for either reliance action to establish how any alleged statement misled Plaintiff, including any statement through execution of the letter of intent.

As to the verbal commitment, the only allegations that attempt to explain reliance are in Paragraphs 46 and 47, which allege that "Defendants' false and fraudulent promises materially induced Jaden to engage in conduct he would not have engaged in otherwise." The allegations are bare legal conclusions and fail to identify the actual statements or how they induced reliance. The Complaint's lack of particularity is magnified by its habitual characterization of nearly any statement as a "promise."

The most generous reading of the Complaint, particularly Paragraph 44, establishes that execution of the Gator Collective contract was the primary, if not sole, cause of Plaintiff's decision to verbally commit to UF. Without any preceding statements, the execution of the agreement would have surely caused the commitment anyway. Without the agreement, it is implausible that the commitment would have been secured.

As to the letter of intent, the Complaint identifies only two statements that could have influenced Plaintiff's decision, and the applicable allegations are internally contradictory: (1) Napier's alleged statement during a phone call with Plaintiff's father described in Paragraph 61; and (2) Castro-Walker's alleged statements during phone calls with Plaintiff and Plaintiff's agent described in Paragraph 63. According to the allegations, Plaintiff was unpersuaded by Castro-Walker's earlier December 7 statements following termination of the Gator

Collective contract and was delaying signing the letter of intent in an effort to secure a follow-up agreement. Compl. ¶¶ 58–61. He never received one.

In lieu of the agreement, Plaintiff then alleges in Paragraph 62 that he signed the letter of intent "[r]elying on Napier's promise"—described in Paragraph 61— that Hathcock would allegedly pay $1 million once the letter of intent was signed.

According to the next paragraph, however, this alleged promise was not sufficient to induce reliance. Compl. ¶ 63. Instead, the Complaint alleges that Castro-Walker had to reinforce Napier's alleged statement, "telling Jaden's agent that Napier would 'get it done' and emphasizing Napier's power as head coach," as well as increasing pressure on Plaintiff to sign "by telling him if he did not do it right away Coach Napier might pull back his scholarship offer." Compl. ¶ 63. Even setting the internal contradictions aside, neither paragraph alleges that Plaintiff relied on any statement by Hathcock.

In addition, and critically, this alleged promise to "get it done" establishes that the subject (here, the deal) was not in fact done at the time, so the statement was merely predictive. Indeed, by emphasizing Napier's "power as head coach," Castro-Walker's statements conveyed that Napier would persuade Hathcock to comply in the future. Even on the most generous reading of the complaint, Plaintiff effectively alleges that Napier's alleged statement was not on behalf of Hathcock but that Napier was acting as an independent agent.

Taken as a whole, the only allegations that appear to meet the Eleventh Circuit's pleading requirements are: (1) the execution of the Gator Collective contract, leading to the verbal commitment; and (2) the alleged statement from Napier, leading to the letter of intent. Hathcock not only did not sign the contract but explicitly "balked" at doing so (Compl. ¶ 37); and Napier's alleged statement was by Plaintiff's own allegations independent of and not attributable to Hathcock.

Accordingly, the fraudulent misrepresentation counts must be dismissed against Hathcock for failing to specifically identify any actionable act, omission, or statement attributable to him.

  b.  <u>The agency-related allegations fail both as a matter of plausibility pleading and as a matter of law.</u>

The Complaint attempts to bridge its myriad evidentiary gaps by broadly alleging a grand conspiracy where everyone involved is somehow an agent of Hathcock. The allegations make no practical sense—this was an alleged eight-figure deal subject to substantial contract negotiations. If there were a deal to be had, the course of events makes clear that the fully negotiated and signed contract would be the only thing that mattered.

  i.  *No factual allegations establish the elements of actual or apparent agency under Florida law with respect to Castro-Walker, Napier, or Ms. Grosso.*

Because Plaintiff cannot attribute any sufficiently particular statements to Hathcock, the Complaint instead attempts to use a theory of agency to attribute

others' alleged statements to Hathcock. The allegations supporting this theory are paper thin, however:

> 34. . . . Throughout these discussions, Hathcock's representations led Jaden to believe that Castro-Walker, Coach Napier, and others had authority to negotiate the NIL agreement that Hathcock and Velocity Automotive would fund. As such, Defendants Castro-Walker and Coach Napier acted with actual and apparent authority with respect to their representations on behalf of Hathcock.

