UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JADEN RASHADA,

      Plaintiff,

v.                               Case No. 3:24-cv-00219-MCR-HTC

HUGH HATHCOCK; WILLIAM
"BILLY" NAPIER; MARCUS
CASTRO-WALKER; and VELOCITY
AUTOMOTIVE SOLUTIONS, LLC,

      Defendants.

_____/

## DEFENDANT NAPIER'S MOTION TO DISMISS
## AND INCORPORATED MEMORANDUM OF LAW

Defendant William Napier ("Napier") moves under Federal Rule of Civil Procedure 12(b)(6) and section 768.28(9)(a), Florida Statutes, to dismiss Plaintiff Jaden Rashada's ("Rashada") Original Complaint (the "Complaint") (ECF No. 1).

## INTRODUCTION

Rashada accuses the Defendants of conspiring to fraudulently induce him to abandon a name-image-and-likeness, or "NIL," deal with a "collective" associated with the University of Miami. Sorely lacking from the Complaint, however, are allegations of fact sufficient to support that accusation. Nothing

alleged in the Complaint supports the notion that Napier participated in any wrongdoing. Nowhere does the Complaint adequately allege, for example, that Napier knew about whatever occurred between Rashada, his "NIL agents," and the Gator Collective, LLC. In fact, the Complaint makes clear that Napier could not have defrauded Rashada, since the sole statement attributed to Napier is alleged to have been made *after* Rashada had already abandoned the Miami NIL deal.

The Complaint is, in short, a textbook example of what the heightened pleading standard imposed by Federal Rule of Civil Procedure 9(b) is designed to prevent: a "spurious charge[] of immoral and fraudulent behavior" unsupported by any allegation of fact. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988)). All claims against Napier should be dismissed.

## BACKGROUND

According to the Complaint, Rashada was recruited by "several of the country's elite college football programs" near the beginning of the "ever-evolving NIL landscape." (Compl. ¶¶ 2-3.) He prepared for the emerging "NIL game" by hiring multiple "NIL agents" to represent him and help him source, negotiate, and enter into NIL deals. (Compl. ¶¶ 3, 31.) Rashada alleges that he entered into an NIL deal with an entity (which he fails to name) aligned with

the University of Miami for millions of dollars (the "Miami NIL Deal"). (Compl. ¶ 25.) He then abandoned that deal in favor of one with the Gator Collective, LLC (the "Collective"), a limited liability company with no alleged affiliation to Napier. (Compl. ¶¶ 6-7.)

Tellingly, the Complaint does not allege that Napier was a party to, or was involved in negotiating, the agreement between Rashada and the Collective. Nor does it allege that Napier was involved in the Collective's termination of the agreement.

The Complaint alleges only one act by Napier. It attributes to Napier a statement that could not have had anything to do with Rashada's decision to renege on the Miami NIL Deal. According to the Complaint, Napier told Rashada's father on National Signing Day that Rashada would receive a $1 million payment from Defendant Hugh Hathcock if Rashada signed with the University of Florida that day. (Compl. ¶ 61.)

As a timeline of the significant events alleged in the Complaint makes clear, Napier's alleged statement could not have caused Rashada to "los[e] the $9.5 million NIL agreement related to his attendance at Miami" or the "opportunity to pursue other NIL deals from other collectives" (Compl. ¶ 117) because it came *after* Rashada had terminated the Miami NIL Deal, entered into

his deal with the Collective, and publicly announced he would attend the University of Florida:

- **June 26, 2022:** Rashada publicly committed to play football at Miami and "agreed to a $9.5 million NIL deal." (Compl. ¶ 25.)

- **November 10, 2022:** Rashada entered into an NIL agreement with the Collective and publicly announced that he had "decided to change [his] commitment [to Miami] and play for the University of Florida." (Compl. ¶ 44.)

- **December 6, 2022:** The Collective notified Rashada that it was terminating its NIL agreement with him. (Compl. ¶ 53.)

- **December 21, 2022 (National Signing Day):** Napier allegedly told Harlen Rashada (not Jaden) "that Jaden would be receiving $1 million from Hathcock as a partial payment towards the promised $13.85 million once Jaden formally signed his National Letter of Intent with UF that day." (Compl. ¶¶ 58, 61.)

- **January 18, 2023:** Rashada "withdrew his National Letter of Intent to play for UF" and ultimately attended Arizona State University. (Compl. ¶ 66.)

