## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

JADEN RASHADA,

     Plaintiff,

v.                            Case No.: 3:24-cv-00219-MCR-HTC

HUGH HATHCOCK, WILLIAM
"BILLY" NAPIER, MARCUS
CASTRO-WALKER, AND VELOCITY
AUTOMOTIVE SOLUTIONS, LLC,

     Defendants.

_____/

## DEFENDANT HUGH HATHCOCK'S
## MOTION TO DISMISS FIRST AMENDED COMPLAINT

Pursuant to Rules 8(a), 9(b), 12(b)(6), and 12(e) of the Federal Rules of Civil Procedure, Defendant, HUGH HATHCOCK, moves to dismiss Plaintiff Jaden Rashada's First Amended Complaint, ECF No. 37 ("Complaint"), and states:

### Summary of the Motion

Plaintiff's First Amended Complaint includes marginal additions that do not remedy the original Complaint's material deficiencies. While there is limited new content and a new cause of action for "economic boycott" not supported by the allegations, an extensive summary of the argument is unnecessary. Instead, each set of claims is addressed in turn below.

## Memorandum of Law

### I.    Applicable legal standards

A complaint should be dismissed under Rule 12 in a case such as this, where, even after drawing all reasonable inferences in the Plaintiff's favor, and accepting all factual allegations as true, the complaint nonetheless "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 n.8 (11th Cir. 1999). The complaint must contain factual allegations that delineate the plausibility of the asserted causes of action. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Plausibility means pleading factual allegations that permit the court to reasonably infer that the defendant is liable for the alleged misconduct. *Id.* at 678. "Bare assertions" amounting "to nothing more than a 'formulaic recitation of the elements'" of a claim must be rejected as "conclusory and not entitled to be assumed true." *Id.* at 681. Legal conclusions are also insufficient—the non-conclusory facts standing alone must state a plausible claim. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010).

Where the complaint pleads fraud, Federal Rule of Civil Procedure 9(b) requires a party to "state with particularity the circumstances constituting fraud." The purpose of this rule is to alert defendants to precise misconduct and to protect against "spurious charges of immoral and fraudulent behavior." *Ziemba v. Cascade*

2

*Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001). Regarding fraudulent inducement

claims specifically:

> To plead fraudulent inducement and comply with Rule 9(b), the plaintiff must allege "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Smiley v. Nationstar Mortg. LLC*, 202 F. Supp. 3d 1322, 1324 (M.D. Fla. 2016)

(quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006)). The

Eleventh Circuit applies the same standard to claims based on fraudulent omission.

*See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

## II. The fraudulent misrepresentation counts against Hathcock are insufficiently specific, fail to plausibly allege an agency relationship needed to attribute co-defendants' statements to him, and fail to plausibly plead a scheme to defraud, requiring their dismissal.

The Complaint repeatedly claims that "promises" were made in the colloquial

sense, however, the facts recited, even read favorably to Plaintiff, make clear what

should be obvious: eight-figure contracts like this are substantially negotiated, often

by individuals[1] well-versed and experienced in the subject matter, and not made

---

[1] Indeed, Florida's NIL law applicable at the time specifically required any athlete agent representing an individual for purposes of securing NIL compensation to be licensed under part IX of Chapter 468, and any attorney doing so to be a member in good standing of the Florida Bar. *See* § 1006.74(d), Fla. Stat. (2021).

haphazardly by text-message. Numerous allegations recite that reality, but everywhere that Plaintiff has a difficult issue of proof, he ignores the context and falls back on descriptions of the potential deal as an alleged promise. In the process, he does not identify statements of material fact necessary to plead a misrepresentation. Ultimately, the Complaint relies on the principle that the entry into a contract is actionable in fraud if the counterparty never intended to perform.

As this theory relates to Hathcock, it suffers from the obvious flaw that Hathcock never signed an agreement with Plaintiff. Indeed, to the extent that a misrepresentation was made in the form of <u>entry</u> into a false agreement, Hathcock never entered into any such agreement and specifically advised Plaintiff of that fact before Plaintiff verbally committed to play football at the University of Florida ("UF"). *See* Compl. ¶ 35. Plaintiff attempts to deal with this problem by attempting to paint a picture greater than the sum of its parts, but at each critical step of the analysis, the Complaint cannot allege facts and substitutes bare, conclusory allegations. The allegations, at least with respect to Hathcock, fail to meet the fraud-particularity standard and even fail to plead plausible claims.

     a. <u>The fraudulent misrepresentation counts fail to meet the specificity required by Rule 9(b) by failing to identify specific factual statements by or attributable to Hathcock, supply the relevant context, or explain how those statements caused actions in reliance on the statements.</u>

The Complaint fails to plead allegations of fraud with the requisite particularity. To satisfy Rule 9(b), Plaintiff had to identify: (1) precise statements;

(2) the time, place, and person making the statements; (3a) the content of statements; (3b) the manner in which statements misled Plaintiff; and (4) what the defendants obtained. *Garfield*, 466 F.3d at 1262. The Complaint fails to meet this standard.

> i. *No statements directly and solely attributable to Hathcock meet the Rule 9(b) standard.*

There are precious few allegations that actually attribute a statement to Hathcock directly and solely, and none identify statements with sufficient particularity. There are few statements directly attributable to Hathcock at all. There are two tweets that are plainly not statements of fact. Compl. ¶¶ 33, 40. The Complaint also alleged purported oral statements at a summer 2022 meeting. Compl. ¶ 23. One conversation describes a listener's general takeaway from the conversation and identifies a single statement of future intent as part of a negotiation process. *See* Compl. ¶ 30. But the Complaint fails to identify the manner in which any statements misled Plaintiff given the explicit and robust abandonment of any prior negotiations. *Compare id.* ¶ 30 *with id.* ¶ 35.

