UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JADEN RASHADA,

      Plaintiff,

v.                        Case No. 3:24-cv-00219-MCR-HTC

HUGH HATHCOCK; WILLIAM
NAPIER; MARCUS CASTRO-WALKER;
and VELOCITY AUTOMOTIVE
SOLUTIONS, LLC,

      Defendants.

_____/

**DEFENDANT NAPIER'S MOTION TO DISMISS FIRST AMENDED
COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

Defendant William Napier ("Napier") moves under Federal Rule of Civil

Procedure 12(b)(6) and section 768.28(9)(a), Florida Statutes, to dismiss Plaintiff

Jaden Rashada's ("Rashada") First Amended Complaint (the "Amended

Complaint") (ECF No. 37).

## INTRODUCTION

Rashada accuses the Defendants of conspiring to fraudulently induce him

to abandon a name-image-and-likeness, or "NIL," deal with a "collective"

associated with the University of Miami. Sorely lacking from the Amended

Complaint, however, are allegations of fact sufficient to support that accusation.

Nothing alleged in the Amended Complaint supports that Napier participated in any wrongdoing. Nowhere does the Amended Complaint adequately allege, for example, that Napier knew about whatever occurred between Rashada, his "NIL agents," and the Gator Collective, LLC.

The Amended Complaint makes clear that Napier could not have defrauded Rashada, since the only statements attributed to Napier are alleged to have been made *after* Rashada had already abandoned the Miami NIL deal. The Amended Complaint admits that by the time of Napier's alleged statements, "other top schools who would have otherwise been interested in Jaden would have already signed their quarterbacks." (Am. Compl. ¶ 62.) Even on Rashada's telling, Napier's alleged statements simply came too late to have done any harm.

The Amended Complaint is a textbook example of what the heightened pleading standard imposed by Federal Rule of Civil Procedure 9(b) is designed to prevent: a "spurious charge[] of immoral and fraudulent behavior" unsupported by any allegation of fact. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988)). All claims against Napier should be dismissed.

## BACKGROUND

According to the Amended Complaint, Rashada was recruited by "several of the country's elite college football programs" near the beginning of the "ever-

2

evolving NIL landscape." (Am. Compl. ¶¶ 2-3.) He prepared for the emerging "NIL game" by hiring multiple "NIL agents" to represent him and help him source, negotiate, and enter NIL deals. (Am. Compl. ¶¶ 3, 28.) Rashada alleges that he entered an NIL deal with an entity (which he fails to name) aligned with the University of Miami for millions of dollars (the "Miami NIL Deal"). (Am. Compl. ¶ 26.) He then abandoned that deal in favor of one with the Gator Collective, LLC (the "Collective"), a limited liability company with no alleged affiliation to Napier. (Am. Compl. ¶¶ 6-7.)

The Amended Complaint does not allege that Napier was a party to or involved in negotiating the agreement between Rashada and the Collective. Nor does it allege that Napier was involved in the Collective's termination of the agreement.

The Amended Complaint alleges no interaction between Napier and Rashada until December 21, 2022, National Signing Day—more than a month after Rashada abandoned the Miami NIL Deal. According to the Amended Complaint, Napier told Rashada[1] and his father on National Signing Day that

---

[1] In his original Complaint (ECF No. 1), Rashada never claimed he heard Napier's alleged statement. Instead, he claimed the statement was made during a conversation between Napier and his father, Harlen. (Compl. ¶ 61 ("During his phone call *with Harlen* . . . ." (emphasis added)).) In response to Napier's motion to dismiss highlighting Rashada's absence (*see* ECF No. 33 at 12), Rashada has shifted to a more convenient set of facts and now claims he was on

Rashada would receive a $1 million payment from Defendant Hugh Hathcock if Rashada signed with the University of Florida. (Am. Compl. ¶ 59.) During the same conversation, according to the Amended Complaint, Napier "told Jaden to go ahead and sign the Letter of Intent [committing to the University of Florida] because the NIL part of securing Jaden's commitment would not be a problem." (Am. Compl. ¶ 59.)

As a timeline of the significant events alleged in the Amended Complaint makes clear, Napier's alleged statements could not have caused Rashada to "los[e] the $9.5 million NIL agreement related to his attendance at Miami" or the "opportunity to pursue other NIL deals from other collectives" (Am. Compl. ¶ 123) because they came *after* Rashada had terminated the Miami NIL Deal, *after* Rashada entered into his deal with the Collective, and *after* he publicly announced he would attend the University of Florida:

- **June 26, 2022:** Rashada publicly committed to play football at Miami and "agreed to a $9.5 million NIL deal." (Am. Compl. ¶ 26.)

- **November 10, 2022:** Rashada entered into an NIL agreement with the Collective and publicly announced that he had "decided to

---

the call. (Am. Compl. ¶ 59 ("Napier called Jaden and Harlen back *and told Jaden and Harlen . . . .*" (emphasis added)).)

4

change [his] commitment [to Miami] and play for the University of Florida." (Am. Compl. ¶ 42.)

- **December 6, 2022:** The Collective notified Rashada that it was terminating its NIL agreement with him. (Am. Compl. ¶ 51.)

- **December 21, 2022 (National Signing Day):** Napier allegedly told Rashada "Hathcock would pay Jaden $1 million as a partial payment towards the promised $13.85 million" if Rashada signed with UF. (Am. Compl. ¶ 59; *see also id.* ¶ 8.)

- **January 18, 2023:** Rashada was permitted to "withdraw his National Letter of Intent to play for UF" and ultimately attended Arizona State University. (Am. Compl. ¶ 66.)