> 39. Ms. Grosso specifically stated that Hathcock would fund the first $500,000 owed to Jaden. She wanted Jaden and his family to know that UF was "serious" about securing Jaden's commitment. She made these representations with actual and apparent authority to negotiate the contract on behalf of Rojas and Hathcock.

Compl. ¶¶ 34, 39; *see also id.* ¶ 47 (omitting Grosso but repeating bare assertion). These allegations, being little more than bare recitations of a legal conclusion, are insufficient. *See, e.g.*, *Iqbal*, 556 U.S. at 664 ("A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations.").

Under Florida law, an actual agency relationship requires "(1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1311 (quoting *Goldschmidt v. Holman*, 571 So. 2d 422, 424 n. 5 (Fla. 1990)). The key element is control by the principal, "[a]nd it is the right of control, not actual control

or descriptive labels employed by the parties, that determines an agency relationship." *Id.* (quoting *Hickman v. Barclay's Int'l Realty, Inc.*, 5 So. 3d 804, 806 (Fla. 4th DCA 2009)).

The Complaint contains no allegations that meet these elements and instead jumps straight to the conclusion. With respect to Castro-Walker and Napier, the conclusion is that Hathcock made unknown representations, and those representations somehow "led [Plaintiff] to believe" there was an agency relationship. But no facts support that conclusion. Other than the fact that all of the parties were at least presumably aligned in the goal of recruitment, no allegation reflects the principal's acknowledgment, the agent's acceptance, or a right of control. The Supreme Court in *Twombly*, albeit in the context of the Sherman Act, made clear that a bare allegation of parallel conduct is not sufficient to plausibly infer an agreement between parties. 550 U.S. at 556–57. On the contrary, the Complaint affirmatively alleges that Hathcock is not affiliated with the athletic department and instead is an independent businessperson with his own company and his own collective. Compl. ¶ 15.

Indeed, to the extent there are genuine factual allegations, they undermine Plaintiff's preferred conclusion. By alleging Castro-Walker's assertion that it was Napier who had power and authority over wayward boosters, the pleaded facts more strongly support the conclusion that Hathcock was an agent of UF, rather than the

other way around. *See* Compl. ¶ 63. But even that is an unreasonable and implausible reading of the events, in which Hathcock is alleged to routinely operate independently of—and indeed flatly contrary to—the comments or predictions of UF personnel. *See infra* note 3.

The Complaint similarly fails to allege an actual agency relationship between Hathcock and Ms. Grosso. Ms. Grosso is described as a "Gator Collective lawyer" in Paragraph 38 but the only allegation asserting Hathcock's connection to it is earlier in the same paragraph that "Castro-Walker and Hathcock then partnered with Rojas." On the contrary, Plaintiff alleges that Hathcock has his own NIL collective. *See* Compl. ¶ 15. There are no allegations connecting Hathcock to Ms. Grosso, aside from the bare legal conclusion of an agency relationship in Paragraph 39. Most importantly, the context of the Gator Collective agreement is one where neither Hathcock nor his collective signed any agreement, having explicitly refused to do so as recited in Paragraph 37.

This case differs from those cases where courts have found sufficient allegations of agency. Under Florida law, most case law concerning right of control addresses cases in which the distinction between an employee and independent contractor is dispositive. *See Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842 (Fla. 2003); *Gradia v. Baptist Hosp., Inc.*, 345 So. 3d 385, 387 (Fla. 1st DCA 2022) ("To resolve right of control issues, courts look first to the parties' written

contract."). Some Florida courts, in explaining that the issue turns on the extent of a principal's right to control the means of the work, rather than the results, cite and rely on section 220 of the Restatement (Second of Agency). *See Harper ex rel. Daley v. Toler*, 884 So. 2d 1124, 1131 (Fla. 2d DCA 2004). The Complaint alleges no facts that plausibly establish a right of control.