The timing of the events alleged in the Complaint shows that Napier could not have "fraudulently induce[d] Jaden to abandon his $9.5 million Miami

deal." (Compl. ¶ 31.) Rashada had already abandoned that deal by November 10, 2022—more than a month *before* Napier's alleged involvement. For that reason, among others, the Complaint fails to state a claim against Napier.

## ARGUMENT

### I.  The Complaint fails to allege facts sufficient to state a claim against Napier.

To state a claim, a complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Mere legal conclusions "are not entitled to the assumption of truth." *Id.* at 679. Nor is a court required to credit "unwarranted deduction[s] of fact." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1294 (11th Cir. 2010) (quoting *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012)). Instead, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Further, Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R.

Civ. P. 9(b). As the Eleventh Circuit has explained, "The purpose of the rule is to protect a defendant's good will and reputation when that defendant's conduct is alleged to have been fraudulent." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1278 (11th Cir. 2006). This requirement "serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Ziemba*, 256 F.3d at 1202 (internal quotation marks omitted) (quoting *Durham*, 847 F.2d at 1511).

To comply with Rule 9(b), a complaint must specifically allege the following:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002) (quoting *Ziemba*, 256 F.3d at 1202). Failure to meet these requirements "is a ground for dismissal of a complaint." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam).

A complaint that "lump[s] together all of the defendants in [its] allegations of fraud" is not sufficient. *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d

1309, 1317 (11th Cir. 2007). Instead, "[i]n a case involving multiple defendants . . . the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Id.* (second alteration in original) (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997)). Indeed, even under ordinary pleading standards, allegations lumping multiple defendants together are insufficient. A complaint is an "impermissible shotgun pleading if it 'assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions.'" *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 732 (11th Cir. 2020) (alteration in original) (quoting *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015)).

Rule 9(b) does not impose heightened pleading standards for allegations of a defendant's mental state. *See* Fed. R. Civ. P. 9(b). Nevertheless, allegations of a defendant's mental state must still meet the same standard that governs a complaint's other allegations. *See Iqbal*, 556 U.S. at 686-87. Accordingly, a conclusory assertion of a defendant's mental state, without allegations of supporting facts, is insufficient. *See id.* at 680-83; *Losey v. Warden*, 521 F. App'x 717, 719 (11th Cir. 2013) (per curiam) ("[A]llegations that [the defendant] had subjective knowledge . . . are entirely conclusory and are therefore not afforded

the presumption of truth absent some factual support that make[s] them plausible.").

Here, each count asserted against Napier is subject to Rule 9(b)'s heightened pleading standard. That rule governs Rashada's claims for fraud (Count I), aiding and abetting fraud (Count II), and conspiracy to commit fraud (Count III). *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1064-65 (11th Cir. 2007) (affirming the dismissal of claims for aiding and abetting fraud and conspiracy to commit fraud because they "fail[ed] to conform to the requirements of Rule 9(b)"). As for Count IV, "'Rule 9(b)'s heightened pleading standard applies to negligent misrepresentation claims' asserted under Florida law because such claims sound in fraud." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1127 (11th Cir. 2019) (quoting *Lamm v. State St. Bank & Trust*, 749 F.3d 938, 951 (11th Cir. 2014)).

Further, Rashada's claims for tortious interference and aiding and abetting tortious interference (Counts V and VI) are based on the same allegations as his fraud claims. (*See* Compl. ¶ 68.) The "risk to a defendant's reputation" from allegations of fraud does not disappear merely because those allegations are repackaged as a tortious interference claim. *Wagner*, 464 F.3d at 1278. Consequently, Counts V and VI are also subject to Rule 9(b). *See ADT LLC v. Alder Holdings, LLC*, No. 17-81237-CIV-ROSENBERG/REINHART,

2018 WL 6505915, at *4 (S.D. Fla. Nov. 7, 2018) (concluding that "Rule 9(b) applies to the tortious interference claim" because it was "supported by facts alleging fraud"), *report and recommendation adopted* 2018 WL 6620301 (S.D. Fla. Dec. 4, 2018); *Medimport S.R.L. v. Cabreja*, 929 F. Supp. 2d 1302, 1319 n.10 (S.D. Fla. 2013) ("Although Rule 9(b) does not apply to a tortious interference claim, it does apply to fraud allegations underlying such a claim."); *see also Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1308 (11th Cir. 2022) (applying the heightened pleading standard under Rule 9(b) to "a claim for unjust enrichment grounded in fraud"); *Wagner*, 464 F.3d at 1278 (holding that Rule 9(b) applies to "nonfraud" securities-law claims "when the facts underlying the misrepresentation at stake in the claim are said to be part of a fraud claim, as alleged elsewhere in the complaint").