Plaintiff fails to resurrect any statements preceding Hathcock's express abandonment by suggesting that a new deal was allegedly similar to the original deal. The allegations make no sense:

> 35. Before the deal was finalized, however, Hathcock balked. Citing plans to sell Velocity Automotive, Hathcock declined to use his company or the Gator Guard to directly fund the promised NIL payments. Castro-Walker and Hathcock therefore suggested that the funds from Hathcock and his company pass through the Gator

5

> Collective. This was a change in structure to make the sale process easier for Hathcock and Velocity, but substantively and from Jaden's perspective, the terms remained the same.

Compl. ¶ 35. If Hathcock had his own collective, the sale of Velocity would do nothing to prohibit personal funds passing through a Hathcock-controlled entity. Nor would passing funds through a <u>non</u>-Hathcock-controlled entity, the Gator Collective, add anything to the transaction. The allegation that "the terms remained the same," particularly strains credulity. If someone is negotiating with Bob and then instead contracts with Gary, the terms are self-evidently not the same—a contract generally cannot be enforced against a non-signatory, let alone a non-party to the transaction.[2] Communicative acts can be expected to mean what any reasonable person would expect them to mean, particularly given that Plaintiff was represented by multiple agents in the transaction. When Hathcock withdrew from the transaction, any obtuse interpretation of subsequent events cannot undo the significance of Hathcock's withdrawal.

---

[2] In its prior motion to dismiss, Velocity Automotive alleged that the November 10 Gator Collective contract was central to Plaintiff's claims and could be considered as part of the four corners of the complaint even when not originally attached as an exhibit. *See* ECF No. 34 at 4 & n.1 (discussing ECF No. 34-1). While Hathcock believes that his absence from the Gator Collective contract is open and apparent from the pleadings themselves, Hathcock adopts Velocity's position and requests that this Court consider the terms of the Gator Collective contract—where Hathcock is neither party, signatory, nor merits a single mention in any recital or substantive provision.

Apparently sensing the fragility of his claim that the new contracting party did not materially change the contract, Plaintiff continues his allegations with the phrase "[r]egardless of the outward appearance," Compl. ¶ 35, and discusses (1) non-specific, (2) post-execution (3) "assurances" (4) from unidentified persons that payment would be forthcoming. But Plaintiff's single-minded interest in receiving payments does not make the Gator Collective contract the same as any previous iteration. And it is a particularly remarkable position to take given that the entire theory of Plaintiff's case against Hathcock turns on the alleged "entry into a contract with no intention to perform" operating as Hathcock's alleged misrepresentation.

From the point at which Hathcock refuses to sign the agreement that was allegedly negotiated in the run up to the November 10 commitment deadline and negotiations shifted to a new contracting counterparty, the Complaint alleges not a single statement made solely by Hathcock with particularity. At this point, the Complaint shifts entirely to lumped-speaker allegations as well as agency and conspiracy allegations that attempt to ensnare Hathcock with statements allegedly made by individuals not in his employ.

### ii. Collective statements that are not attributed to a single speaker are irrelevant under the Rule 9 framework.

Plaintiff falls short under Rule 9 in his attempts to attribute to Hathcock the statements of others, or an indistinguishable collective of multiple alleged speakers. The Eleventh Circuit is clear that in fraud cases with multiple defendants,

7

"generalized allegations 'lumping' multiple defendants together are insufficient." *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008) (citing, *inter alia*, *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997) (collecting cases)); *Prof'l LED Lighting, Ltd. v. AAdyn Tech., LLC*, 88 F. Supp. 3d 1356, 1374 (S.D. Fla. 2015). Multiple allegations fail this standard and should be ignored in an analysis of whether fraud is pleaded with the requisite specificity. *See* Compl. ¶¶ 32 ("Castro-Walker and Hathcock"), 32 n.3 ("Hathcock and Castro-Walkers' representations"), 35 ("Castro-Walker and Hathcock therefore suggested"), 36 ("They all assured Jaden"), 44 ("Castro-Walker, Hathcock, and Velocity's misrepresentations"), 45 ("made by Defendants Hathcock and Castro-Walker"), 53 ("Hathcock, Velocity, and/or Castro-Walker represented"), 56 ("Hathcock and Castro-Walker assured"), 58 (unspecified discussion "with Castro-Walker and Hathcock"); *see also id.* ¶¶ 44-45 (general allegations of reliance and intent). Many of these allegations similarly fail specificity in terms of time, specific content, and how the alleged statements misled and induced Plaintiff to verbally commit, sign a letter of intent, or take any action whatsoever.

      iii.   *Statements by other defendants cannot be attributed on a blanket basis to Hathcock and require specificity because the same circumstances are being used to allege both fraud and agency.*

Because Plaintiff cannot allege that Hathcock himself made any specific and relevant statements, Plaintiff instead attempts to bootstrap the more specific alleged

statements of co-defendants to attribute them to Hathcock. Attempts to circumvent Rule 9(b) by use of vicarious liability are constrained by two limitations, one applicable here under Rule 9(b), and the other applicable under the general plausibility standard. Under Rule 9(b), agency allegations must be pleaded with particularity "when the plaintiff relies upon the same circumstances to establish both the alleged fraud and the agency relationship of a defendant." *Sun Life Assurance Co. of Can. (U.S.) v. Imperial Holdings, Inc.*, No. 13-80385-Civ-Brannon, 2014 WL 12452450, at *3 (S.D. Fla. June 26, 2014) (quoting *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 783 (7th Cir. 1999)). If Rule 9(b) does not apply to agency allegations, the agency must still be plausibly alleged. *See Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1236 (11th Cir. 2014).