The Amended Complaint asserts that "signing the National Letter of Intent on signing day would commit Jaden to UF and significantly and adversely affect his ability to secure other recruiting opportunities and related NIL deals." (Am. Compl. ¶ 62.) The Amended Complaint fails, however, to identify any other opportunities that were still available to Rashada on National Signing Day and that Rashada could have pursued but for his commitment to UF. In fact, the Amended Complaint acknowledges that by the time of Napier's alleged statements, *i.e.*, by National Signing Day, "other top schools who would have otherwise been interested in Jaden would have already signed their

5

quarterbacks to National Letters of Intent." (Am. Compl. ¶ 62.) In other words, by the time of Napier's alleged statements, any other potential opportunities were already foreclosed.

In addition to alleging a single interaction between Napier and Rashada on National Signing Day, the Amended Complaint asserts that Hathcock and Defendant Marcus Castro-Walker made other statements "on behalf of" Napier. (*E.g.*, Am. Compl. ¶¶ 25, 28, 70, 73.) According to the Amended Complaint, the alleged misrepresentations leading to Rashada's decision to renege on the Miami NIL Deal "were made by Defendants Hathcock and Castro-Walker either acting on behalf of themselves or as agents of Coach Napier with actual and apparent authority." (Am. Compl. ¶ 45.) The Amended Complaint fails to explain the nature of any agency relationship between Napier and Hathcock and Castro-Walker. Nor does it allege that Napier represented to Rashada that they had authority to speak for him.

## ARGUMENT

## I.   The Amended Complaint fails to allege facts sufficient to state a claim against Napier.

To state a claim, a complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Mere legal conclusions "are not entitled to

the assumption of truth." *Id.* at 679. Nor is a court required to credit "unwarranted deduction[s] of fact." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1294 (11th Cir. 2010) (quoting *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012)). Instead, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). As the Eleventh Circuit has explained, "The purpose of the rule is to protect a defendant's good will and reputation when that defendant's conduct is alleged to have been fraudulent." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1278 (11th Cir. 2006). This requirement "serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Ziemba*, 256 F.3d at 1202 (internal quotation marks omitted) (quoting *Durham*, 847 F.2d at 1511).

To comply with Rule 9(b), a complaint must specifically allege the following:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002) (quoting *Ziemba*, 256 F.3d at 1202). Failure to meet these requirements "is a ground for dismissal of a complaint." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam).

A complaint that "lump[s] together all of the defendants in [its] allegations of fraud" is not sufficient. *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007). Instead, "[i]n a case involving multiple defendants . . . the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Id.* (second alteration in original) (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997)). Indeed, even under ordinary pleading standards, allegations lumping multiple defendants together are insufficient. A complaint is an "impermissible shotgun pleading if it 'assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions.'" *Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707,

732 (11th Cir. 2020) (alteration in original) (quoting *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015)).

Each count asserted against Napier is subject to Rule 9(b)'s heightened pleading standard. That rule governs Rashada's claims for fraud (Count I), aiding and abetting fraud (Count II), and conspiracy to commit fraud (Count III). *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1064-65 (11th Cir. 2007) (affirming the dismissal of claims for aiding and abetting fraud and conspiracy to commit fraud because they "fail[ed] to conform to the requirements of Rule 9(b)"). As for Count V, "'Rule 9(b)'s heightened pleading standard applies to negligent misrepresentation claims' asserted under Florida law because such claims sound in fraud." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1127 (11th Cir. 2019) (quoting *Lamm v. State St. Bank & Trust*, 749 F.3d 938, 951 (11th Cir. 2014)).

Further, Rashada's claims for tortious interference and aiding and abetting tortious interference (Counts VI and VII) are based on the same allegations as his fraud claims. (*See* Am. Compl. ¶ 68.) The "risk to a defendant's reputation" from allegations of fraud does not disappear merely because those allegations are repackaged as a tortious interference claim. *Wagner*, 464 F.3d at 1278. Consequently, Counts VI and VII are also subject to Rule 9(b). *See ADT LLC v. Alder Holdings, LLC*, No. 17-81237-CIV-ROSENBERG/REINHART,

2018 WL 6505915, at *4 (S.D. Fla. Nov. 7, 2018) (concluding that "Rule 9(b) applies to the tortious interference claim" because it was "supported by facts alleging fraud"), *report and recommendation adopted* 2018 WL 6620301 (S.D. Fla. Dec. 4, 2018); *Medimport S.R.L. v. Cabreja*, 929 F. Supp. 2d 1302, 1319 n.10 (S.D. Fla. 2013) ("Although Rule 9(b) does not apply to a tortious interference claim, it does apply to fraud allegations underlying such a claim."); *see also Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1308 (11th Cir. 2022) (applying the heightened pleading standard under Rule 9(b) to "a claim for unjust enrichment grounded in fraud"); *Wagner*, 464 F.3d at 1278 (holding that Rule 9(b) applies to "nonfraud" securities-law claims "when the facts underlying the misrepresentation at stake in the claim are said to be part of a fraud claim, as alleged elsewhere in the complaint"). The same reasoning applies to Rashada's claim for conspiracy "to use a peculiar power of coercion" (Count IV). (Am. Compl. ¶ 101.)

Under the Rule 9(b) standard, each count fails to state a claim against Napier.