The Eleventh Circuit has held similarly in analogous contexts. In maritime cases, for example, several factors are probative of control:

> (1) direct evidence of the principal's right to or actual exercise of control; (2) the method of payment for an agent's services, whether by time or by the job; (3) whether or not the equipment necessary to perform the work is furnished by the principal; and (4) whether the principal had the right to fire the agent.

*Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1237 (11th Cir. 2014) (quoting *Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1121 (11th Cir. 2011). The *Langfitt* case cited by *Franza* in turn also relies on section 220, which describes factors differentiating an employment from independent contractor relationship. 647 F.3d at 1121. Under these or similar standards, there is no reason to believe that Hathcock had any right of control over Ms. Grosso, Castro-Walker, or Napier, largely owing to their employment by separate entities. Plaintiff simply declines to allege any substantial facts that would make an actual agency relationship plausible.

The same analysis obtains under Florida law for apparent agency, which requires a plaintiff to prove: "(1) a representation by the purported principal; (2) a reliance on that representation by a third party; and (3) a change in position by the third party in reliance on the representation." *Marchisio*, 919 F.3d at 1312 (citing *Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995)). As discussed above, there are no representations with respect to Ms. Grosso, and only the bare allegation that representations exist with respect to Castro-Walker and Napier. But these are conclusory, not allegations of fact entitled to a presumption of truth within the meaning of *Iqbal*. The Complaint alleges that unknown representations were made that caused Plaintiff to believe in an agency relationship. Without knowing what any of the representations are, this Court lacks either the alleged facts or the context to draw any meaningful conclusions about the elements of apparent agency. Knowing the legal conclusion that Plaintiff believed is not the same as pleading the elements of actual or apparent agency.

> ii. *The overall context of negotiations undermines the plausibility of the Complaint's agency assertions, even if threadbare declarations were otherwise sufficient.*

The Complaint fares no better in attempting to infer an agency relationship in the surrounding factual context. There are precious few allegations with respect to Grosso and Napier, as they only appear in isolated paragraphs prior to Plaintiff's commitment and letter of intent. But with all of these alternative speakers, they

operate independently of Hathcock and assert future predictions contrary to what Hathcock had done to date or would do in the future. For example, the Complaint alleges a variety of Castro-Walker's suggestions, proposals, or predictions that never come to pass.[4] If an agency relationship could be established by making consistently inaccurate predictions about what another person will do, much of the world would be in agency relationships with one another. That is not the law.

Amidst the overarching framework of the allegations in which that the parties were negotiating an NIL contract, the only statements that reasonably matter are the contractual negotiations with the principals. Plaintiff was represented by *at least* two agents disclosed in the Complaint, and particularly in light of the constraints of Florida law, an eight-figure deal would naturally and necessarily require substantial negotiation and would be established by a written contract. *See* § 1006.74, Fla. Stat. (2022) (requiring contract to be provided to institution for comparison with team's contract). That contract would ordinarily be negotiated directly by the principal, or perhaps by the principal's attorney. There is no reason to believe such a task would be delegated to an employee of UF. And indeed, the Complaint avoids making the plainly false assertion that Castro-Walker was responsible for contract negotiation.

---

[4] *Compare* Compl. ¶ 36 (promises on alleged November 2022 deal) *with id.* ¶ 37 ("Hathcock balked" on the same day); Compl. ¶ 49, 51 (alleged conversations confirming December payment) with *id.* ¶ 53 (no payment and contract terminated); Compl. ¶ 55, 57, 63 (alleged contract-assumption plan) *with id.* ¶ 65 (no such agreement).