Under that standard, each count fails to state a claim against Napier.

**A.  Count I fails to state a claim for fraud.**

To state a claim for fraud, a complaint must allege the following elements:

> (a) a misrepresentation of a material fact; (b) that the representor of the misrepresentation knew or should have known of the statement's falsity; (c) that the representor intended that the representation would induce another to rely and act on it; and (d) that the plaintiff suffered injury in justifiable reliance on the representation.

*Eagletech Commc'ns, Inc. v. Bryn Mawr Inv. Grp., Inc.*, 79 So. 3d 855, 861 (Fla. 4th DCA 2012) (quoting *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489, 497 (Fla. 4th DCA 2001)). The Complaint fails to allege these elements against Napier.

The Complaint's allegations fall well short of the heightened standard imposed by Rule 9(b). A complaint that levels an accusation of fraud, again, must specify "the person responsible for making" each statement. *Clausen*, 290 F.3d at 1310 (quoting *Ziemba*, 256 F.3d at 1202). Rashada's Complaint fails to do so. Instead, when it mentions Napier at all, it "lump[s] [him] together" with the other Defendants, failing to give him notice of "the nature of his alleged participation in the fraud." *Ambrosia Coal & Constr. Co.*, 482 F.3d at 1317 (quoting *Brooks*, 116 F.3d at 1381).

The Complaint exhibits this shortcoming again and again. It alleges, for example, that "Defendants' fraudulent promises caused Jaden to forgo a $9.5 million NIL deal and other potential NIL packages." (Compl. ¶ 46.) It alleges that "[a]ll representations regarding the $13.85 million NIL deal leading up to this inducement were made by Defendants Hathcock, Castro-Walker, and Coach Napier" without bothering to identify those "representations" or specify which Defendant made each of them. (Compl. ¶ 47.) And it alleges that "Defendants' words and actions continued to communicate an intent to honor

10

their promises" and that "the Defendants never intended to pay Jaden the $500,000 that was promised as an initial payment." (Compl. ¶¶ 49-50.)

None of these generalized accusations of wrongdoing by "the Defendants" are sufficient under Rule 9(b). Indeed, the Complaint so consistently lumps Napier together with the other Defendants that it falls short of ordinary pleading standards and amounts to a shotgun pleading. *See, e.g.*, *Auto. Alignment & Body Serv., Inc.*, 953 F.3d at 732 ("A complaint constitutes an impermissible shotgun pleading if it 'assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions . . . .'" (first alteration in original) (quoting *Weiland*, 792 F.3d at 1323)). That shortcoming alone is sufficient to warrant dismissal. *See Frederick v. LaFont*, No. 3:16-CV-00035-MCR-EMT, 2016 WL 11745552, at *5 (N.D. Fla. Sept. 30, 2016) ("The court may police and weed out shotgun pleadings through its inherent authority to control its docket, including the authority to dismiss complaints that violate Federal Rules of Civil Procedure 8(a)(2) and 10(b). Dismissal is appropriate where it is virtually impossible to know which allegations of fact are intended to support which claims for relief." (citation omitted)).[1]

---

[1] In addition, each of the Complaint's seven counts incorporates every paragraph of the Complaint, including all the allegations of the other counts

Exactly one statement by Napier is alleged in the Complaint: a statement to Rashada's father—not to Rashada himself. The Complaint alleges:

> 61.     In response to Jaden delaying the signing of his National Letter of Intent, Coach Napier personally called Jaden and Harlen to convince Jaden to sign. *During his phone call with Harlen*, Coach Napier relayed that Jaden would be receiving $1 million from Hathcock as a partial payment towards the promised $13.85 million once Jaden formally signed his National Letter of Intent with UF that day.

> 62.     Relying on Napier's promise, Jaden was induced to go ahead and sign his Letter of Intent before the Defendants made good on any of their commitments. Harlen reported this conversation to Zager and Thomsen stating:

>> Coach Napier said [Hathcock's] on a plane and that he will wire 1 Mil. He wants the paper work and I'm sending it if you are good.

(Compl. ¶¶ 61-62 (emphasis added; alteration in original).)