In this case, Rule 9(b) applies to the allegations of agency because of the inextricable facts underlying the alleged agency relationship and the alleged fraud of misrepresentation through negotiation. The Complaint's allegations show no daylight between the negotiation process that is the basis of the fraud and the alleged agency:

> **Throughout these discussions, Hathcock's representations** to Jaden's agents, which were later communicated to him, led Jaden to believe that Castro-Walker had authority to negotiate the NIL agreement that Hathcock and Velocity Automotive would fund. As such, Defendant Castro-Walker acted with actual and apparent authority with respect to his representations on behalf of Hathcock.

Compl. ¶ 32 (emphasis added). These allegations are barebones legal conclusions with only the faintest nod to allegations of fact. The Complaint includes pure legal conclusions of agency elsewhere with not even a tacit nod to factual amplification. *See id.* ¶¶ 45, 53. The allegations of agency fail to follow Rule 9(b)'s requirements because they do not identify specific statements by Hathcock at specific times or places. No factual allegations of agency at all are made between Hathcock and Grosso. *See id.* ¶ 37 (conclusory allegation between Hathcock and Grosso). Moreover, the Complaint does not allege that Napier is an agent of Hathcock at all, instead arguing the reverse that Hathcock is Napier's agent. *See id.* ¶¶ 32, 45.

Because the allegations of agency are not pleaded with specificity, the conclusory attribution of statements from Castro-Walker fail to establish facts relevant to state a claim against Hathcock. These include statements in paragraphs 34, 47, 49, 53, 55, and 60. Indeed, every allegation related to Hathcock following the November withdrawal is premised either directly or indirectly on representations made by Castro-Walker that must be imputed to Hathcock to state a claim. Under Rule 9(b), the agency allegations are insufficient and the claims against Hathcock fail. But they would also fail under the plausibility standard discussed below.

> *iv. Only limited statements identify the manner in which Plaintiff was allegedly misled.*

The Complaint identifies only two actions by Plaintiff allegedly taken in reliance: (1) announcing a verbal commitment to UF; and (2) executing the letter of

intent. The vast majority of statements discussed in the Complaint did not directly lead to these actions, as Plaintiff patiently negotiated before acting. With respect to the verbal commitment, the Complaint identifies a number of statements and then broadly concludes that all of the statements caused Plaintiff's reliance. With respect to the letter of intent, the Complaint identifies two phone calls that actually undermine, rather than support, Plaintiff's theory. The Complaint lacks the particularity required for either reliance action to establish how any alleged statement misled Plaintiff, including any statement through execution of the letter of intent.

As to the verbal commitment, the only allegations that attempt to explain reliance are in Paragraphs 44 and 45, which allege that "Defendants' false and fraudulent promises materially induced Jaden to engage in conduct he would not have engaged in otherwise." The allegations are bare legal conclusions and fail to identify the actual statements or how they induced reliance. The Complaint's lack of particularity is magnified by its habitual characterization of nearly every statement as a "promise."

The only reasonable reading of the Complaint establishes that execution of the Gator Collective contract was the primary, if not sole, cause of Plaintiff's decision to verbally commit to UF. The circumstances described in paragraphs 36 through 41 lead to the obvious conclusion that Plaintiff surprisingly alleges outright:

> 42. Late on the night of November 10, 2022, Jaden agreed to a $13.85 million NIL deal and publicly flipped his commitment from Miami to UF.

Compl. ¶ 42. Without any preceding statements, the execution of the agreement would have surely caused the commitment anyway. Without the agreement, Plaintiff makes clear that no commitment would have been made.

The Complaint attempts to sidestep this fact by suggesting that there were specific assurances about the logistics of the deal, relying on statements by Grosso that Hathcock would take certain actions. *See* Compl. ¶¶ 36-37. But the Complaint never alleges that these statements were included in the signed agreement or that the Gator Collective contract bound Hathcock in any way at all, and thus never alleges how these statements misled Plaintiff. Even if Plaintiff's conclusory allegations of reliance were sufficient, as shown by the actual contract, ECF No. 34-1, no such terms appear in the Gator Collective contract and the contract does not even bind Hathcock in any way. Where a "mere cursory glance" would disclose the falsity of an alleged representation, the falsity of the representation is obvious and a misrepresentation claim will not lie. *Open Sea Distrib. Corp. v. Artemis Distrib., LLC*, 692 F. Supp. 3d 1151, 1198 (M.D. Fla. 2023) (quoting *Besett v. Basnett*, 389 So. 2d 995, 997–98 (Fla. 1980)).

As to the letter of intent, the Complaint identifies only two statements that could have influenced Plaintiff's decision, and the applicable allegations are

internally contradictory: (1) Napier's alleged statement during a phone call with Plaintiff's father; and (2) Castro-Walker's alleged statements during phone calls with Plaintiff and Plaintiff's agent. Compl. ¶¶ 59-60. According to the allegations, Plaintiff was unpersuaded by Castro-Walker's earlier December 7 statements following termination of the Gator Collective contract and was delaying signing the letter of intent in an effort to secure a follow-up agreement. Compl. ¶¶ 55-58. He never received one.