### A.    Count I fails to state a claim for fraud.

To state a claim for fraud, a complaint must allege the following elements:

> (a) a misrepresentation of a material fact; (b) that the
> representor of the misrepresentation knew or should
> have known of the statement's falsity; (c) that the
> representor intended that the representation would

> induce another to rely and act on it; and (d) that the
> plaintiff suffered injury in justifiable reliance on the
> representation.

*Eagletech Commc'ns, Inc. v. Bryn Mawr Inv. Grp., Inc.*, 79 So. 3d 855, 861 (Fla. 4th

DCA 2012) (quoting *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489,

497 (Fla. 4th DCA 2001)). The Amended Complaint fails to allege these

elements against Napier.

The Amended Complaint's allegations fall well short of the heightened

standard imposed by Rule 9(b). A complaint that levels an accusation of fraud,

again, must specify "the person responsible for making" each statement. *Clausen*,

290 F.3d at 1310 (quoting *Ziemba*, 256 F.3d at 1202). Rashada's Amended

Complaint fails to do so. Instead, when it mentions Napier at all, it "lump[s]

[him] together" with the other Defendants, failing to give him notice of "the

nature of his alleged participation in the fraud." *Ambrosia Coal & Constr. Co.*, 482

F.3d at 1317 (quoting *Brooks*, 116 F.3d at 1381).

The Amended Complaint exhibits this shortcoming again and again. It

alleges that "Defendants' fraudulent promises caused Jaden to forgo a $9.5

million NIL deal and other potential NIL packages." (Am. Compl. ¶ 44.) It

alleges that "Defendants continued to lie and make material misrepresentations

to Jaden, Harlen, and Jaden's NIL agents." (Am. Compl. ¶ 52.) It also alleges

that "Defendants' words and actions continued to communicate an intent to

11

honor their promises" and that "the Defendants never intended to pay Jaden the $500,000 that was promised as an initial payment." (Am. Compl. ¶¶ 47-48.)

None of these generalized accusations of wrongdoing by "Defendants" are sufficient under Rule 9(b). Indeed, the Complaint so consistently lumps Napier together with the other Defendants that it falls short of ordinary pleading standards and amounts to a shotgun pleading. *See, e.g.*, *Auto. Alignment & Body Serv., Inc.*, 953 F.3d at 732 ("A complaint constitutes an impermissible shotgun pleading if it 'assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions . . . .'" (first alteration in original) (quoting *Weiland*, 792 F.3d at 1323)). That shortcoming alone is sufficient to warrant dismissal. *See Frederick v. LaFont*, No. 3:16-CV-00035-MCR-EMT, 2016 WL 11745552, at *5 (N.D. Fla. Sept. 30, 2016) ("The court may police and weed out shotgun pleadings through its inherent authority to control its docket, including the authority to dismiss complaints that violate Federal Rules of Civil Procedure 8(a)(2) and 10(b). Dismissal is appropriate where it is virtually impossible to know which allegations of fact are intended to support which claims for relief." (citation omitted)).

To the extent that the basis for Rashada's fraud claim against Napier can be discerned, it appears to rest on two theories. First, the Amended Complaint

relies on a telephone conversation between Napier, Rashada, and Rashada's father alleged to have taken place on National Signing Day. Second, it attempts to impute liability for Castro-Walker's and Hathcock's statements to Napier. Neither theory succeeds.

### 1. The conduct attributed to Napier in the Amended Complaint is insufficient to support a fraud claim.

The entirety of Napier's alleged conduct is captured in a single paragraph of the Amended Complaint:

> In response to Jaden delaying the signing of his National Letter of Intent, Coach Napier delayed his press conference and personally called Jaden and Harlen to convince Jaden to sign. During his first phone call with Jaden and Harlen, Coach Napier put pressure on Jaden by explaining that he did not want to go into his press conference without his quarterback signed. Harlen explained that the reason for Jaden's delay in signing was the fact that the NIL deal still had not been assigned or honored. Napier then tried to contact Hathcock, but he could not reach him because Hathcock was on a plane. Nevertheless, *Napier called Jaden and Harlen back and told Jaden and Harlen that Hathcock would pay Jaden $1 million as a partial payment towards the promised $13.85 million. Napier told Jaden to go ahead and sign the Letter of Intent because the NIL part of securing Jaden's commitment would not be a problem.* Napier's promised financial inducement violated Florida's NIL statute, NCAA regulations, and, on information and belief, the terms of Napier's employment contract.

(Am. Compl. ¶ 59 (emphasis added).) Purportedly relying on a "promise" that he now contends was illegal, Rashada signed a Letter of Intent committing to

UF (Am. Compl. ¶ 61)—a commitment from which Rashada was allowed to withdraw less than a month later (Am. Compl. ¶ 66).

Napier's alleged statements cannot support a fraud claim because Rashada could not have "suffered injury in justifiable reliance on" them. *Eagletech Commc'ns, Inc.*, 79 So. 3d at 861. The Amended Complaint asserts that the Defendants induced Rashada to decommit from Miami and, consequently, lose out on the $9.5 million Miami NIL Deal. (Am. Compl. ¶ 44.) But Napier's alleged statements occurred more than a month *after* Rashada had decommitted from Miami and publicly announced his intention to play for UF. (*See* Am. Compl. ¶¶ 42, 56.) Rashada could not have relied to his detriment on Napier's alleged statements before they were made.