Instead, the Complaint requires the reader to conclude that stray comments from a recruiter were negotiations under actual or apparent authority despite the separately-proceeding contract negotiations. These allegations fail to push the Complaint past the threshold of plausibility.

Additionally, the Complaint alleges no facts that plausibly allege a right of control. The key speakers to whom Plaintiff assigns agency are not members of Hathcock's organizations. The Complaint identifies no facts suggesting that Hathcock had actual control, let alone a right of control, over any other speaker (aside from perhaps Penney) identified in the allegations.

### c. The Complaint fails to state plausible claims with respect to the no-intention-to-perform theory of fraudulent inducement, at least as to Hathcock.

The Complaint is at odds with itself, handwaving away key factual steps with bare legal conclusions, all the while affirmatively alleging genuine facts that undermine its own case. The key allegation that undermines the central premise of the Complaint is Paragraph 37. After alleged contractual negotiations (¶ 34) that transpired over a roughly one-week period (¶¶ 33, 36), the Complaint alleges that Hathcock "declined to use his company or the Gator Guard to directly fund the promised NIL payments." Compl. ¶ 37. The Complaint makes clear that this occurred "[b]efore the deal was finalized" because it was understood that there was no deal until a contract was executed. *Id.* The remainder of the pre-commitment

allegations discuss a follow-on deal with the Gator Collective. *See id.* ¶¶ 38-40. And the Complaint shows that it was the resulting executed NIL agreement with the Gator Collective that induced Plaintiff's verbal commitment to UF. *See id.* ¶ 44. While the now-terminated agreement was not attached to the Complaint, the allegations demonstrate that it was signed with the Gator Collective, not Hathcock and not Hathcock's NIL collective. *See id.* ¶ 53. As such, the agreement was not the equivalent of a statement attributable to Hathcock.

The only genuine "misrepresentation" alleged in the Complaint before December 2022 is the Gator Collective NIL agreement itself, on the theory that no one intended to honor the agreement. *See* Compl. ¶¶ 46, 50, 52. Indeed, the fraudulent-misrepresentation count is specific on the point, arguing that the inducement was to promise to enter into a deal with no intention to honor commitment. *See id.* ¶¶ 70-73. To the extent an offer or a proposal to enter into an agreement is at issue, Florida law holds that a promise of future performance does not satisfy the statement-of-fact element. *See, e.g.*, *Gandy v. Trans World Computer Tech. Grp.*, 787 So. 2d 116, 118–19 (Fla. 2d DCA 2001). The Complaint proceeds on a theory understood as an exception to the rule that a statement of fact is a required element. But that exception does not make every offer or every statement in a negotiation into a fraudulent inducement, as only statements that induce reliance are actionable.

Even under a generous reading of the Complaint, the action that induced Plaintiff's verbal commitment was the execution of the Gator Collective agreement. *See* Compl. ¶ 44. After the termination of the Gator Collective contract, Plaintiff further alleges that he deferred signing a letter of intent until that terminated contract had been assumed. *See id.* ¶¶ 58-59. Plaintiff continued to refrain until payments under the terminated contract were made, and only changed that position on an alleged last-minute prediction of a future payment by someone other than Hathcock. *See id.* ¶¶ 60-62.

The consistent feature in both these vignettes is the absence of a sufficiently particular allegation about a representation from Hathcock, as well as the absence of Hathcock's signature on any agreement. To the extent one can fraudulently induce by promising to perform, Hathcock's explicit rejection of a promise to perform is telling. Plaintiff's efforts to transform unaffiliated parties' statements to ensnare Hathcock are unavailing.