The Complaint does not say whether—much less how—the alleged statement was ever relayed to Rashada. It does not allege that Rashada's father told him about it—only that he told the NIL agents, Zager and Thomsen. (Compl. ¶ 62.) And the Complaint does not reveal what, if anything, Zager and Thomsen told Rashada about Napier's alleged statement.

---

(Compl. ¶ 68), making the Complaint a "quintessential 'shotgun' pleading[]." *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002).

Even setting aside the Complaint's failure to allege exactly what, if anything, Rashada was told and by whom, Napier's alleged statement to Rashada's father cannot support a fraud claim for at least three reasons. First, Napier's alleged statement was not a "misrepresentation of a material fact." *Eagletech Commc'ns, Inc.*, 79 So. 3d at 861. "A false statement of fact, to be a ground for fraud, must be of a past or existing fact, not a promise to do something in the future." *Bailey v. Covington*, 317 So. 3d 1223, 1228 (Fla. 3d DCA 2021) (quoting *Vance v. Indian Hammock Hunt & Riding Club, Ltd.*, 403 So. 2d 1367, 1371 (Fla. 4th DCA 1981)). A statement about a future payment by Hathcock is not a representation of a "past or existing fact." *Id.* (quoting *Vance*, 403 So. 2d at 1371).

To be sure, a claim for fraud can still be based on a "promise to perform a material matter in the future . . . [if] made without any intention of performing or made with the positive intention not to perform." *Id.* (quoting *Vance*, 403 So. 2d at 1372). But the alleged statement was not a promise by Napier to do anything. It was, in essence, a prediction about what someone else—Hathcock—would do in the future.

Nor does the Complaint allege any well-pleaded facts plausibly suggesting that Napier had superior knowledge regarding Hathcock's intentions. The Complaint's generalized conclusions about a purported conspiracy between the

Defendants are not enough. (*See, e.g.*, Compl. ¶ 31 ("Hathcock conspired with Castro-Walker, Coach Napier, and others . . . .").) Rashada does not, and cannot, support those conclusory assertions with, for example, allegations detailing communications between Napier and Hathcock.[2] In short, the Complaint fails to allege the most basic element of fraud: a misrepresentation of a material fact.

Second, the Complaint fails to allege that Napier knew or should have known his statement was false. Again, the Complaint fails to allege any well-pleaded facts plausibly suggesting that Hathcock did not intend to pay Rashada, much less that Napier knew as much.[3] The legal conclusion that "Defendants" "act[ed] with scienter" is not sufficient. (Compl. ¶ 71.)

Finally, the Complaint makes it clear that Rashada could not have "suffered injury in justifiable reliance on" Napier's alleged statement. *Eagletech Commc'ns, Inc.*, 79 So. 3d at 861. The Complaint asserts that the Defendants

---

[2] The Complaint alleges with respect to a *different* payment—the initial $500,000 payment required by a contract that had already been terminated by the time of Napier's alleged statement—that Defendants knew "no one had any intention of enforcing Hathcock's promise" and that they did not "have any way of enforcing it." (Compl. ¶ 52.) But everyone, including Rashada, knew Napier had no way of enforcing that promise. Napier is not alleged to have been a party to any NIL agreement.

[3] The conclusory (and, frankly, puzzling) assertion that Napier "acted with actual and apparent authority" on behalf of Hathcock does not plausibly show such knowledge on Napier's part. (Compl. ¶ 34.)

induced Rashada to decommit from Miami and, consequently, lose out on the $9.5 million Miami NIL Deal. (Compl. ¶¶ 46, 75.) But Napier's alleged statement occurred more than a month *after* Rashada had decommitted from Miami and publicly announced his intention to play for UF. (*See* Compl. ¶¶ 44, 58.) Rashada could not have relied to his detriment on Napier's alleged statement before it was made. Nor does the Complaint identify any other specific opportunities Rashada missed out on as a result of Napier's statement, apart from gesturing at the mere possibility of another deal. (*See* Compl. ¶ 75.) How the commitment Rashada purportedly made after Napier's alleged statement—a commitment from which Rashada withdrew after less than a month (*see* Compl. ¶ 66)—could have caused him any injury is left entirely to the imagination.

The Complaint thus fails to allege that Rashada suffered, or even could have suffered, any injury in reliance on Napier's purported statement. Count I fails to state a claim against Napier for fraud.