In lieu of the agreement, Plaintiff alleges in Paragraph 61 that he signed the letter of intent "[r]elying on Napier's promise, in combination with Castro-Walker's assurances that it would be honored." Napier's purported promise was that Hathcock would allegedly pay $1 million once the letter of intent was signed. But on its face, that statement is predictive about something another party would do—and the only allegations were that Hathcock was Napier's agent, not the other way around.

According to the next paragraph, however, this alleged promise was not sufficient to induce reliance. Compl. ¶ 60. Instead, the Complaint alleges that Castro-Walker had to reinforce Napier's alleged statement, "telling Jaden's agent that Napier would 'get it done' and emphasizing Napier's power as head coach," as well as increasing pressure on Plaintiff to sign "by telling him if he did not do it right away Coach Napier might pull back his scholarship offer." *Id*. Even setting the

internal contradictions aside, neither paragraph alleges that Plaintiff relied on any statement by Hathcock.

Critically, Castro-Walker's alleged promise to "get it done" establishes that the subject (here, the deal) was not in fact done at the time, so the statement was merely predictive. Indeed, by emphasizing Napier's "power as head coach," Castro-Walker's statements conveyed that Napier would persuade Hathcock to comply in the future. Even on the most generous reading of the Complaint, Plaintiff effectively alleges that Napier's purported statement was not on behalf of Hathcock but that Napier would take on the role of persuading Hathcock.

Taken as a whole, the only allegations that could even arguably meet the Eleventh Circuit's pleading requirements are: (1) the execution of the Gator Collective contract, leading to the verbal commitment; and (2) the alleged last-day December statements leading to the letter of intent. Neither allegation is attributable to Hathcock, particularly after he explicitly declined to sign any agreement that was otherwise essential to constitute any "promise" on which a person could—or would—rely.

Accordingly, the fraudulent misrepresentation counts fail to specifically identify any actionable act, omission, or statement attributable to Hathcock and should be dismissed with prejudice because amendment would be futile.

      b. <u>Leaving aside the lack of any statement or omission attributable to Hathcock for any purpose, the agency and reliance allegations fail both as a matter of plausibility pleading and as a matter of law.</u>

The Complaint attempts to bridge its myriad evidentiary gaps by broadly alleging a grand conspiracy where everyone involved is somehow an agent of Hathcock, except Napier. The allegations make no practical sense—this was an alleged eight-figure deal subject to substantial contract negotiations. If there were a deal to be had, the course of events makes clear that the fully negotiated and signed contract would be the only thing that mattered.

          *i. No factual allegations establish the elements of actual or apparent agency under Florida law with respect to Castro-Walker, Napier, or Ms. Grosso.*

Because Plaintiff cannot attribute any sufficiently particular statements to Hathcock, the Complaint instead attempts to attribute others' alleged statements to Hathcock. The agency allegations supporting this theory are paper thin, however. The only facts alleged as to agency are "[t]hroughout these discussions, Hathcock's representations to Jaden's agents, which were later communicated to him, led Jaden to believe that Castro-Walker, had authority to negotiate the NIL agreement that Hathcock and Velocity Automotive would fund." Compl. ¶ 32. While this removes "Napier and others" from the initial complaint's alleged list of persons authorized to negotiate on Hathcock's behalf, limiting the allegations to Castro-Walker does not cure the deficiencies of the initial complaint that were discussed in the initial motion

to dismiss. These allegations, being little more than bare recitations of a legal conclusion, are insufficient. *See, e.g.*, *Iqbal*, 556 U.S. at 679 ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

Under Florida law, an actual agency relationship requires "(1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1311 (quoting *Goldschmidt v. Holman*, 571 So. 2d 422, 424 n. 5 (Fla. 1990)). The key element is control by the principal, "[a]nd it is the right of control, not actual control or descriptive labels employed by the parties, that determines an agency relationship." *Id.* (quoting *Hickman v. Barclay's Int'l Realty, Inc.*, 5 So. 3d 804, 806 (Fla. 4th DCA 2009)).

The Complaint contains no allegations that meet these elements and instead jumps straight to the conclusion. With respect to Castro-Walker, the conclusion is that Hathcock made unknown representations to agents, those representations were filtered to Plaintiff in an unknown way, and those unknowably filtered representations somehow "led [Plaintiff] to believe" there was an agency

relationship. But no facts support that conclusion. Other than the fact that all of the parties were at least presumably aligned in the goal of recruitment, no allegation reflects the principal's acknowledgment, the agent's acceptance, or a right of control. The Supreme Court in *Twombly*, albeit in the context of the Sherman Act, made clear that a bare allegation of parallel conduct is not sufficient to plausibly infer an agreement between parties. 550 U.S. at 556–57. On the contrary, the Complaint affirmatively alleges that Hathcock is an independent businessperson, not a member of the UF athletic department, with his own company and his own collective. Compl. ¶ 15.

Indeed, to the extent there are genuine factual allegations, they undermine Plaintiff's preferred conclusion. By alleging Castro-Walker's assertion that it was Napier who had power and authority over wayward boosters, the pleaded facts more strongly support the conclusion that Hathcock was an agent of UF, rather than the other way around. *See* Compl. ¶ 61. But even that is an unreasonable and implausible reading of the events, in which Hathcock is alleged to routinely operate independently of—and indeed flatly contrary to—the comments or predictions of UF personnel.

The Complaint similarly fails to allege an actual agency relationship between Hathcock and Ms. Grosso. Ms. Grosso is described as a "Gator Collective lawyer" in Paragraph 36 but the only allegation asserting Hathcock's connection to it is

earlier in the same paragraph that "Castro-Walker and Hathcock then partnered with Rojas." On the contrary, Plaintiff alleges that Hathcock has his own NIL collective. *See* Compl. ¶ 15. There are no non-conclusory allegations connecting Hathcock to Ms. Grosso. *See id.* ¶ 37. Most importantly, the context of the Gator Collective agreement is one where neither Hathcock nor his collective signed any agreement, having explicitly refused to do so as alleged in Paragraph 35.