Nor does the Amended Complaint identify any other specific opportunities Rashada missed out on as a result of Napier's alleged statements, apart from gesturing at the mere possibility of "other recruiting opportunities and related NIL deals." (Am. Compl. ¶ 62.) In fact, the Amended Complaint makes clear that by the time of Rashada's conversation with Napier, any other opportunities had already dried up. By Rashada's own admission, it was the "efforts" *preceding* Napier's alleged statements that "were critical": "by National Signing Day," the day of Napier's alleged statements, "other top schools who

14

would have otherwise been interested in Jaden would have already signed their quarterbacks to National Letters of Intent." (Am. Compl. ¶ 62.)

In short, any harm to Rashada preceded Napier's alleged conduct and, therefore, could not have been caused by it. The Amended Complaint thus fails to allege any injury suffered in reliance on statements made by Napier.

### 2. The Amended Complaint fails to allege a basis for imputing Castro-Walker's or Hathcock's conduct to Napier.

Nowhere did Rashada's original Complaint assert that Hathcock or Castro-Walker acted as Napier's actual or apparent agents. Apparently recognizing the insufficiency of the conduct directly attributed to Napier, in the Amended Complaint, Rashada seeks to hold Napier responsible for alleged conduct by Castro-Walker, UF's "Director of Player Engagement & NIL," and Hathcock, a "successful entrepreneur and dedicated UF athletics booster." (Am. Compl. ¶¶ 15, 17.) The Amended Complaint asserts that "[a]ll representations regarding the $13.85 million NIL deal leading up to" Rashada's decommitment from Miami "were made by Defendants Hathcock and Castro-Walker either acting on behalf of themselves *or as agents of Coach Napier with actual and apparent authority*." (Am. Compl. ¶ 45 (emphasis added).) But the Amended Complaint contains no allegations of fact supporting that farfetched legal conclusion.

To establish an actual agency relationship, a complaint must allege the following elements: "(1) acknowledgement by the principal that the agent will

act for him; (2) the agent's acceptance of the undertaking; and (3) control by the principal over the actions of the agent." *Parker Waichman LLP v. Chaikin*, 313 So. 3d 921, 923 (Fla. 2d DCA 2021) (quoting *Ilgen v. Henderson Props., Inc.*, 683 So. 2d 513, 515 (Fla. 2d DCA 1996)). The Amended Complaint fails to allege any of these elements.

The Amended Complaint does not allege that either Castro-Walker or Hathcock was an employee of Napier. Instead, with respect to Castro-Walker, it alleges that Napier was his "direct supervisor" and that Castro-Walker "t[ook] instruction" from Napier. (Am. Compl. ¶ 29.) But the mere fact that Napier was Castro-Walker's supervisor does not create an agent-principal relationship sufficient to hold Napier vicariously liable for Castro-Walker's conduct. *See Watts v. Wal-Mart Stores East, LP*, 656 F. Supp. 3d 1363, 1368 (S.D. Fla. 2023) ("[A] manager does not incur individual liability merely because of their title or 'official character.'" (quoting *McPherson v. Wells Fargo Bank, N.A.*, No. 1:13-cv-20545-KMM, 2013 WL 12059608, at *2 (S.D. Fla. Apr. 10, 2013))); *Cataudella v. Sam's East, Inc.*, No. 2:21-cv-77-JLB-MRM, 2021 WL 1661015, at *2 (M.D. Fla. Apr. 28, 2021) ("Florida law . . . holds that tort liability may not be vicariously imposed on a corporate officer or employee but instead must be based on a breach of duty through *personal* fault." (emphasis in original)); *Kimmons v. IMC Fertilizer, Inc.*, 844 F. Supp. 738, 740 (M.D. Fla. 1994)

(concluding that a vice president and general manager was not liable in tort because he did not "personally participate[] in the events giving rise to the accident"). Further, the fact that Castro-Walker supposedly "t[ook] instruction" from Napier—without any additional detail about the nature of the alleged instruction, when and how often it was given, or whether Napier had the right to insist that Castro-Walker follow such instruction—hardly shows sufficient control to meet the third element of an agency relationship, much less the other two elements. (Am. Compl. ¶ 29.)

With respect to Hathcock, the Amended Complaint alleges that "given [Hathcock's] close relationship with Coach Napier and the UF football program, it is implausible that Hathcock would agree to pay Jaden, among the 28 other similarly-ranked quarterbacks in the 2023 recruiting class, without being instructed by Napier to do so." (Am. Compl. ¶ 32.) The Court is not required to accept Rashada's "unwarranted deduction" that Napier instructed Hathcock to enter into an NIL agreement with Rashada. *Am. Dental Ass'n*, 605 F.3d at 1294 (quoting *Sinaltrainal*, 578 F.3d at 1268). At most, the facts alleged support an inference that Hathcock knew Rashada was a recruiting target—information Hathcock could easily have received from sources other than Napier, such as Rashada's own social media postings.

Nor does the Amended Complaint plausibly allege an apparent agency relationship. Apparent agency requires three elements: "(a) a representation by the purported principal; (b) a reliance on that representation by a third party; and (c) a change in position by the third party in reliance on the representation." *Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995) (per curiam). Critically, "An agent cannot establish her own agency. Apparent agency is conferred based upon the principal's actions or statements." *UATP Mgmt., LLC v. Barnes*, 320 So. 3d 851, 858 (Fla. 2d DCA 2021).

Here, the Amended Complaint fails to allege that Napier took any action or made any representation on which Rashada relied. Because the Amended Complaint fails to allege any basis for imputing Castro-Walker's or Hathcock's conduct to Napier, Count I fails to state a claim against Napier for fraud.