Finally, the Complaint suffers from the substantial plausibility problem that the alleged scheme makes no sense. Under Plaintiff's recollection of events, each iteration of the alleged NIL deal involved Plaintiff performing second—substantial payments were owed before signing day and well before matriculation. There is no intrinsic value in securing a verbal commitment to play football at a particular university, as the Complaint makes clear commitments can be changed. There is

little intrinsic value in securing a letter of intent, which is only partially binding on the athlete and subject to myriad exceptions and opportunities for rescission.[5] Indeed, Plaintiff was released from his letter of intent. *See* Compl. ¶ 66.[6] There is no reason to believe that an athlete who was promised eight figures and who received nothing would remain at the recruiting university. Whatever impacts Plaintiff individually claims to have suffered, no reasonable recruiter could have believed that UF would ever profit from a plan to deliberately mislead as Plaintiff claims. Plaintiff could have reacted to any misdirection by refusing to enroll (¶ 66) or by transferring (¶ 67), leaving UF with no ultimate benefit to show for its alleged concatenations. The complaint alleges little more than a scheme to nowhere.

While intent can be alleged generally, the requirement of plausibility pleading precludes claims that are this inherently illogical. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564–69 (rejecting logical arguments for existence of conspiracy where non-conspiracy explanation was equally plausible in light of "common economic experience"). If there was a remotely plausible exit strategy to the alleged scheme,

---

[5]    http://www.nationalletter.org/documentLibrary/administrativeGuidelines.pdf (2023 revision).

[6] Although unspecified, to compete in 2023 would require the university to release Plaintiff's letter of intent. *See supra* note 4 at 12–13. Plaintiff did so. *See* Fed. R. Evid. 201(b)(2) (Plaintiff's 2023 NCAA statistics available from numerous sources).

it is difficult to conceptualize. And this Complaint makes no effort to allege facts that would make it plausible.

Accordingly, Count I should be dismissed without prejudice. Although Hathcock believes that Plaintiff will not be able to meet the heightened pleading standard, he should be afforded another opportunity to attempt to do so.

### d. The conspiracy and aiding and abetting counts fail in the absence of an actionable misrepresentation.

As a general rule, when there is no underlying tort, there can be no claim based on conspiracy or aiding-and-abetting liability. *See, e.g.*, *Balcor Prop. Mgmt., Inc. v. Ahronovitz*, 634 So. 2d 277, 279 (Fla. 4th DCA 1994); *Wright v. Yurko*, 446 So. 2d 1162, 1164–65 (Fla. 5th DCA 1984); *see also Trump v. Clinton*, 626 F. Supp. 3d 1264, 1311–12 (S.D. Fla. 2022) (citing *Balcor*); *Carney v. IDI-DX, Inc.*, No. 2:12-cv-00449-FtM-29DNF, 2013 WL 4080326, at *3 (aiding and abetting breach of fiduciary duty). Here, Count II is pleaded in generalities about claims for future performance (¶ 80) and assurances regarding the uncancelled-agreement theory (¶¶ 81, 83). Because these fail the particularity and plausibility standards, no claims based on these alleged misrepresentations can stand.

Only one claim bears mention. Paragraph 61 involves a specific alleged statement by Napier that Hathcock would make a specific payment upon execution of the letter of intent. With due respect to Napier's right to make his own argument, the alleged statement is a classic non-actionable claim of anticipated future

performance by a third party. This claim fails for all of the reasons described above, including (1) the future-performance limitation; (2) the failure of agency allegations; and (3) the inherent implausibility of the alleged scheme. But as to Hathcock, there are additional pleading failures. Hathcock could not have known of or substantially assisted this alleged last-minute representation—as the Complaint recites, he was on a plane at the time. *See* Compl. ¶ 62.[7] And the allegations of conspiracy are rendered implausible by the history of Hathcock's actions; by repeatedly declining to enter into agreements, his actions were contrary to all of the alleged recruiting representations on which Plaintiff allegedly relied.

Accordingly, Counts II and III should be dismissed without prejudice.

**IV.    The negligent-misrepresentation counts should be dismissed with prejudice against Hathcock because the only theory of misrepresentation is grounded in an alleged intent to never perform, which by definition cannot be performed negligently.**

While Count IV is pleaded as a fallback alternative to the fraudulent-misrepresentation counts, it is instead weaker than those counts because the essence of the alleged scheme is intent. Each representation Plaintiff identifies in the factual allegations and in Count I relate to future performance. But that is only actionable "where the promise to perform a material matter in the future is made without any intention of performing or is made with the positive intention not to perform." *E.g.,*

---

[7] Or alternatively, if he were reachable through in-flight networks, it would have obviated the need to discuss such details with Napier at all.