## B. Count II fails to state a claim for aiding and abetting fraud.

To state a claim for aiding and abetting fraud, a complaint must allege that "1. [t]here existed an underlying fraud; 2. [t]he defendant had knowledge of the fraud; [and] 3. [t]he defendant provided substantial assistance to advance the commission of the fraud." *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.*, 917

So. 2d 368, 372 (Fla. 5th DCA 2005). The Complaint fails to allege those elements against Napier.

First, the Complaint fails to allege any well-pleaded facts that, if true, plausibly suggest that Napier was aware of any fraud. Again, the Complaint does not allege that Napier participated in the negotiation of the NIL agreement. Nor does it allege that he had any specific communications with any other Defendant that would have made him aware of a supposed plan to defraud Rashada. The Complaint offers only bare assertions of knowledge, which are insufficient even under the ordinary pleading standards that govern allegations of a defendant's mental state. *See Losey*, 521 F. App'x at 719 ("[A]llegations that [the defendant] had subjective knowledge . . . are entirely conclusory and are therefore not afforded the presumption of truth absent some factual support that make[s] them plausible.").

Second, the Complaint fails to allege anything done by Napier to provide substantial assistance to advance the commission of any fraud. The Complaint, again, alleges a single statement by Napier—one allegedly made *after* Rashada had already reneged on his commitment to attend Miami and lost the associated NIL deal. Even if Rashada could somehow show fraud—and he cannot—any purported fraud happened well before Napier's alleged involvement. Count II thus fails to state a claim for aiding and abetting fraud.

16

### C. Count III fails to state a claim for civil conspiracy.

To state a claim for civil conspiracy, a complaint must allege:

> (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy.

*Philip Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 n.9 (Fla. 2015). The Complaint fails to allege these elements against Napier.

Count III fails for the same reasons as Rashada's claim against Napier for aiding and abetting fraud. In the absence of well-pleaded allegations of fact plausibly showing an express agreement to engage in a fraud—and the Complaint offers none—a conspiracy claim requires at a minimum that a defendant "know of the scheme and assist in it in some way." *Condor, S.A. v. Plurinational State of Bolivia*, 352 So. 3d 921, 927 (Fla. 3d DCA 2022) (per curiam) (quoting *Savoia-McHugh v. Glass*, No. 3:19cv2018-MCR/HTC, 2020 WL 12309558, at *8 (N.D. Fla. Aug. 5, 2020)). But the Complaint fails to allege either that Napier was aware of any supposed fraud or that he did anything to assist in a fraud. Count III therefore fails to state a claim.

### D. Count IV fails to state a claim for negligent misrepresentation.

To state a claim for negligent misrepresentation, a complaint must allege:

> (1) a misrepresentation of material fact that the defendant believed to be true but which was in fact

false; (2) that defendant should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely on the misrepresentation; and (4) the plaintiff acted in justifiable reliance upon the misrepresentation, resulting in injury.

*Arlington Pebble Creek, LLC v. Campus Edge Condo. Ass'n*, 232 So. 3d 502, 505 (Fla. 1st DCA 2017). Rashada's negligent misrepresentation claim fails for the same reasons as his fraud claim.

First, Napier's sole alleged statement was not a representation of a material fact. Negligent misrepresentation, like fraud, requires a misrepresentation of a "past or existing fact," not a statement about the future. *Treminio v. Crowley Maritime Corp.*, 649 F. Supp. 3d 1223, 1239-40 (M.D. Fla. 2023) (quoting *Prieto v. Smook, Inc.*, 97 So. 3d 916, 917 (Fla. 4th DCA 2012)). An alleged statement about a future payment by Hathcock is not sufficient to support a negligent misrepresentation claim.

Second, the Complaint does not plausibly allege that Napier "should have known" his alleged statement was false any more than it alleges actual knowledge. *Arlington Pebble Creek, LLC*, 232 So. 3d at 505. The Complaint offers no well-pleaded allegations of facts that should have put Napier on notice of an alleged secret intention by Hathcock not to pay.

Finally, Rashada could not have suffered injury in reliance on Napier's sole alleged statement because the alleged injury preceded that statement. By the

time of the alleged statement, Rashada had already decommitted from Miami and given up the Miami NIL Deal. (*See* Compl. ¶¶ 44-45, 58.) Count IV thus fails to state a claim against Napier for negligent misrepresentation.