This case differs from those where courts have found sufficient allegations of agency. Indeed, in most of the Florida cases that address right of control, the distinction between an employee and independent contractor is dispositive. *See Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842 (Fla. 2003); *Gradia v. Baptist Hosp., Inc.*, 345 So. 3d 385, 387 (Fla. 1st DCA 2022) ("To resolve right of control issues, courts look first to the parties' written contract."). Some Florida courts, in explaining that the issue turns on the extent of a principal's right to control the means of the work, rather than the results, cite and rely on section 220 of the Restatement (Second of Agency). *See Harper ex rel. Daley v. Toler*, 884 So. 2d 1124, 1131 (Fla. 2d DCA 2004). The Complaint alleges no facts that plausibly establish a right of control.

The Eleventh Circuit has held similarly in analogous contexts. In maritime cases, for example, several factors are probative of control:

> (1) direct evidence of the principal's right to or actual exercise of control; (2) the method of payment for an agent's services, whether by

time or by the job; (3) whether or not the equipment necessary to perform the work is furnished by the principal; and (4) whether the principal had the right to fire the agent.

*Franza*, 772 F.3d at 1237 (quoting *Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1121 (11th Cir. 2011). The *Langfitt* case cited by the *Franza* court in turn also relies on section 220, which describes factors differentiating an employment from independent contractor relationship. 647 F.3d at 1121. Under these or similar standards, there is no reason to believe that Hathcock had any right of control over Ms. Grosso, or Castro-Walker, as they were employed by separate entities. Plaintiff alleges no substantial facts that would make an actual agency relationship plausible.

The same analysis obtains under Florida law for apparent agency, which requires a plaintiff to prove: "(1) a representation by the purported principal; (2) a reliance on that representation by a third party; and (3) a change in position by the third party in reliance on the representation." *Marchisio*, 919 F.3d at 1312 (citing *Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995)). As discussed above, there are no representations with respect to Ms. Grosso and only the bare allegation that representations exist with respect to Castro-Walker. But these are conclusory, not allegations of fact entitled to a presumption of truth under *Iqbal*. The Complaint alleges that unknown representations were made that caused Plaintiff to believe in an agency relationship. But without those representations, the Court lacks either the alleged facts or the context to draw any meaningful conclusions about the elements.

Knowing the legal conclusion that Plaintiff drew from unknown statements is not the same as pleading the elements of actual or apparent agency.

Even setting aside the failure to plead essential elements, the claim of an agency relationship is undermined by the factual context. A recurring theme of the Complaint is that every speaker allegedly asserts future predictions about what will happen that are flatly contrary to what Hathcock had done to date or would do in the future. For example, the Complaint alleges a variety of Castro-Walker's suggestions, proposals, or predictions that never come to pass.[3] If an agency relationship could be established by making consistently inaccurate predictions about what another person will do, much of the world would be in agency relationships with one another. That is not the law.

Amidst the overarching framework of the allegations in which that the parties were negotiating an NIL contract, the only statements that reasonably matter are the contractual negotiations with the principals. Plaintiff was represented by *at least* two agents disclosed in the Complaint, and particularly in light of the constraints of Florida law, an eight-figure deal would naturally and necessarily require substantial negotiation and a written contract. *See* § 1006.74, Fla. Stat. (2022) (requiring

---

[3] *Compare* Compl. ¶ 34 (promises on alleged November 2022 deal) *with id.* ¶ 34 ("Hathcock balked" on the same day); Compl. ¶¶ 35, 47, 49 (alleged conversations confirming December payment) with *id.* ¶ 51 (no payment and contract terminated); Compl. ¶¶ 53, 55-56 (alleged contract-assumption plan) *with id.* ¶ 64 (no such agreement).

contract to be provided to institution for comparison with team's contract). That contract would ordinarily be negotiated directly by the principal, or perhaps by the principal's attorney. There is no reason to believe such a task would be delegated to an employee of UF. And indeed, the Complaint avoids squarely asserting that Castro-Walker was responsible for contract negotiations. Instead, the Complaint relies on stray comments happening separate and apart from the actual contract-term negotiations. These allegations fail to meet the threshold of plausibility.

      c.  <u>The Complaint fails to state plausible claims with respect to the no-intention-to-perform theory of fraudulent inducement, at least as to Hathcock.</u>

The Complaint not only makes conclusory assertions at key factual steps, it also alleges genuine facts that undermine Plaintiff's own case. To the extent an offer or proposal to enter into an agreement is at issue, Florida law holds that a promise of future performance does not satisfy the statement-of-fact element. *See, e.g.*, *Gandy v. Trans World Computer Tech. Grp.*, 787 So. 2d 116, 118–19 (Fla. 2d DCA 2001). Moreover, proving fraudulent misrepresentation requires a plausible allegation that Plaintiff relied on the representation. *See, e.g.*, *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010). With respect to Hathcock, the Complaint proceeds on the entry-into-contract theory understood as an exception to the rule requiring a statement of fact. But that exception does not convert every offer or statement made in a negotiation into a fraudulent inducement, as only statements that induce reliance

are actionable. With respect to Castro-Walker and Napier, the Complaint proceeds on a theory that their predictions of Hathcock's future actions constitute statements of fact. But even the no-intention exception cannot apply here, as they are incapable of knowing Hathcock's intent.