### B.   Count II fails to state a claim for aiding and abetting fraud.

To state a claim for aiding and abetting fraud, a complaint must allege that "1. [t]here existed an underlying fraud; 2. [t]he defendant had knowledge of the fraud; [and] 3. [t]he defendant provided substantial assistance to advance the commission of the fraud." *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.*, 917 So. 2d 368, 372 (Fla. 5th DCA 2005). The Amended Complaint fails to allege those elements against Napier.

First, the Amended Complaint fails to allege any well-pleaded facts that, if true, plausibly suggest that Napier was aware of a fraud being perpetrated by the other Defendants. The Amended Complaint does not allege that Napier participated in the negotiation of the NIL agreement. Nor does it allege that he had any specific communications with any other Defendant that would have made him aware of a supposed plan to defraud Rashada. The Amended Complaint offers only bare assertions of knowledge, which are insufficient even under the pleading standards that govern allegations of a defendant's mental state. *See Losey v. Warden*, 521 F. App'x 717, 719 (11th Cir. 2013) (per curiam) ("[A]llegations that [the defendant] had subjective knowledge . . . are entirely conclusory and are therefore not afforded the presumption of truth absent some factual support that make[s] them plausible.").

Second, the Amended Complaint fails to allege anything Napier did to provide substantial assistance to advance the commission of any fraud. The Amended Complaint alleges a single exchange between Napier and Rashada—one that allegedly occurred *after* Rashada had already reneged on his commitment to attend Miami and lost the associated NIL deal. Even if Rashada could somehow show fraud—and he cannot—any events from which Plaintiff could possibly claim fraud happened well before Napier's alleged involvement. Count II thus fails to state a claim for aiding and abetting fraud.

19

**C.     Count III fails to state a claim for conspiracy to commit fraud.**

To state a claim for civil conspiracy, a complaint must allege:

> (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy.

*Philip Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 n.9 (Fla. 2015). The Amended Complaint fails to allege these elements against Napier.

Count III fails for the same reasons as Rashada's claim against Napier for aiding and abetting fraud. In the absence of well-pleaded allegations of fact plausibly showing an express agreement to engage in a fraud—and the Amended Complaint offers none—a conspiracy claim requires at a minimum that a defendant "know of the scheme and assist in it in some way." *Condor, S.A. v. Plurinational State of Bolivia*, 352 So. 3d 921, 927 (Fla. 3d DCA 2022) (per curiam) (quoting *Savoia-McHugh v. Glass*, No. 3:19cv2018-MCR/HTC, 2020 WL 12309558, at *8 (N.D. Fla. Aug. 5, 2020)). But the Amended Complaint fails to allege either that Napier was aware of any supposed fraud or that he did anything to assist in a fraud. Count III therefore fails to state a claim.

**D.     Count IV fails to state a claim for conspiracy to "use a peculiar power of coercion."**

Typically, a claim for conspiracy requires an "independent civil wrong on which the civil conspiracy is dependent," which "must be alleged in the

complaint." *Marriott Int'l, Inc. v. Am. Bridge Bahamas, Ltd.*, 193 So. 3d 902, 909 (Fla. 3d DCA 2015) (citing *Blatt v. Green, Rose, Kahn & Piotrkowski*, 456 So. 2d 949, 951 (Fla. 3d DCA 1984)). Florida courts make one "narrow" exception, however, to the requirement of an underlying tort. *Kee v. Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1542 (11th Cir. 1990). Florida law recognizes an "independent tort of conspiracy, sometimes referred to as an 'economic boycott,'" when "by reason of force of numbers or other exceptional circumstances, the defendants possess some peculiar power of coercion." *Id.* (quoting *Am. Diversified Ins. Servs., Inc. v. Union Fid. Life Ins. Co.*, 439 So. 2d 904, 906 (Fla. 2d DCA 1983)).

Notably, "[a]llegations of anti-competitive conduct are generally necessary to state an independent conspiracy claim under the exception." *Eox Tech. Solutions v. Galasso*, No. 23-CV-60448-RUIZ/STRAUSS, 2023 WL 8436082, at *11 (S.D. Fla. Sept. 13, 2023), *report and recommendation adopted* 2023 WL 8116774 (S.D. Fla. Nov. 22, 2023); *see also Am. Diversified Ins. Servs., Inc.*, 439 So. 2d at 906 ("[A]ppellant has not alleged an economic boycott claim because the allegations do not show that appellees, by force of numbers or other exceptional circumstances . . . , attempted to destroy appellant's business by acting together."). The "essence of the tort is that the defendants be possessed of 'some peculiar power of coercion . . . by virtue of their combination, which

21

power an individual would not possess.'" *Martin v. Marlin*, 529 So. 2d 1174, 1179 (Fla. 3d DCA 1988) (alteration in original) (quoting *Churruca v. Miami Jai-Alai, Inc.*, 353 So. 2d 547, 550 (Fla. 1977)). Accordingly, "[w]hen the concerted acts of the defendants do not create a greater harm than if the acts were committed by one person alone, then there can be no recovery." *Id.*

The Amended Complaint fails to state a claim for the independent tort of conspiracy. Wholly absent from the Amended Complaint is any suggestion of an "economic boycott," *Am. Diversified Ins. Servs., Inc.*, 439 So. 2d at 906, or "the type of anti-competitive conduct that is the *sine qua non* of an independent conspiracy claim," *Eox Tech. Solutions*, 2023 WL 8436082, at \*12.