*Gandy*, 787 So. 2d at 118–19 (quotation omitted). There are no other material facts pleaded that were purely factual, unrelated to alleged future promises to perform. Even if some purely factual misrepresentation could be read into a stray allegation, the overall factual recitation makes clear that any reliance and change-in-position was correlated to alleged promises of future action, not any stray fact.

The fundamental theory of the case is incompatible with a negligent misrepresentation theory. If the alleged statement is a promise of future performance, it is generally not actionable unless the speaker acts with a specific intent not to perform. One cannot negligently intend to do something, which negates the essential element of a negligent misrepresentation claim that the speaker believed the representation to be true but it was in fact false. *See, e.g.*, *Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 309 (Fla. 1st DCA 2011).

Even if it were hypothetically possible to plead a negligent misrepresentation claim based on the intersection of an ancillary matter, no such claim is pleaded here. Plaintiff clearly alleges that at all times, and despite myriad efforts to secure his commitment, the Defendants never intended to perform. The repetition of alleged "promises" emphasized by the Complaint vitiates any plausible interpretation of negligent behavior that the speaker did not know the speaker's own intent.

In any event, the negligent misrepresentation claim would also fail for the pleading-based arguments applicable to the fraudulent misrepresentation claim. *See,*

*e.g.*, *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1127–28 (11th Cir. 2019) (applying Rule 9(b) to negligent misrepresentation claims). In particular, the absence of necessary pleadings regarding how Plaintiff was misled, combined with the well-documented history of Hathcock not executing any enforceable agreement, undermines the justifiable-reliance element particular to a negligent misrepresentation claim. *See Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).

Accordingly, Count IV should be dismissed with prejudice.

## V. The tortious-interference counts must be dismissed with prejudice because the tort does not protect a plaintiff from his own voluntary breaches of contract or cessation of business relationships.

The tortious-interference counts fail because an essential element of the tort is that the defendant improperly acted to either (1) cause a third party to breach its contract with the plaintiff or (2) impede the performance of the plaintiff's contract with a third party. Neither is alleged here.[8] Plaintiff concedes that it was he who voluntarily walked away from the Miami NIL deal—not because it would be difficult to perform but because he preferred the other deal. *See* Compl. ¶¶ 44–45. The voluntary action by Plaintiff negates the harm protected by the tort.

---

[8] Rule 9(b) also applies when the tortious interference claim is grounded in an allegedly fraudulent course of conduct. *See, e.g.*, *ADT LLC v. Alder Holdings, LLC*, Case No. 17-81237-CIV-ROSENBERG/REINHART, 2018 WL 6505915, at *4 (S.D. Fla. Nov. 7, 2018). Hathcock incorporates his prior Rule 9(b) discussion as applicable to the tortious interference counts. *See supra* part III.a.

While the stated elements of the tort under Florida law are not specific on the point, Florida has adopted the Restatement formulation of the tort. Courts interpreting Florida law recite the following elements:

> (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference.

*Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381 (Fla. 4th DCA 1999). The term "interference" is not specifically correlated to particular actors, because it generally covers different types of interference. The first, and most prominent, type of interference occurs when the defendant's actions cause a third party to breach the contract:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise **causing the third person not to perform the contract**, is subject to liability to the other for the pecuniary loss resulting to the other from the **failure of the third person to perform** the contract.

Restatement (Second) of Torts § 766 (1979) (emphasis added). The Supreme Court of Florida has held that its precedent is consistent with section 766. *Gossard v. Adia Servs., Inc.*, 723 So. 2d 182, 185 (Fla. 1998). Comment p to section 766 explicitly provides that "[t]he person protected by the rule stated in this Section is the specified person with whom the third person had a contract that the actor caused him not to perform."