### E. Count V fails to state a claim for tortious interference against Napier.

To state a claim for tortious interference with a business relationship, a complaint must allege "(1) the existence of a business relationship . . . [;] (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (first alteration in original) (quoting *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985)).

Here, the Complaint asserts that "Defendants" tortiously interfered with Rashada's $9.5 million Miami NIL Deal by offering him a better deal worth $13.85 million. (Compl. ¶¶ 103, 104.) Because of this better offer, Rashada chose to renege on his commitment to Miami and committed to UF. (*See* Compl. ¶¶ 31, 46.) For two reasons, these allegations are insufficient to state a tortious interference claim against Napier.

First, Napier could not have interfered with the Miami NIL Deal because Rashada had already abandoned it by the time of Napier's alleged conduct.

Given that Napier's only alleged conduct occurred more than a month *after* Rashada's decision to terminate his Miami NIL Deal, that conduct could not have influenced Rashada's decision. Because Rashada cannot "support [his] allegation[s] with facts from which a reasonable trier of fact could infer inducement," *Duty Free America, Inc. v. Estée Lauder Cos.*, 797 F.3d 1248, 1281 (11th Cir. 2015) (emphasis omitted), the Complaint fails to allege the third element of tortious interference. Further, because the Miami NIL Deal had already been terminated by the time of Napier's alleged conduct—in other words, because the business relationship no longer existed—the Complaint also fails to allege the first element of tortious interference.

Second, the Complaint admits that *Rashada chose* to renege on whatever agreement he had with the Miami NIL entity. After being advised by his multiple NIL agents, *Rashada chose* to take one NIL deal over another. (*See* Compl. ¶ 31 (Rashada "abandon[ed] his $9.5 million Miami deal.").) Rashada cannot recover damages under a tortious interference theory for his voluntary decision to trade one deal for another.

To maintain an action for tortious interference, a plaintiff must allege that a "third party interfere[d] with a contract or business relationship by influencing, inducing or coercing one of the parties to the relationship to abandon the relationship or breach the contract, thereby causing injury to *the other party*."

*West v. Troelstrup*, 367 So. 2d 253, 255 (Fla. 1st DCA 1979) (emphasis added); *see also Dade Enters., Inc. v. Wometco Theatres, Inc.*, 160 So. 209, 210 (Fla. 1935). As the terminating or breaching party, Rashada has no tortious interference claim.

The tortious interference paradigm is familiar: A and B have a contract, and C interferes, inducing B to breach the contract. A then has a breach of contract claim against B and a tortious interference claim against C for inducing B's breach. But the breaching party, B, has no claim related to the interference because B chose to go along with C's inducements and voluntarily abandon his relationship with A. Here, the Miami NIL entity, A, and Rashada, B, are alleged to have had an agreement. The Defendants, C, allegedly interfered with that relationship. But Rashada admits that *he* voluntarily abandoned, breached, or terminated the agreement. (*See* Compl. ¶¶ 31, 46.) He cannot recover under a tortious interference theory for the loss of a business relationship that he chose to sever.

On point is *McKinney-Green, Inc. v. Davis*, 606 So. 2d 393 (Fla. 1st DCA 1992). In that case, the plaintiff alleged that he had an agreement with his brother to jointly own a company and use it to develop a subdivision of residential lots. *Id.* at 394. The plaintiff claimed that the mortgage broker he was working with tortiously interfered with that agreement by adding conditions to a construction

loan the jointly owned entity was seeking on the eve of the loan's closing. *Id.* at 394, 398. The plaintiff alleged that the mortgage broker's demands were so arduous that rather than going forward with his agreement with his brother, he chose to transfer assets to his brother and have the brother take out the loan himself—rather than their jointly owned entity as the brothers had agreed. *Id.* He then sued the mortgage broker for tortious interference with his agreement with his brother. *Id.* at 396-97.