Thus, the key allegation that undermines the central premise of the Complaint is Paragraph 35. Nearly every alleged "promise" or "misrepresentation," and surely every one by Hathcock, is a statement of future intent. Only the communicative act of entering into an agreement, without an intent to perform, can constitute a misrepresentation under the no-intention exception. But the Complaint makes clear that Hathcock refused to execute such an agreement and did so "[b]efore the deal was finalized" because it was understood that there was no deal until a contract was executed. *Id.* Negotiation statements are not, by themselves, statements on which any person relies when the point of the endeavor is a fully executed agreement.

As such, the only theoretically genuine "misrepresentation" alleged in the Complaint before December 2022 is the Gator Collective NIL agreement itself, on the theory that no one intended to honor the agreement. *See* Compl. ¶ 45. The fraudulent-misrepresentation count is specific on the point, alleging that the inducement was to promise to enter into a deal with no intention to honor the commitment. *See id.* ¶¶ 70-72.

22

Even under a generous reading of the Complaint, the action that induced Plaintiff's verbal commitment was the execution of the Gator Collective agreement. *See* Compl. ¶ 42. After the termination of this contract, Plaintiff further alleges that he deferred signing a letter of intent until the terminated contract had been assumed. *See id.* ¶¶ 56-58. Plaintiff repeatedly confirms that the point of the endeavor was the agreement. He continued to refrain until payments under the terminated contract were made, and only changed that position on an alleged last-minute prediction of a future payment by someone other than Hathcock. *See id.* ¶¶ 59-61.

The consistent features in both these vignettes are (1) the absence of a sufficiently particular allegation about a representation from Hathcock, and (2) the absence of Hathcock's signature on any agreement. To the extent one can fraudulently induce by promising to perform, Hathcock's explicit rejection of a promise to perform is telling. Plaintiff's efforts to transform unaffiliated parties' statements to ensnare Hathcock are insufficient as a matter of law.

        d.  <u>The Complaint is implausible at even a conceptual level.</u>

Finally, the Complaint suffers from two significant overarching plausibility problems. The first of these is the context of multi-party negotiations in college recruiting. Athletes entertain and negotiate offers from multiple programs and, given the competition, those programs always negotiate with multiple players. Limited resources abound—the fixed schedule for certain events like National Signing Day,

the race to be the first to sign players, and the limited number of roster spots and scholarships. It is thus implausible for any athlete to place reliance on any ongoing discussions, regardless of whether described as negotiations or offers. At any time, and for any reason, an athlete can abandon discussions with a given program and the program can sign another athlete or two at the same position and terminate further discussions. The common understanding, consistent with basic contract law, is that there is no such thing as a "promise" until the agreements are struck. Parties that defer some opportunities while still negotiating others necessarily do so at their own peril, and the relevant market for a late signer can alternately be good or bad for the athlete. None of these results are predictable in advance.

More importantly, the Complaint also suffers from the substantial plausibility problem that the alleged scheme makes no sense. Under Plaintiff's recollection of events, each iteration of the alleged NIL deal involved Plaintiff performing second— substantial payments were owed before signing day and well before matriculation. There is no intrinsic value in securing a verbal commitment to play football at a particular university, as the Complaint makes clear commitments can be changed. There is little intrinsic value in securing a letter of intent, which is only partially binding and subject to myriad exceptions and opportunities for rescission.[4] Indeed,

---

[4]   http://www.nationalletter.org/documentLibrary/administrativeGuidelines.pdf (2023 revision).

Plaintiff was released from his letter of intent. *See* Compl. ¶ 66.[5] There is no reason to believe that an athlete who was promised eight figures and who received nothing would remain at the recruiting program. Whatever impacts Plaintiff individually claims to have suffered, no reasonable recruiter could have believed that UF would ever profit from a plan to deliberately mislead as Plaintiff claims. Plaintiff could have reacted to any misdirection by refusing to enroll (¶ 66) or by transferring (¶ 67), leaving UF with no ultimate benefit to show for its alleged concatenations. The complaint alleges little more than a scheme to nowhere.

While intent can be alleged generally, the requirement of plausibility pleading precludes claims that are this inherently illogical. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564–69 (rejecting logical arguments for existence of conspiracy where non-conspiracy explanation was equally plausible in light of "common economic experience"). If a remotely plausible exit strategy to the alleged scheme could even exist, it is difficult to conceptualize. Regardless, however, the Complaint alleges no facts that would make it plausible.

Because Plaintiff has already had a chance to amend and has added only a single, irrelevant statement specific to Hathcock, Count I should be dismissed with prejudice.

---

[5] To compete in 2023 would require the university to release Plaintiff's letter of intent. *See supra* note 4 at 12–13. Plaintiff competed in 2023. *See* Fed. R. Evid. 201(b)(2) (Plaintiff's 2023 NCAA statistics available from numerous sources).

    e.  <u>The conspiracy and aiding and abetting counts fail in the absence of an actionable misrepresentation.</u>

As a general rule, when there is no underlying tort, there can be no claim based on conspiracy or aiding-and-abetting liability. *See, e.g.*, *Balcor Prop. Mgmt., Inc. v. Ahronovitz*, 634 So. 2d 277, 279 (Fla. 4th DCA 1994); *Wright v. Yurko*, 446 So. 2d 1162, 1164–65 (Fla. 5th DCA 1984); *see also Trump v. Clinton*, 626 F. Supp. 3d 1264, 1311–12 (S.D. Fla. 2022) (citing *Balcor*); *Carney v. IDI-DX, Inc.*, No. 2:12-cv-00449-FtM-29DNF, 2013 WL 4080326, at *3 (aiding and abetting breach of fiduciary duty). This extends to the particularity pleading required rule under Rule 9(b), which applies to aiding-and-abetting or conspiracy counts directed to alleged fraudulent schemes. *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1064–65 (11th Cir. 2007). Additionally, the alleged agreement is not pleaded with specificity, as the allegations are conclusory and the actual facts show significant variance between the parties. *See* Compl. ¶¶ 88-92 (conclusory allegations of parallel conduct); *see also supra* note 2 (conduct not, in fact, parallel). Moreover, every part of the alleged scheme is squarely undermined not only by Hathcock's decision not to sign an NIL agreement, but also the cancellation of the Gator Collective contract in December 2022 and the refusal to sign any "uncancellation" agreement.