Further, the Amended Complaint fails to allege facts showing the Defendants enjoyed a "peculiar power of coercion." *Martin*, 529 So. 2d at 1179. In fact, Rashada's allegations refute the notion that Defendants had any such power. The Amended Complaint describes Rashada as a "star" recruit and alleges that he "was recruited by several of the country's elite college football programs, including Louisiana State University, Texas A&M University, University of Oregon, University of Mississippi, University of Miami, and UF." (Am. Compl. ¶¶ 1-2.) Given Rashada's evident bargaining power—and the assistance of his father and his NIL agents—Defendants were hardly in a position to coerce him.

22

In any event, the Amended Complaint fails to allege that Napier was a member of any such conspiracy. As explained above with respect to Count III, the Amended Complaint fails to plausibly allege that Napier was aware of a conspiracy between the other Defendants or did anything to further that alleged conspiracy's aims. Count IV therefore fails to state a claim for conspiracy against Napier.

### E.   Count V fails to state a claim for negligent misrepresentation.

To state a claim for negligent misrepresentation, a complaint must allege:

> (1) a misrepresentation of material fact that the defendant believed to be true but which was in fact false; (2) that defendant should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely on the misrepresentation; and (4) the plaintiff acted in justifiable reliance upon the misrepresentation, resulting in injury.

*Arlington Pebble Creek, LLC v. Campus Edge Condo. Ass'n*, 232 So. 3d 502, 505 (Fla. 1st DCA 2017). Rashada's negligent misrepresentation claim fails for the same reasons as his fraud claim.

Rashada could not have suffered injury in reliance on Napier's alleged statements because the alleged injury preceded them. By the time of his alleged conversation with Napier, Rashada had already given up the Miami NIL Deal, and any other opportunities had also dried up. (*See* Am. Compl. ¶¶ 42, 56, 62.) Further, the Amended Complaint fails to allege any basis for imputing Castro-

Walker's or Hathcock's conduct to Napier. Count V thus fails to state a claim against Napier for negligent misrepresentation.

**F.     Count VI fails to state a claim for tortious interference against Napier.**

To state a claim for tortious interference with a business relationship, a complaint must allege "(1) the existence of a business relationship . . . [;] (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (first alteration in original) (quoting *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985)).

Here, the Amended Complaint asserts that "Defendants" tortiously interfered with Rashada's $9.5 million Miami NIL Deal by offering him a better deal. (Am. Compl. ¶¶ 110-11.) Because of this better offer, Rashada chose to renege on his commitment to Miami and committed to UF. (*See* Am. Compl. ¶¶ 42, 44.) For two reasons, these allegations are insufficient to state a tortious interference claim against Napier.

First, Napier could not have interfered with the Miami NIL Deal because Rashada had already abandoned it by the time of Napier's alleged conduct. Because Napier's only alleged conduct occurred more than a month *after*

Rashada's decision to terminate his Miami NIL Deal, that conduct could not have influenced Rashada's decision. The Amended Complaint thus fails to allege the third element of tortious interference. Further, because the Miami NIL Deal had already been terminated by the time of Napier's alleged conduct—in other words, because the business relationship no longer existed—the Amended Complaint also fails to allege the first element of tortious interference.

Second, the Amended Complaint admits that *Rashada chose* to renege on whatever agreement he had with the Miami NIL entity. After being advised by his multiple NIL agents, *Rashada chose* to take one NIL deal over another. (*See* Am. Compl. ¶ 28 (Rashada "abandon[ed] his $9.5 million Miami deal.").) Rashada cannot recover damages under a tortious interference theory for his voluntary decision to trade one deal for another.

To maintain an action for tortious interference, a plaintiff must allege that a "third party interfere[d] with a contract or business relationship by influencing, inducing or coercing one of the parties to the relationship to abandon the relationship or breach the contract, thereby causing injury to *the other party*." *West v. Troelstrup*, 367 So. 2d 253, 255 (Fla. 1st DCA 1979) (emphasis added); *see also Dade Enters., Inc. v. Wometco Theatres, Inc.*, 160 So. 209, 210 (Fla. 1935). As the terminating or breaching party, Rashada has no tortious interference claim.

25

The tortious interference paradigm is familiar: A and B have a contract, and C interferes, inducing B to breach the contract. A then has a breach of contract claim against B and a tortious interference claim against C for inducing B's breach. But the breaching party, B, has no claim related to the interference because B chose to go along with C's inducements and voluntarily abandon his relationship with A. Here, the Miami NIL entity, A, and Rashada, B, are alleged to have had an agreement. The Defendants, C, allegedly interfered with that relationship. But Rashada admits that *he* voluntarily abandoned, breached, or terminated the agreement. (*See* Am. Compl. ¶¶ 28, 44.) He cannot recover under a tortious interference theory for the loss of a business relationship that he chose to sever.

On point is *McKinney-Green, Inc. v. Davis*, 606 So. 2d 393 (Fla. 1st DCA 1992). In that case, the plaintiff alleged that he had an agreement with his brother to jointly own a company and use it to develop a subdivision of residential lots. *Id*. at 394. The plaintiff claimed that a mortgage broker had tortiously interfered with that agreement by adding conditions to a construction loan the jointly owned entity was seeking on the eve of the loan's closing. *Id*. at 394, 398. The plaintiff alleged that the mortgage broker's demands were so arduous that rather than going forward with his agreement with his brother, he chose to transfer assets to his brother and have the brother take out the loan himself—rather than

26

their jointly owned entity as the brothers had agreed. *Id*. He then sued the mortgage broker for tortious interference with his agreement with his brother. *Id*. at 396-97.