By contrast, no Florida court has even cited, let alone adopted, the companion Restatement section 766A, which applies when the defendant interferes with the plaintiff's performance of its own contract. *See KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1323 (11th Cir. 2004) (noting that "the Florida courts have not adopted § 766A"). Florida courts addressing liability that would arguably fall within section 766A have rejected claims based on a plaintiff's own voluntary breach— even if that breach was influenced by the defendant's acts. *See McKinney-Green, Inc. v. Davis*, 606 So. 2d 393 (Fla. 1st DCA 1992) ("The gravamen of an action for tortious interference with a contractual relationship is the malicious interference by a third party, with a contract between other persons, whereby one contracting party is induced to breach the contract **to the injury of the other**." (emphasis added)). In general, a party cannot be damaged by its own voluntary breach of contract. *See, e.g.*, *Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.*, 83 F. Supp. 2d 384, 391 (S.D.N.Y. 2000). As such, under Florida law, a tortious interference claim will not lie for a Plaintiff that was the voluntary breaching party of its own contract.[9]

Because Counts V–VI allege no action taken by Ruiz or Miami to breach the alleged Miami NIL deal, and instead admit that Plaintiff voluntarily abandoned his

---

[9] In any event, the alleged facts do not meet the elements of section 766A, which requires the defendant's acts to make performance of the plaintiff's contract impossible or burdensome. Merely making an independent offer did nothing to impose a burden on Plaintiff's performance of the Miami NIL deal.

own agreement, *see* Compl. ¶ 104, the counts must be dismissed with prejudice because the fundamental theory of relief is not actionable.

WHEREFORE, the defendant Hugh Hathcock requests that this Court enter an order dismissing Counts I-III without prejudice and dismissing Counts IV-VI with prejudice, and awarding such further relief as is just and proper.

Dated this 23rd day of July 2024.

*/s/ Jason W. Peterson*

**JASON W. PETERSON**
Florida Bar No.: 174701
**JEREMY C. BRANNING**
Florida Bar No.: 507016
**DOUGLAS A. BATES**
Florida Bar No.: 791431
**ANDREW M. SPENCER**
Florida Bar No.: 119966
CLARK PARTINGTON
125 E. Intendencia Street
Pensacola, FL 32502
Phone: (850) 434-9200;
P/E: jpeterson@clarkpartington.com
P/E: jbranning@clarkpartington.com
P/E: dbates@clarkpartington.com
P/E: aspencer@clarkpartington.com
S/E: cbmoore@clarkpartington.com
S/E: pmimperial@clarkpartington.com
S/E: bwilkerson@clarkpartington.com
S/E: jdallman@clarkpartington.com
S/E: svierth@clarkpartington.com

**KEITH L. BELL, Jr.**
Florida Bar No.: 573809
**TREVOR A. THOMPSON**
Florida Bar No.: 68006
**BAILEY HOWARD**
Florida Bar No.: 1002258
CLARK PARTINGTON
215 South Monroe Street, Suite 530
Tallahassee, FL 32301
Phone: (850) 497-7483;
P/E: kbell@clarkpartington.com
P/E: tthompson@clarkpartington.com
P/E: bhoward@clarkpartington.com

***Attorneys for Defendant, Hugh Hathcock***

35

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE FORMATTING AND WORD LIMIT REQUIREMENTS

I HEREBY CERTIFY that the font used in this motion is Times New Roman 14-point font, and the word count is 7,953, exclusive of the case style, signature block, Certificate of Conference, Certificate of Service, and this Certification. This motion complies with the font and margin requirements of Local Rule 5.1(C) and the word count limitation of Local Rule 7.1(F).

*/s/ Jason W. Peterson*
**JASON W. PETERSON**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed with the Clerk of Court and furnished electronically all counsel of record via CM/ECF E-Filing on this 23rd day of July 2024:

*/s/ Jason W. Peterson*
**JASON W. PETERSON**