The defendants moved to dismiss the tortious interference claim, which the trial court denied. *Id.* at 394. On appeal, the district court reversed, finding that the plaintiff could not allege tortious interference because he had chosen not to abide by the agreement with which the defendants had allegedly interfered. *Id.* at 398. The district court observed that "[i]t is not alleged that [the plaintiff's] brother was induced by [the mortgage broker] to breach the agreement with [the plaintiff]. In fact, Paragraph 23 of the complaint indicates the demands made by [the mortgage broker] *induced [the plaintiff] himself to act in contravention of the agreement." Id.* (emphasis added). Because the plaintiff himself had voluntarily "act[ed] in contravention of the agreement," the court concluded that the complaint "fail[ed] to state a cause of action for tortious interference." *Id.*

Rashada likewise "act[ed] in contravention of the [Miami NIL] agreement" by choosing to abandon it. In the Complaint's telling, the Miami

entity did not walk away from him; rather, Rashada chose to "abandon" or "forgo" the Miami NIL Deal. (*See* Compl. ¶ 31 (the alleged inducement caused "Jaden to abandon his $9.5 million Miami deal"); *id.* ¶ 46 (the alleged promises caused "Jaden to forgo a $9.5 million NIL deal")).) Rashada's decision to abandon the Miami NIL Deal—like the plaintiff's decision to act contrary to his agreement with his brother in *McKinney-Green, Inc.*—cannot support a tortious interference claim.[4] Count V thus fails to state a claim.

### F. Count VI fails to state a claim for aiding and abetting tortious interference.

To state a claim for aiding and abetting, a complaint must allege "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abetter; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012)

---

[4] Similarly, an employee's decision to resign dooms a later claim by that employee for tortious interference with his or her employment contract. *See Mulligan v. Wallace*, 349 So. 2d 745, 747 (Fla. 3d DCA 1977) (per curiam) ("Plaintiffs' resignations … bar their action for tortious interference with employment contracts."); *Geller v. Von Hagens*, No. 8:10-CIV-1688-EAK-AEP, 2010 WL 4867540, at *4 (M.D. Fla. Nov. 23, 2010) ("The Defendants' point is well-taken that, having presented that his resignation was voluntary, [Plaintiff] cannot now be allowed to maintain a cause of action for tortious interference with his contract. Therefore, the Defendants' Motion to Dismiss is granted as to [Plaintiff's] tortious interference with contract claim.").

(per curiam). The Complaint fails to allege each of those elements against Napier.

As explained above, Rashada's decision to voluntarily withdraw from the Miami NIL Deal cannot support a tortious interference claim. The Complaint therefore fails to allege an "underlying violation." *Id.*

Nor does the Complaint allege that Napier knew of any purported wrongdoing, or that Napier did anything that provided "substantial assistance in committing the wrongdoing." *Id.* Again, Rashada had already given up the Miami NIL Deal by the time of the only conduct alleged against Napier. Count VI therefore fails to state a claim against Napier for aiding and abetting tortious interference.

## II. Sovereign immunity bars all claims against Napier.

As the Complaint alleges, Napier is the "head football coach at the University of Florida." (Compl. ¶ 16.) Both the University of Florida and the University Athletic Association, Inc. are state agencies protected by sovereign immunity under Florida law. *See* § 768.28(2), Fla. Stat. (providing that "state agencies or subdivisions" protected by sovereign immunity include "state university boards of trustees"); *Univ. of Fla. Bd. of Trs. v. Rojas*, 351 So. 3d 1167, 1170 (Fla. 1st DCA 2022) (holding that a claim against the University of Florida should have been dismissed based on sovereign immunity), *rev. granted*, No.

SC2023-0126, 2023 WL 4784215 (Fla. July 27, 2023); *see also Plancher v. UCF Athletics Ass'n, Inc.*, 175 So. 3d 724, 725, 729 (Fla. 2015) (holding that UCF Athletics Association, Inc. is entitled to sovereign immunity under Florida law); *cf. Edwards v. Learfield Commc'ns, LLC*, 697 F. Supp. 3d 1297, 1302 (N.D. Fla. 2023) (concluding that "the [University Athletic Association, Inc.] is an arm of the state" and is therefore "entitled to Eleventh Amendment immunity").

Section 768.28(9)(a), Florida Statutes, extends that immunity to Napier as an employee of a state agency. That statute provides in part:

> An officer, employee, or agent of the state or of any of its subdivisions may not be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

§ 768.28(9)(a), Fla. Stat.; *see also McGhee v. Volusia Cnty.*, 679 So. 2d 729, 733 (Fla. 1996) (explaining that section 768.28(9)(a) "extend[s] the veil of sovereign immunity to . . . governmental employees when they are acting within the scope of employment").