Accordingly, Counts II and III should be dismissed with prejudice.

### III. The conspiracy-to-coerce count should be dismissed with prejudice because there are no facts that can plausibly allege coercion through numbers or economic influence.

The Complaint adds a rarely-used, archaic cause of action that only applies in circumstances substantially different than those alleged. In *Churruca v. Miami Jai-Alai, Inc.*, 353 So. 2d 547, 550 (Fla. 1977), the Supreme Court of Florida identified a tort that exists "in certain circumstances [where] mere force of numbers acting in unison may comprise an actionable wrong." The essential elements are: (1) malicious motive; and (2) coercion through numbers or economic influence. This type of claim is aptly characterized as an "economic boycott" claim. *See Blatt v. Green, Rose, Kahn & Piotrkowski*, 456 So. 2d 949, 951 n.2 (Fla. 3d DCA 1984).

The Complaint alleges no form of economic coercion, but rather alleged persuasion. When one has two offers available, the fact that one is higher does not amount to coercion by any reasonable reading of the tort, either as that term is generally understood or as comparable to common law duress. *See Torres v. Pasco Cnty. Bd. of Cnty. Comm'rs*, 2021 WL 3550369, at *3 (M.D. Fla. Aug. 11, 2021). As discussed above, there is no ability to "coerce" in light of the ample available alternatives to recruitment.

Second, the Complaint fails to allege numbers or economic influence sufficient to coerce. Florida football is one of dozens of Division I football teams and there were similarly numerous NIL collectives. *See generally* Compl. ¶ 10 n.1.

There were myriad alternatives and nothing preventing Plaintiff from having other irons in the fire if he was upset about the lack of a signed agreement on National Signing Day.

Finally, the Count fails because it does not allege how concerted action would cause greater or different damage than could be accomplished individually. *See Bray & Gillespie Mgmt LLC v. Lexington Ins. Co.*, 527 F. Supp. 2d 1355, 1371–72 (M.D. Fla. 2007). Any person or party that could have entered into an agreement with Plaintiff, and then violated it, would have caused the same alleged damages.

Accordingly, Count IV should be dismissed with prejudice.

**IV.    The negligent-misrepresentation counts against Hathcock should be dismissed with prejudice because the only theory of misrepresentation is grounded in an alleged intent to never perform, which by definition cannot be performed negligently.**

While Count V is pleaded as a fallback alternative to the fraudulent-misrepresentation counts, it is instead weaker than those counts because the essence of the alleged scheme is intent. Each representation Plaintiff identifies in the factual allegations and in Count I relate to future performance. But that is only actionable "where the promise to perform a material matter in the future is made without any intention of performing or is made with the positive intention not to perform." *E.g.*, *Gandy*, 787 So. 2d at 118–19 (quotation omitted). There are no other material facts pleaded that were purely factual, unrelated to alleged future promises to perform. Even if some purely factual misrepresentation could be read into a stray allegation,

the overall factual recitation makes clear that any reliance and change-in-position was correlated to alleged promises of future action, not any stray fact.

The fundamental theory of the case is incompatible with a negligent misrepresentation theory. If the alleged statement is a promise of future performance, it is generally not actionable unless the speaker acts with a specific intent not to perform. One cannot negligently *intend* to do something, which negates the essential element of a negligent misrepresentation claim that the speaker believed the representation to be true but it was in fact false. *See, e.g.*, *Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 309 (Fla. 1st DCA 2011). The repetition of alleged "promises" emphasized by the Complaint vitiates any plausible interpretation of negligent behavior that the speaker did not know the speaker's own intent.

In any event, the negligent misrepresentation claim would also fail for the pleading-based arguments applicable to the fraudulent misrepresentation claim. *See, e.g.*, *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1127–28 (11th Cir. 2019) (applying Rule 9(b) to negligent misrepresentation claims). In particular, the absence of necessary pleadings regarding how Plaintiff was misled, combined with the well-documented history of Hathcock not executing any enforceable agreement, undermines the justifiable-reliance element particular to a negligent misrepresentation claim. *See Butler*, 44 So. 3d at 105.

Accordingly, Count V should be dismissed with prejudice.

## V. The tortious-interference counts must be dismissed with prejudice because the tort does not protect a plaintiff from his own voluntary breaches of contract or cessation of business relationships.

The tortious-interference counts fail because an essential element of the tort is that the defendant improperly acted to either (1) cause a third party to breach its contract with the plaintiff or (2) impede the performance of the plaintiff's contract with a third party. Neither is alleged here.[6] Plaintiff concedes that it was he who voluntarily walked away from the Miami NIL deal—not because it would be difficult to perform but because he preferred the other deal. *See* Compl. ¶¶ 44–45. This voluntary action by Plaintiff negates the harm protected by the tort.