The defendants moved to dismiss the tortious interference claim, which the trial court denied. *Id*. at 394. On appeal, the district court reversed, finding that the plaintiff could not allege tortious interference because he had chosen not to abide by the agreement with which the defendants had allegedly interfered. *Id*. at 398. The district court observed that "[i]t is not alleged that [the plaintiff's] brother was induced by [the mortgage broker] to breach the agreement with [the plaintiff]. In fact, Paragraph 23 of the complaint indicates the demands made by [the mortgage broker] *induced [the plaintiff] himself to act in contravention of the agreement.*" *Id*. (emphasis added). Because the plaintiff himself had voluntarily "act[ed] in contravention of the agreement," the court concluded that the complaint "fail[ed] to state a cause of action for tortious interference." *Id*.; *see also KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1323 (11th Cir. 2004) (observing that "the Florida courts have not adopted § 766A" of the Restatement (Second) of Torts, on which Rashada relies in paragraph 109, footnote 11 of the Amended Complaint); *Bavelis v. Doukas (In re Bavelis)*, 571 B.R. 278, 315 (Bankr. S.D. Ohio 2017) ("Florida . . . does not recognize a cause of action for tortious interference with contractual relations under Section 766A."), *overturned in part*

27

*on other grounds*, No. 2:17-cv-0327, 2019 WL 101916 (S.D. Ohio Jan. 4, 2019),

*aff'd in part, vacated in part on other grounds*, 835 F. App'x 798 (6th Cir. 2020).

Rashada likewise "act[ed] in contravention of the [Miami NIL] agreement" by choosing to abandon it. In the Amended Complaint's telling, the Miami entity did not walk away from him; rather, Rashada chose to "abandon" or "forgo" the Miami NIL Deal. (Am. Compl. ¶¶ 28, 44.) Rashada's decision to abandon the Miami NIL Deal—like the plaintiff's decision to act contrary to his agreement with his brother in *McKinney-Green*—cannot support a tortious interference claim.[2] Count VI thus fails to state a claim.

### G.    Count VII fails to state a claim for aiding and abetting tortious interference.

To state a claim for aiding and abetting, a complaint must allege "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abetter; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and

---

[2] Similarly, an employee's decision to resign dooms a later claim by that employee for tortious interference with his or her employment contract. *See Mulligan v. Wallace*, 349 So. 2d 745, 747 (Fla. 3d DCA 1977) (per curiam) ("Plaintiffs' resignations . . . bar their action for tortious interference with employment contracts."); *Geller v. Von Hagens*, No. 8:10-CIV-1688-EAK-AEP, 2010 WL 4867540, at *4 (M.D. Fla. Nov. 23, 2010) ("The Defendants' point is well-taken that, having presented that his resignation was voluntary, [Plaintiff] cannot now be allowed to maintain a cause of action for tortious interference with his contract. Therefore, the Defendants' Motion to Dismiss is granted as to [Plaintiff's] tortious interference with contract claim.").

abettor." *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012) (per curiam). The Amended Complaint fails to allege each of those elements against Napier.

As explained above, Rashada's decision to voluntarily withdraw from the Miami NIL Deal cannot support a tortious interference claim. The Amended Complaint therefore fails to allege an "underlying violation." *Id.*

Nor does the Amended Complaint allege that Napier knew of any purported wrongdoing, or that Napier did anything that provided "substantial assistance in committing the wrongdoing." *Id.* Again, Rashada had already given up the Miami NIL Deal by the time of the only conduct alleged against Napier. Count VII therefore fails to state a claim against Napier for aiding and abetting tortious interference.

## II. Sovereign immunity bars all claims against Napier.

As the Amended Complaint alleges, Napier is the "head football coach at the University of Florida." (Am. Compl. ¶ 16.) Both the University of Florida and the University Athletic Association, Inc. are state agencies protected by sovereign immunity under Florida law. *See* § 768.28(2), Fla. Stat. (providing that "state agencies or subdivisions" protected by sovereign immunity include "state university boards of trustees"); *Univ. of Fla. Bd. of Trs. v. Rojas*, 351 So. 3d 1167, 1170 (Fla. 1st DCA 2022) (holding that a claim against the University of Florida

should have been dismissed based on sovereign immunity), *rev. granted*, No. SC2023-0126, 2023 WL 4784215 (Fla. July 27, 2023); *see also Plancher v. UCF Athletics Ass'n, Inc.*, 175 So. 3d 724, 725, 729 (Fla. 2015) (holding that UCF Athletics Association, Inc. is entitled to sovereign immunity under Florida law); *cf. Edwards v. Learfield Commc'ns, LLC*, 697 F. Supp. 3d 1297, 1302 (N.D. Fla. 2023) (concluding that "the [University Athletic Association, Inc.] is an arm of the state" and is therefore "entitled to Eleventh Amendment immunity").

Section 768.28(9)(a), Florida Statutes, extends that immunity to Napier as an employee or agent of a state agency. That statute provides in part:

> An officer, employee, or agent of the state or of any of its subdivisions may not be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

§ 768.28(9)(a), Fla. Stat.; *see also McGhee v. Volusia Cnty.*, 679 So. 2d 729, 733 (Fla. 1996) (explaining that section 768.28(9)(a) "extend[s] the veil of sovereign immunity to . . . governmental employees when they are acting within the scope of employment").