The conduct alleged in the Complaint involved the recruitment of a football player to the University's team, a task clearly within "the scope of [Napier's] employment or function." § 768.28(9)(a), Fla. Stat. Consequently, to

overcome Napier's immunity under section 768.28(9)(a), the Complaint must allege that Napier "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *Id.*; *see also Eiras v. Fla. Dep't of Bus. & Pro. Regul.*, 239 F. Supp. 3d 1331, 1343 (M.D. Fla. 2017) ("[I]n order for a plaintiff to succeed in piercing the statutory immunity defense, he must make a good faith allegation in the complaint that the public . . . official either acted outside the scope of his employment or in bad faith." (quoting *Brown v. McKinnon*, 964 So. 2d 173, 175 (Fla. 3d DCA 2007))). Further, a "conclusory" allegation that a defendant "acted maliciously and in bad faith" is "insufficient to survive a motion to dismiss." *Brivik v. Law*, 545 F. App'x 804, 807 (11th Cir. 2013) (per curiam); *see also Eiras*, 239 F. Supp. 3d at 1344 (observing that "a threadbare recital" is "insufficient").

"Bad faith" under section 768.28(9)(a) is a high bar. It requires "actual malice," which means "ill will, hatred, spite, [or] an evil intent." *Reed v. State*, 837 So. 2d 366, 369 (Fla. 2002) (alteration in original) (quoting *Young v. State*, 753 So. 2d 725, 728-29 (Fla. 1st DCA 2000); *State v. Gaylord*, 356 So. 2d 313, 314 (Fla. 1978)); *see also Coleman v. Hillsborough Cnty.*, 41 F.4th 1319, 1325 (11th Cir. 2022) ("Florida courts have equated bad faith with 'the actual malice standard.'" (quoting *Peterson v. Pollack*, 290 So. 3d 102, 109 (Fla. 4th DCA 2020))). The "wanton and willful" standard requires "conduct much more

reprehensible and unacceptable than mere intentional conduct." *Coleman*, 41

F.4th at 1325 (quoting *Peterson*, 290 So. 3d at 109). "Wanton" means "with a

conscious and intentional indifference to consequences and with the knowledge

that damage is likely to be done to persons or property," and "willful" means

"intentionally, knowingly and purposely." *Id.* (quoting *Peterson*, 290 So. 3d at

110).

Here, the Complaint fails to allege that Napier "acted in bad faith or with

malicious purpose or in a manner exhibiting wanton and willful disregard of

human rights, safety, or property." § 768.28(9)(a), Fla. Stat. Again, the

Complaint attributes only one statement to Napier. (Compl. ¶ 61.) Further, it

fails to allege any well-pleaded facts plausibly suggesting that Napier knew the

statement was false, much less that he acted with "ill will, hatred, spite, [or] an

evil intent." *Reed*, 837 So. 2d at 369 (quoting *Gaylord*, 356 So. 2d at 314). Nor

does the Complaint allege "conduct much more reprehensible and unacceptable

than mere intentional conduct." *Coleman*, 41 F.4th at 1325 (quoting *Peterson*, 290

So. 3d at 109).

Some authority suggests that fraud may be sufficient to establish bad faith

under section 768.28(9)(a). *See Parker v. State of Fla. Bd. of Regents ex rel. Fla. State

Univ.*, 724 So. 2d 163, 168-69 (Fla. 1st DCA 1998). Here, however, the

Complaint fails, for reasons explained above, to adequately allege fraud. All

claims against Napier are therefore barred by sovereign immunity under section 768.28(9)(a).

## CONCLUSION

The Complaint accuses Napier of fraud but fails to support that accusation with sufficient allegations of fact. Further, Rashada's claims against Napier are barred by sovereign immunity. All claims against Napier should therefore be dismissed.

*(Remainder of page intentionally left blank.)*

## Local Rule 7.1(F) Certification of Word Count

I hereby certify that the foregoing memorandum contains 6,289 words and complies with the word count requirement of Local Rule 7.1(F).

Dated: July 23, 2024.

BEDELL, DITTMAR, DeVAULT, PILLANS & COXE
Professional Association

By: s/Henry M. Coxe III
Henry M. Coxe III
Florida Bar No. 155193
Email: hmc@bedellfirm.com
Michael E. Lockamy
Florida Bar No. 69626
Email: mel@bedellfirm.com
R. Troy Smith
Florida Bar No. 485519
Email: rts@bedellfirm.com
John G. Woodlee
Florida Bar No. 0100990
Email: jgw@bedellfirm.com
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
Telephone: (904) 353-0211
Facsimile: (904) 353-9307

Attorneys for Defendant William Napier