While the stated elements of the tort under Florida law are not specific on the point, Florida has adopted the Restatement formulation of the tort. Courts interpreting Florida law recite the following elements:

> (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference.

---

[6] Rule 9(b) also applies when the tortious interference claim is grounded in an allegedly fraudulent course of conduct. *See, e.g., ADT LLC v. Alder Holdings, LLC*, Case No. 17-81237-CIV-ROSENBERG/REINHART, 2018 WL 6505915, at *4 (S.D. Fla. Nov. 7, 2018). Hathcock incorporates his prior Rule 9(b) discussion as applicable to the remaining counts.

*Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381 (Fla. 4th

DCA 1999). The most common type of interference occurs when the defendant's

actions cause a third party to breach a contract:

> One who intentionally and improperly interferes with the performance
> of a contract (except a contract to marry) between another and a third
> person by inducing or otherwise **causing the third person not to
> perform the contract**, is subject to liability to the other for the
> pecuniary loss resulting to the other from the **failure of the third
> person to perform** the contract.

Restatement (Second) of Torts § 766 (1979) (emphasis added). The Supreme Court

of Florida has held that its precedent is consistent with section 766. *Gossard v. Adia*

*Servs., Inc.*, 723 So. 2d 182, 185 (Fla. 1998). Comment p to section 766 explicitly

provides that "[t]he person protected by the rule stated in this Section is the specified

person with whom the third person had a contract that the actor caused him not to

perform."

By contrast, no Florida court has even cited, let alone adopted, the companion

Restatement section 766A, which applies when the defendant interferes with the

plaintiff's performance of its own contract. *See KMS Rest. Corp. v. Wendy's Int'l,*

*Inc.*, 361 F.3d 1321, 1323 (11th Cir. 2004) (noting that "the Florida courts have not

adopted § 766A"). Florida courts addressing liability that would arguably fall within

section 766A have rejected claims based on a plaintiff's own voluntary breach—

even if that breach was influenced by the defendant's acts. *See McKinney-Green,*

*Inc. v. Davis*, 606 So. 2d 393, 397–98 (Fla. 1st DCA 1992). In general, a party cannot

be damaged by its own voluntary breach of contract. *See, e.g.*, *Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.*, 83 F. Supp. 2d 384, 391 (S.D.N.Y. 2000). As such, under Florida law, a tortious interference claim will not lie for a Plaintiff that was the voluntary breaching party of its own contract.[7]

Because Counts VI–VII allege no action taken by Ruiz or Miami to breach the alleged Miami NIL deal, and instead admit that Plaintiff voluntarily abandoned his own agreement, *see* Compl. ¶ 104, the counts must be dismissed with prejudice because the fundamental theory of relief is not actionable.

## Conclusion

WHEREFORE, Defendant Hugh Hathcock requests that the Court dismiss Plaintiff's Complaint with prejudice and award any other relief the Court deems appropriate.

---

[7] In any event, the alleged facts do not meet the elements of section 766A, which requires the defendant's acts to make performance of the plaintiff's contract impossible or burdensome. Merely making an independent offer did nothing to impose a burden on Plaintiff's performance of the Miami NIL deal.

*/s/ Jason W. Peterson*

**JASON W. PETERSON**
Florida Bar No.: 174701
**JEREMY C. BRANNING**
Florida Bar No.: 507016
**DOUGLAS A. BATES**
Florida Bar No.: 791431
**ANDREW M. SPENCER**
Florida Bar No.: 119966
CLARK PARTINGTON
125 E. Intendencia Street
Pensacola, FL 32502
Phone: (850) 434-9200;
P/E: jpeterson@clarkpartington.com
P/E: jbranning@clarkpartington.com
P/E: dbates@clarkpartington.com
P/E: aspencer@clarkpartington.com
S/E: cbmoore@clarkpartington.com
S/E: pmimperial@clarkpartington.com
S/E: bwilkerson@clarkpartington.com
S/E: jdallman@clarkpartington.com
S/E: svierth@clarkpartington.com

**KEITH L. BELL, Jr.**
Florida Bar No.: 573809
**TREVOR A. THOMPSON**
Florida Bar No.: 68006
**BAILEY HOWARD**
Florida Bar No.: 1002258
CLARK PARTINGTON
215 South Monroe Street, Suite 530
Tallahassee, FL 32301
Phone: (850) 497-7483;
P/E: kbell@clarkpartington.com
P/E: tthompson@clarkpartington.com
P/E: bhoward@clarkpartington.com

***Attorneys for Defendant***
***Hugh Hathcock***

33

## **REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 7.1(K), Defendant Hathcock requests that the Court set a two-hour hearing on the motions to dismiss filed by the four Defendants. Defendant proposes the time to be allocated equally, one hour each, between Plaintiff and Defendants, with the Defendants agreeing amongst themselves how to allocate their hour.

*/s/ Jason W. Peterson*
**JASON W. PETERSON**


## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE FORMATTING AND WORD LIMIT REQUIREMENTS**

I HEREBY CERTIFY that the font used in this motion is Times New Roman 14-point font, and the word count is 7,646, exclusive of the case style, signature block, Request for Oral Argument, Certificate of Service, and this Certification. This motion complies with the font and margin requirements of Local Rule 5.1(C) and the word count limitation of Local Rule 7.1(F).

*/s/ Jason W. Peterson*
**JASON W. PETERSON**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed with the Clerk of Court and furnished electronically all counsel of record via CM/ECF E-Filing on this 27th day of September 2024.

*/s/ Jason W. Peterson*
**JASON W. PETERSON**