In a transparent attempt to circumvent Napier's immunity, the Amended Complaint alleges that Napier "is not employed by the University of Florida"

but declines to identify his employer. (Am. Compl. ¶ 16.) But an individual need not be formally employed by a state agency to enjoy immunity under section 768.28(9)(a). *See Stoll v. Noel*, 694 So. 2d 701, 703 (Fla. 1997) (recognizing that the defendants, though not state employees, "are not precluded from being agents of the state—thereby entitling them to its statutory immunity from suit and liability" under section 768.28(9)(a)); *see also Horn v. Volusia Cnty.*, No. 6:08-cv-18-Orl-19DAB, 2008 WL 977179, at *5-6 (M.D. Fla. Apr. 9, 2008) (dismissing a complaint because the court concluded that the defendants, though not state employees, were agents of the state entitled to immunity under section 768.28(9)(a)). Napier, as head football coach, acted as an agent of the University of Florida and the University Athletic Association, Inc.

The conduct alleged in the Amended Complaint involved the recruitment of a football player to the University's team, a task clearly within "the scope of [Napier's] employment or function" as head football coach. § 768.28(9)(a), Fla. Stat. Consequently, to overcome Napier's immunity under section 768.28(9)(a), the Amended Complaint must allege that Napier "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *Id.*; *see also Eiras v. Fla. Dep't of Bus. & Pro. Regul.*, 239 F. Supp. 3d 1331, 1343 (M.D. Fla. 2017) ("[I]n order for a plaintiff to succeed in piercing the statutory immunity defense, he must make a good

31

faith allegation in the complaint that the public . . . official either acted outside the scope of his employment or in bad faith." (quoting *Brown v. McKinnon*, 964 So. 2d 173, 175 (Fla. 3d DCA 2007))). Further, a "conclusory" allegation that a defendant "acted maliciously and in bad faith" is "insufficient to survive a motion to dismiss." *Brivik v. Law*, 545 F. App'x 804, 807 (11th Cir. 2013) (per curiam); *see also Eiras*, 239 F. Supp. 3d at 1344 (observing that "a threadbare recital" is "insufficient").

"Bad faith" under section 768.28(9)(a) is a high bar. It requires "actual malice," which means "ill will, hatred, spite, [or] an evil intent." *Reed v. State*, 837 So. 2d 366, 369 (Fla. 2002) (alteration in original) (quoting *Young v. State*, 753 So. 2d 725, 728-29 (Fla. 1st DCA 2000); *State v. Gaylord*, 356 So. 2d 313, 314 (Fla. 1978)); *see also Coleman v. Hillsborough Cnty.*, 41 F.4th 1319, 1325 (11th Cir. 2022) ("Florida courts have equated bad faith with 'the actual malice standard.'" (quoting *Peterson v. Pollack*, 290 So. 3d 102, 109 (Fla. 4th DCA 2020))). The "wanton and willful" standard requires "conduct much more reprehensible and unacceptable than mere intentional conduct." *Coleman*, 41 F.4th at 1325 (quoting *Peterson*, 290 So. 3d at 109). "Wanton" means "with a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons or property," and "willful" means

"intentionally, knowingly and purposely." *Id.* (quoting *Peterson*, 290 So. 3d at 110).

Here, the Amended Complaint fails to allege that Napier "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." § 768.28(9)(a), Fla. Stat. Again, the Amended Complaint alleges only one exchange between Rashada and Napier. (Am. Compl. ¶ 59.) Further, it fails to allege any well-pleaded facts plausibly suggesting that Napier acted with "ill will, hatred, spite, [or] an evil intent." *Reed*, 837 So. 2d at 369 (quoting *Gaylord*, 356 So. 2d at 314). Nor does the Amended Complaint allege "conduct much more reprehensible and unacceptable than mere intentional conduct." *Coleman*, 41 F.4th at 1325 (quoting *Peterson*, 290 So. 3d at 109).

Some authority suggests that fraud may be sufficient to establish bad faith under section 768.28(9)(a). *See Parker v. State of Fla. Bd. of Regents ex rel. Fla. State Univ.*, 724 So. 2d 163, 168-69 (Fla. 1st DCA 1998). Here, however, the Amended Complaint fails, for reasons explained above, to adequately allege fraud. All claims against Napier are therefore barred by sovereign immunity under section 768.28(9)(a).

**CONCLUSION**

The Amended Complaint accuses Napier of fraud but fails to support that accusation with sufficient allegations of fact. Further, Rashada's claims against Napier are barred by sovereign immunity. All claims against Napier should, therefore, be dismissed.

**Request for Oral Argument**

Under Local Rule 7.1(K), Defendant Napier requests the Court to set a two-hour hearing on the motions to dismiss the four Defendants filed. Defendant proposes the time to be allocated equally, one hour each, between Plaintiff and Defendants, with the Defendants agreeing amongst themselves how to allocate their hour.

**Local Rule 7.1(F) Certification of Word Count**

I hereby certify that the foregoing memorandum contains 7,629 words and complies with the word count requirement of Local Rule 7.1(F).

Dated: September 27, 2024.

                       BEDELL, DITTMAR, DeVAULT, PILLANS & COXE
                           Professional Association

                       By:  s/Henry M. Coxe III
                           Henry M. Coxe III
                           Florida Bar No. 155193
                           Email: hmc@bedellfirm.com
                           Michael E. Lockamy
                           Florida Bar No. 69626
                           Email: mel@bedellfirm.com
                           R. Troy Smith
                           Florida Bar No. 485519
                           Email: rts@bedellfirm.com
                           John G. Woodlee
                           Florida Bar No. 0100990
                           Email: jgw@bedellfirm.com
                           The Bedell Building
                           101 East Adams Street
                           Jacksonville, Florida 32202
                           Telephone: (904) 353-0211
                           Facsimile: (904) 353-9307

                     Attorneys for Defendant William Napier