# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

**JADEN RASHADA,**

     **Plaintiff,**

v.                                                   **Case No.  3:24-cv-219-MCR-HTC**

**HUGH HATHCOCK, et al.,**

     **Defendants.**

_____/

## ORDER

Plaintiff Jaden Rashada sued Defendants Hugh Hathcock, William Napier, Marcus Castro-Walker, and Velocity Automotive Solutions, LLC for allegedly engaging in a fraudulent scheme to secure his commitment to play football for the University of Florida and to deny its rivals of his athletic talents.  *See* ECF No. 37. Each Defendant subsequently moved to dismiss the Amended Complaint.  *See* ECF Nos. 45, 46, 47, 48.[1]  Rashada responded in opposition to each motion.  *See* ECF Nos. 49, 50, 51, 52.  With leave of Court, Napier and Velocity filed briefs in reply, to which Rashada sur-replied.  *See* ECF Nos. 61, 63, 65,[2] 67.  The Court heard oral

---

[1] Hathcock also moved under Rule 12(e) for a more definite statement.  *See* Fed. R. Civ. P. 12(e).

[2] Velocity filed a reply brief to amend its original filing, ECF No. 64, to address an oversight in complying with the word count requirement for the brief.  Because the initial reply was filed in violation of the Court's Order on word count, *see* ECF No. 59, the undersigned has only considered the amended briefing, *see* ECF No. 65.

argument on the motions to dismiss.  For the reasons below, the Court concludes that Defendants' motions are due to be granted in part and denied in part.

## I.    Background[3]

This case arises out of the failed recruitment of high school football standout, Jaden Rashada, to the University of Florida ("UF") between 2022 and 2023.  This was a volatile period in the governance of name, image, and likeness ("NIL") rights for college student athletes in the wake of *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021).  Following that decision, the National Collegiate Athletic Association ("NCAA") began allowing student athletes to be compensated based on their NIL rights for the first time.  *See* ECF No. 37 at ¶ 21.[4]  Contemporaneously

---

[3] Given the procedural posture of the pending motions, the Court accepts as true the factual allegations in the Amended Complaint, drawing all inferences derived from those facts in the light most favorable to Rashada.  *See Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[4] Amateurism served as the bedrock of college sports for the first 115 years of the NCAA's existence.  For decades, the NCAA maintained that its commitment to amateurism distinguished collegiate sports from professional leagues and increased their appeal to consumers.  In pursuit of its amateurism designs, the NCAA promulgated and enforced rules that, among other things, significantly limited the compensation of student-athletes, pervasively regulated the recruitment process, and restricted the number of athletic scholarships its member schools could award.  And "with surprising success, the NCAA . . . long shielded its [amateurism] rules from ordinary antitrust scrutiny," *Alston*, 594 U.S. at 107 (Kavanaugh, J., concurring), in part, due to "stray comments," *id.* at 93, made by the Supreme Court in one of its earliest NCAA-related cases, *see Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 120 (1984) ("The NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports. There can be no question but that it needs ample latitude to play that role, or that the preservation of the student-athlete in higher education . . . is entirely consistent with the goals of the Sherman Act.").  But at the turn of the century, things began to change.  Public support appeared to grow for loosening the NCAA's amateurism rules, and the number of lawsuits brought by current and former student-athletes challenging those rules grew with it.  Ultimately, following some notable decisions by lower courts, *see, e.g., O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1079 (9th Cir. 2015) ("[T]he NCAA is not above the antitrust laws, and courts

with *Alston* and the NCAA policy changes, some states implemented their own rules for use of NIL, including Florida. *See, e.g.*, Fla. Stat. § 1006.74 (2021) (amended 2023). The Florida NIL statute in effect at the time of Rashada's recruitment, Fla. Stat. § 1006.74, included conditions on NIL compensation, namely that it must "not be provided in exchange for athletic performance or attendance at a particular institution" and could "only be provided by a third party unaffiliated with the intercollegiate athlete's postsecondary educational institution." *Id.* at § 1006.74(2)(a). Likewise, an "officer, director, or employee of [a postsecondary educational] institution or entity [could] not compensate or cause compensation to be directed to a current or prospective intercollegiate athlete for her or his name,

---

cannot and must not shy away from requiring the NCAA to play by the Sherman Act's rules"), the Supreme Court unanimously held in *Alston* that the NCAA's restrictions on non-cash education-related benefits violated the antitrust laws. 594 U.S. at 107. Justice Kavanaugh went further, observing in his concurrence that "[t]he NCAA's [then-existing] business model would be flatly illegal in almost any other industry in America." *Id.* at 109 (Kavanaugh, J., concurring). Only days after *Alston* was issued, the NCAA, in an extraordinary reversal, announced that it would permit student-athletes to engage in—and be compensated for—NIL activities with third parties, effective July 1, 2021. *See* NCAA, *NCAA adopts interim name, image and likeness policy* (June 30, 2021), https://www.ncaa.org/news/2021/6/30/ncaa-adopts-interim-name-image-and-likeness -policy.aspx (last accessed Apr. 8, 2025). Since then, college sports have only become more professionalized. Among other things, it has been publicly reported that collectives supporting big-time college football programs have spent up to $20 million on NIL deals to build a roster. *See, e.g.*, David Ubben, *How much do NIL roster budgets really matter for College Football Playoff teams?*, The Athletic (Dec. 17, 2024), https://www.nytimes.com/athletic/5998305/2024/12/17/college-football-playoff-nil-roster-budgets/ (last accessed Apr. 8, 2025) ("Ohio State athletic director Ross Bjork . . . said this summer that the Buckeyes players received about $20 million [in NIL] funds"). And a preliminarily-approved settlement in *House, et al. v. Nat'l Collegiate Athletic Ass'n, et al.*, Case No. 4:20-cv-03919-CW (N.D. Cal.) promises—if ultimately approved—to fundamentally reshape the landscape of college sports for the second time in five years by establishing a revenue-sharing framework between members schools and student-athletes up to $20.5 million per year.

image, or likeness." *Id.* at § 1006.74(2)(c).  As described by Rashada, "[t]his new NIL regime opened the door to the formation of so-called 'collectives'—groups of donors who agreed to fund NIL contracts with athletes in exchange for the athletes' de facto commitment to a particular university."  ECF No. 37 at ¶ 21.[5]  This morass of unprecedented operational change, alongside novel legislation and new NCAA policy guidance, provides the backdrop to the events underlying Rashada's suit.

After graduating from high school in Spring 2022, Rashada—seventh-ranked nationally among "Class of 2023 college-bound quarterbacks"—was recruited by several college football programs nationwide, including blue bloods like Louisiana State University, Texas A&M University, the University of Oregon, the University of Mississippi, the University of Miami ("Miami"), and UF.  ECF No. 37 at ¶ 2.  In June 2022, Rashada visited UF in person as a part of the school's recruitment efforts. *Id.* at ¶ 23.  According to Rashada, "[d]uring the visit, [he] and his family met with UF's director of NIL and player engagement, Defendant [Marcus] Castro-Walker," who "was scheduled to present on the topic of NIL" during the day—purportedly at the behest of Defendant William Napier, UF's head football coach.  *Id.*  Castro-

---

[5] When NIL collectives took the world of collegiate sports by storm, the NCAA issued guidance in May 2022 clarifying that collectives may not promise NIL agreements to prospective recruits that were contingent on their enrollment with a particular school. *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 760 (E.D. Tenn. 2024).  However, that guidance (which was in effect at all times relevant to the present case) was subsequently enjoined on antitrust grounds, *id.* at 766, and the parties recently announced a settlement that requires the NCAA to drop the NIL-recruiting ban altogether, *Tennessee v. Nat'l Collegiate Athletic Ass'n*, Case No. 3:24-cv-00033 (E.D. Tenn. Mar. 21, 2025) (permanently enjoining the NCAA policies at issue).

Walker told Rashada's father that a prominent UF booster, Hugh Hathcock, was on campus for a photo shoot with his Lamborghini and wanted to meet Rashada. *Id.* Alert to the NIL rules in place at the time, Castro-Walker told Rashada's father, "you didn't see [Hathcock]." *Id.* Hathcock entered the UF athletic facility meeting room "from a back entrance" and "explained who he was, bragged that he was a big financial supporter of UF's football program, and assured [Rashada] that UF's football program was going to achieve much success under Coach Napier." *Id.* at ¶ 24. Additionally, during the meeting, "Hathcock told Castro-Walker that whatever [Rashada] needed to come to UF from an NIL standpoint, Hathcock would make [it] happen," and "suggested that he could secure employment for [Rashada's] father . . . if [Rashada] were to commit to UF." *Id.*

According to Rashada, Hathcock ultimately offered him "approximately $11 million" later that summer in a "UF-affiliated NIL deal," *id.* at ¶ 25, with funding split between Velocity and a collective named "Gator Guard," which was "Hathcock's NIL collective." *Id.* at ¶ 31. However, by that point—in or around June 2022—Rashada had committed verbally to play for Miami—a commitment made public on June 26, 2022. *Id.* at ¶ 26. In connection with that commitment, Rashada made a $9.5 million NIL deal with a Miami-affiliated collective. Press outlets like *Sports Illustrated* publicly reported this $9.5 million deal. *Id.* at ¶¶ 26, 28 n.1.

Despite the public commitment elsewhere, efforts to recruit Rashada to UF continued.  For example, Castro-Walker reached out to Rashada's NIL agents, telling them on October 27, 2022, to "Get us the QB."  *Id.* at ¶ 28.[6]  Additional messages a few days after from Castro-Walker to at least one of Rashada's agents stated, "We need to lock down Jaden!" and "[UF would] want [Jaden] to flip this week."  *Id.* at ¶ 29 (alterations in original).  Hathcock also made calls to Rashada's agents between November 9 and 10, stating "he would do whatever Castro-Walker and Napier said was necessary to secure a talented player" and he "just listen[s] to them."  *Id.* at ¶ 30.

In early November 2022, Defendants upped the ante; a $13.85 million proposal was presented to Rashada, with the money to be paid out over a four-year period at UF.  *Id.* at ¶ 31.  The same two sources of funding would support the payments: Velocity, Hathcock's automotive company, and Gator Guard, his NIL collective.  *Id.*  According to Rashada, "Hathcock's representations to [his] agents . . . led [him] to believe that Castro-Walker had authority to negotiate the NIL agreement that Hathcock and Velocity Automotive would fund."[7]  *Id.* at ¶ 32.

---

[6] Pursuant to Florida's NIL statute at the time, "an athlete agent representing an intercollegiate athlete for purposes of securing compensation for the use of her or his name, image, or likeness" was required to "be licensed under part IX of chapter 468."  Fla. Stat. § 1006.74(2)(d) (2021) (amended 2023).  Rashada's agents are identified in the Amended Complaint as Jackson Zager and Thomas Thomsen.

[7] If Castro-Walker did hold such authority, it appears this conduct may have violated the Florida NIL statute then in effect: "A postsecondary educational institution; an entity whose purpose includes supporting or benefiting the institution or its athletic programs; or an officer,

Hathcock then intimated that a changed commitment was imminent by making online posts on Twitter.[8]  On November 9, 2022, Hathcock tweeted, "Tomorrow will be a Great Day Gator Fans!!!"  *Id.* at ¶ 33.  Hathcock again tweeted on November 10, 2022, "All Good!!! Just a little longer!!!"  *Id.* at ¶ 40.[9]

At some point "[b]efore the deal was finalized," however, Hathcock pivoted and "declined to use his company or the Gator Guard to directly fund the promised NIL payments," citing his plans to sell Velocity soon.  *Id.* at ¶ 35.  Instead, Hathcock and Castro-Walker proposed that funds "pass through" a different UF-affiliated collective, "the Gator Collective," even though the money would still come from Hathcock and Velocity.  *Id.*

Ultimately, both Castro-Walker and Hathcock "partnered" with Edward Rojas, CEO of the Gator Collective, on the deal.  *Id.* at ¶¶ 6, 36.  Jennifer Grosso, a lawyer for the Gator Collective, purportedly told Rashada's agents "Hathcock would wire money monthly so that all necessary payments could be made to [Rashada]," and "confirmed that she frequently worked with Mr. [David] Penney, Velocity's

---

director, or employee of such institution or entity may not . . . cause compensation to be directed to a current or prospective intercollegiate athlete for her or his name, image, or likeness."  Fla. Stat. § 1006.74 (2021) (amended 2023).

[8] "Since the events of this suit, Twitter has merged into X Corp. and is now known as X." *Murthy v. Missouri*, 603 U.S. 43, 50 n.1 (2024).  "For the sake of clarity, [the Court] will refer to th[is] platform[ ] as Twitter," as it was known during the events of this suit.  *Id.*

[9] That day, one of Rashada's agents reported to Rashada's father that he thought the contract memorializing the agreement was close to being ready to sign.  ECF No. 37 at ¶ 34.

CEO, to facilitate the monthly payments it made to the Gator Collective." *Id.* at ¶ 36.

Specifically, on November 10, 2022, Grasso told Rashada "that Hathcock would fund the first $500,000," to be wired in two weeks' time, of the deal with Gator Collective, and "UF was 'serious' about securing [Rashada's] commitment." *Id.* at ¶ 37.[10]  She also texted one of Rashada's agents, "I might go to sleep if I had $500K headed my way in two weeks . . . But we need a commitment to get there!!!" *Id.* at ¶ 41.  Rojas was also in touch with one of Rashada's agents on November 10 about his excitement for Rashada joining UF, texting, "We are going to have to dodge the freaks in Miami[.] I hate Miami.  This is going to be fun to watch." *Id.* at ¶ 38 (alteration in original).

Late in the evening on November 10, 2022, Rashada publicly announced a verbal commitment change from Miami to UF.  *Id.* at ¶ 42.  Rashada also signed a contract with the Gator Collective the same day, memorializing the $13.85 million

---

[10] It is unclear from the face of the Amended Complaint to whom these statements were made (Rashada, his family, his agents, or otherwise).

NIL deal.  *See* ECF No. 47 at 41.[11]  Rojas appears to have signed on November 10 at 10:16 pm EST.  ECF No. 47 at 41.[12]

Under that contract, the first payment to Rashada, $500,000, was due on December 5, 2022.  Rashada alleges that "Ms. Grosso informed [his] representatives that Mr. Penney would coordinate Hathcock's payments," and "Penney, in turn, informed [his] agents that he was waiting on Hathcock's direction before paying" the initial $500,000.  ECF No. 37 at ¶ 47.  Likewise, "Castro-Walker also represented that he was communicating with Hathcock about the payment, and that Hathcock was finalizing the logistics of the payment."  *Id.*  When Rashada's agents asked Castro-Walker about the payment on December 4, Castro-Walker responded that when he spoke with Hathcock previously, Hathcock indicated "was working something out with his accountants."  *Id.* at ¶ 49.

---

[11] This is the page number of the PDF containing the November 2022 NIL contract, which is attached to Velocity's motion to dismiss.  *See* ECF No. 47.  While ordinarily the Court "do[es] not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss," there is an exception when "a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss."  *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007).  Although Rashada has not brought a claim for breach of contract, the Court finds that the November 2022 NIL contract provided by Velocity is still sufficiently germane to the claims asserted in the Amended Complaint.  Plus, Rashada has not objected to its authenticity.  As the remaining factors are otherwise met, the Court will consider the contract even though it was not attached to the Amended Complaint.

[12] The tweet from Rashada included in the Amended Complaint reflects that he publicly flipped his commitment from Miami to UF after Rojas signed the $13.85 million NIL deal.  *See* ECF No. 37 at ¶ 42.

On December 6, 2022, just after the initial payment due date, "the Gator Collective sent [Rashada] a letter purporting to terminate the $13.85 million NIL contract." *Id.* at ¶ 51. The next day, Castro-Walker represented to Rashada's agents that the NIL deal, still totaling $13.85 million, would be "assigned" to Gator Guard, Hathcock's collective, and that Hathcock would personally guarantee the obligation. *Id.* at ¶ 53; *see also id.* ("To facilitate this new arrangement, Hathcock, Velocity, and/or Castro-Walker represented that the Gator Collective would retract its unfounded termination, and once the agreement was 'un-cancelled,' the $13.85 million obligation would be assigned to the Gator Guard collective."). Shortly after, on December 9, Penney wired $150,000 to Rashada on Hathcock's behalf. *Id.* at ¶ 54. The purpose of this payment by Hathcock was to avoid litigation between Rashada ("and presumably also Hathcock and Velocity") and John Ruiz, a Miami booster "who was seeking repayment from the $9.5 million NIL deal after [Rashada] flipped his commitment." *Id.* According to Rashada, it also served as a partial payment towards his $500,000 signing bonus. *Id.* at ¶ 56.

Less than two weeks later, December 21, 2023, was the 2023 NCAA football early-commitment National Letter of Intent signing day. Historically, this is an important day on the college football recruiting calendar. Filled with fanfare and pageantry, this is the day many of the nation's top football recruits, formally accept one of the finite number of athletic scholarships available at their institution of

choice for the next academic year. On signing day, though, Rashada was still awaiting the $350,000 remaining of his $500,000 signing bonus and the "assignment" of the $13.85 million contract to Hathcock's NIL collective, prompting him to ask his agents if he should sign a Letter of Intent for Florida; they responded, "not yet." *Id.* at ¶ 58 (internal quotations omitted).

As the signing day delay grew, Napier called Rashada and his father, and "explain[ed] that he did not want to go into [a] press conference without his quarterback signed." *Id.* at ¶ 59. Rashada's father responded that the hold up was because there was still no NIL deal in place. *Id.* Napier later called the Rashadas back and represented that "Hathcock would pay [Rashada] $1 million as a partial payment towards the promised $13.85 million," and urged Rashada to sign his Letter of Intent. *Id.*[13] Rashada's agents counseled him not to sign the Letter of Intent without an NIL deal in hand and "offered to discuss the issue with Castro-Walker" again, which they did. *Id.* at ¶ 60. In that conversation, Castro-Walker emphasized that "Napier would 'get it done.'" *Id.* Castro-Walker also threatened that if Rashada did not sign quickly, "Napier might pull back his scholarship offer." *Id.* Rashada signed his Letter of Intent with UF about an hour after his call with Napier. *Id.* at ¶¶ 61–63.

---

[13] The Amended Complaint alleges that Napier tried to contact Hathcock before calling Rashada back but could not reach him because Hathcock was on a plane. *See* ECF No. 37 at ¶ 59.

But, by January 2023, a secondary or "assigned" NIL contract still had not materialized. Castro-Walker provided "assurance that [Rashada] would receive the signing bonus and all promised payments going forward" during the early part of that month. *Id.* at ¶ 64. However, when this did not happen, Rashada sought and was permitted to withdraw his Letter of Intent on January 18, 2023. He then began his college football career at Arizona State University and later transferred to the University of Georgia for the 2024-25 school year. *Id.* at ¶¶ 66–67. Rashada states he "neither sought nor was promised any type of NIL commitment from Arizona State," and his later "decision to attend Georgia [in 2024] was not in response to any promises, assurances, or offers connected to NIL money." *Id.*

On May 21, 2024, Rashada filed the present action against Hathcock, Napier, Castro-Walker, and Velocity, which he then amended as of right on August 13, 2024.[14] The Amended Complaint contains eight counts, each arising out of Florida common law: fraudulent misrepresentation and fraudulent inducement (Count I); aiding and abetting fraud (Count II); conspiracy to commit fraud (Count III); the independent tort of conspiracy (Count IV); negligent misrepresentation (Count V); tortious interference (Count VI); aiding and abetting tortious interference

---

[14] The Court denied the motions to dismiss the original Complaint, ECF No. 1, as moot after Rashada filed his Amended Complaint, ECF No. 37. *See* ECF No. 38.

(Count VII); and, solely against Velocity, vicarious liability for acts taken by Hathcock (Count VIII).

## II.    Applicable Standards

A Rule 12(b)(6) motion seeks dismissal of a pleading for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In considering a Rule 12(b)(6) motion, the Court accepts factual allegations as true and construes them in the light most favorable to the plaintiff.  *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008).  Rule 12(b)(6) requires that the allegations of a complaint "state a claim to relief that is plausible on its face."  *See Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  This plausibility requirement "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Motions pursuant to Rule 12(b)(6) test the facial sufficiency of the complaint and, therefore, should be analyzed in conjunction with the legal standard set forth in Rule 8, unless the claims sound in fraud or mistake, which are subject to the heightened pleading standards of Rule 9.  *Streeter v. City of Pensacola*, 2007 WL 4468705, at *5 (N.D. Fla. Dec. 18, 2007).  To satisfy the pleading requirements of Rule 8, a complaint must simply give the defendant fair

notice of what the plaintiff's claims are and the grounds upon which they rest. *See Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510–12 (2002). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *See id.* at 511; *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 881 (11th Cir. 2003). Where a party alleges fraud or mistake, Rule 9 provides that the party "must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Rule 12(e) provides that "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). Where Rule 12(e) relief is warranted, the proper remedy is to require a repleader in order to set the proper boundaries for discovery. *See Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1126–27 (11th Cir. 2014).

## III. Discussion

### a. Fraud Claims (Counts I, II, and V)

Rashada asserts various fraud-based claims against Defendants, including for fraudulent misrepresentation and fraudulent inducement (Count I), aiding and abetting fraud (Count II), and negligent misrepresentation (Count V). ECF No. 37

at ¶¶ 69–87, 105–108; *see Lamm v. State St. Bank & Trust*, 749 F.3d 938, 951 (11th Cir. 2014) (negligent misrepresentation claims sound in fraud under Florida law); *Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1511 (11th Cir. 1993) (Cox, J., concurring in the result) ("Historically, in Florida an action for negligent misrepresentation sounds in fraud rather than negligence."). The essence of Rashada's fraud-based claims is that Defendants made repeated promises of a top-dollar NIL deal so that he would flip his commitment to UF, but they never actually intended to pay him full freight. Rashada asserts that Defendants orchestrated the scheme to "secure a star quarterback for a bargain," ECF No. 51 at 11, and to deprive UF's rival schools, namely Miami, of the same. Those allegations make the grade.

A fraudulent misrepresentation claim under Florida law has four elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010) (internal quotations and citation omitted) (emphasis deleted). The Florida Supreme Court has held that the second element can be shown several ways, and not all of them involve knowledge of falsity: "The knowledge, by the maker of the representation, of its falsity, . . . . can be established by either one of the three following phases of proof: (1) [t]hat the representation was made with actual knowledge of its falsity; (2)

without knowledge either of its truth or falsity; [or] (3) under circumstances in which the person making it ought to have known, if he did not know, of its falsity." *Joiner v. McCullers*, 28 So.2d 823, 824 (Fla. 1947); *see In re Harris*, 3 F.4th 1339, 1349 (11th Cir. 2021) (same). Moreover, *justifiable* reliance is not required—plausible allegations of plain reliance will do. *See Butler*, 44 So.3d at 105; *Besett v. Basnett*, 389 So.2d 995, 998 (Fla. 1980) ("[A] recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him."). A defendant may also be liable for aiding and abetting fraud under Florida law when a plaintiff can show "(1) the existence of an underlying fraud; (2) the defendant['s] knowledge of the fraud; and (3) the defendant['s] provision of substantial assistance to advance the commission of the fraud." *See Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 884 (11th Cir. 2014) (citation omitted).

Negligent misrepresentation claims under Florida law share many of the same ingredients. A plaintiff is not required to allege that the defendants had knowledge that the misrepresentation was false; a plaintiff can likewise prevail on a lesser showing—that the defendant made the misrepresentation "without knowledge of its truth or falsity" or that the defendant "should have known the representation was false." *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1259 (11th Cir. 2014).

But in the case of negligent misrepresentation, a plaintiff's reliance must be justified. *Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1503 (11th Cir. 1993) (Under Florida law, the elements of negligent misrepresentation are "(1) a misrepresentation of a material fact; (2) the representor made the representation without knowledge as to its truth or falsity, or under circumstances in which he ought to have known of its falsity; (3) the representor intended that the misrepresentation induce another to act on it; and (4) injury to the party acting in justifiable reliance on the misrepresentation." (internal quotations and citation omitted)).

As noted above, where a party alleges fraud, the party "must state with particularity the circumstances constituting fraud," but "conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see Lamm*, 749 F.3d at 951 ("Rule 9(b)'s heightened pleading standard applies to negligent misrepresentation claims" under Florida law). Here, the parties hotly contest two threshold questions: (i) to what extent, if any, the putative statements and actions of each individual Defendant can be attributed to other Defendants via the agency relationships alleged in the Amended Complaint; and (ii) whether the allegations supporting the putative agency relationships must meet Rule 9(b)'s heightened pleading standard.

Defendants contend that Rashada failed to adequately plead agency relationships among the various individuals, parties and non-parties alike, involved in his failed UF recruitment, and Hathcock, in particular, urges the Court to apply

Rule 9(b)'s heightened pleading standard to those assertions of agency. Rashada rejoins that, even under Rule 9(b), he has met his burden of showing a variety of agency relationships—including Hathcock and Castro-Walker acting as Napier's agents; Hathcock as an agent of Velocity; and Castro-Walker as an agent of Hathcock—existed amongst the Defendants at the time of the alleged fraud.

Viewed in the light most favorable to Rashada, and heedful that parsing agency relationships is a fact-intensive exercise best reserved for later stages of litigation, the Court concludes that Rashada's allegations on this score are sufficient for present purposes. *See Larach v. Standard Chartered Bank Int'l (Ams.), Ltd.*, 724 F. Supp. 2d 1228, 1239 (S.D. Fla. 2010) (determination of whether an agency relationship exists is fact-intensive and not properly resolved at the motion to dismiss stage) (citation omitted); *Roche v. Rushmore Loan Mgmt. Servs., LLC*, 2020 WL 1452346, at *14 (S.D. Fla. Mar. 25, 2020) (same) (collecting cases); *cf. Sheikhalizadehjahed v. Gaudiosi*, 2024 WL 4505648, at *8 (E.D. Cal. Oct. 16, 2024) ("There is nothing unusual about abstaining from undertaking . . . a fact-intensive inquiry at the pleading stage. Courts regularly do so.") (collecting cases).[15]

---

[15] Outside of the Amended Complaint, Rashada also explicitly contends that Penney is an agent of Velocity, and Penney and Grosso are agents of Hathcock. *See* ECF No. 50 at 17–19. Rashada indicates in the Amended Complaint that Grosso acted with authority to negotiate on Hathcock and Rojas's behalf. ECF No. 37 at ¶ 37. Similarly, Penney is described as Velocity's CEO and "Manager," and as sharing responsibility for completing wire payments to Rashada. *See id.* at ¶¶ 31 n.2, 35, 54. Again, because analyzing these putative agency relationships calls for a fact-intensive inquiry that cannot be resolved in a principled manner at the pleading stage, *see*

The Court will not apply Rule 9(b) to evaluate the alleged agency relationships. Rule 9(b)'s particularity requirements apply only when the "predicate facts for the agency and fraud are the same," *Sun Life Assurance Co. of Canada (U.S.) v. Imperial Holdings, Inc.*, 2014 WL 12452450, at *3 (S.D. Fla. June 26, 2014), which is not the case here. Viewed in totality, the Amended Complaint alleges a recruiting apparatus comprised of Napier, Castro-Walker, Hathcock, and Velocity that was assembled—not only to recruit Rashada to UF—but other student-athletes as well. *See, e.g.*, ECF No. 37 at ¶ 4 (The NIL "relationship between a university's sports program and its alumni, boosters, and . . . 'collectives' . . . . play a crucial role in . . . aiding in recruitment"); *id.* at ¶ 15 (Hathcock "established his own NIL collective" for "attract[ing] high-profile athletes by offering substantial sums of money."); *id.* at ¶ 36 (alleging that Velocity made monthly contributions for NIL payments to UF student athletes). That recruiting ecosystem, as alleged, existed separate and apart from any putative fraud by Defendants.[16]

---

*Larach*, 724 F. Supp. 2d at 1239, the Court concludes that Rashada's allegations are sufficient to proceed to discovery.

[16] Even assuming Rule 9(b)'s heightened pleading standard applied to the agency relationships alleged, the Court's conclusion would be the same. *See Savoia-McHugh v. Glass*, 2020 WL 12309558, at *5 (N.D. Fla. Aug. 5, 2020) ("Rule 9(b) does not require a plaintiff to allege the time and content of every fraudulent statement in the event of a 'prolonged multi-act scheme,' or if the fraud took place over an extended time period." (internal quotations and citations omitted)); *cf. Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) ("The application of Rule 9(b) . . . must not abrogate the concept of notice pleading." (internal quotations and citation omitted)).

This means Rashada's alleged agency relationships just need to be plausible. And they are. *See Iqbal*, 556 U.S. at 679 (observing that courts are entitled to draw on their "judicial experience and common sense" when evaluating the sufficiency of a complaint).[17]  Actual agency requires "(1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Villazon v. Prudential Health Care Plan, Inc.*, 843 So.2d 842, 853 n.10 (Fla. 2003) (internal quotations and citations omitted).  Whereas an apparent agency exists where "there is: (1) a representation by the purported principal; (2) reliance on that representation by a third party; and (3) a change in position by the third party in reliance upon such representation." *Sun Life*, 2014 WL 12452450, at *3 (citation omitted).

The Amended Complaint specifically alleges a myriad of mutually reinforcing, interlocking actions and statements by Napier, Castro-Walker, and Hathcock over the course of Rashada's ill-fated UF recruitment.  Among other things, Napier allegedly deputized Castro-Walker to lead UF's NIL efforts and authorized Hathcock (and his Lamborghini) to meet with recruits and arrange NIL deals to secure commitments to UF.  *See, e.g.*, ECF No. 37 at ¶¶ 15, 17, 23–25; *see*

---

[17] The Court's decision on this issue today is exceedingly limited; it simply finds that the facts set out in the Amended Complaint are sufficient to raise the agency relationships alleged above a "speculative level."  *Twombly*, 550 U.S. at 555 (internal citations omitted).  Whether discovery will substantiate or augment these supposed agency relationships is another matter.

*also id.* at ¶ 59 (alleging that, on signing day, Napier represented to Rashada that Hathcock would wire Rashada $1 million as a partial payment despite the two being unable to confer beforehand). Hathcock allegedly boasted to Castro-Walker, within earshot of Rashada and his family, that he would deliver whatever NIL compensation package was needed to secure Rashada's commitment to UF. *Id.* at ¶ 24. And while Hathcock and Castro-Walker were in the thick of the initial negotiations with Rashada's agents, Hathcock allegedly said that he "just listen[ed] to" whatever Napier and Castro-Walker told him to do. *Id.* at ¶ 30.

Napier's putative actions, in concert with the surrounding circumstances alleged in the Amended Complaint, at the very least created a plausible appearance that Castro-Walker and Hathcock were acting as Rashada's apparent agents during his recruitment to UF. *See Borg-Warner Leasing, a Div. of Borg-Warner Acceptance Corp. v. Doyle Elec. Co.*, 733 F.2d 833, 836 (11th Cir. 1984) (apparent agency exists when a principal "by its actions creates a reasonable appearance of authority" (citing *Stiles v. Gordon Land Co.,* 44 So.2d 417, 421–22 (Fla. 1950))). The same goes for Hathcock's alleged actions, which—granting all inferences in favor of Rashada—plausibly suggest that Castro-Walker was acting as his apparent agent during the negotiations. *See*, *e.g.*, ECF No. 37 at ¶ 30 (alleging that Hathcock stated that he "just listen[s] to [Napier and Castro-Walker]" and would do whatever they instructed was necessary to secure any given recruit's commitment to UF); *id.*

at ¶ 32 ("Hathcock's representations to [Rashada]'s agents, which were later communicated to him, led [Rashada] to believe that Castro-Walker had authority to negotiate the NIL agreement that Hathcock and Velocity Automotive would fund."). Similarly, the Amended Complaint plausibly alleges that Hathcock was acting as an actual agent of Velocity. Hathcock allegedly founded Velocity and owned it at all relevant times, *see* ECF No. 37 at ¶ 35, and Velocity's then-CEO David Penney's alleged involvement in the NIL negotiations with Rashada only lends credence to the inference that Hathcock was acting on Velocity's behalf, *id.* at ¶¶ 35, 36, 47, 54. The Court therefore finds that agency relationships alleged by Rashada pass muster for now.

Turning to the fraud allegations, and applying Rule 9(b), the Court is satisfied that Rashada's Amended Complaint adequately alleges each of the fraud-based claims under Florida law and does so with the particularity required. The twin lodestars of Rule 9(b) are "alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *United States ex rel. 84Partners, LLC v. Nuflo, Inc.*, 79 F.4th 1353, 1360 (11th Cir. 2023) (internal quotations and citation omitted). It is oft stated that a plaintiff must therefore sufficiently allege "the who, what, where, when, and how" of the alleged fraud. *See Gose v. Native Am. Servs. Corp.*, 109 F.4th 1297, 1318 (11th Cir. 2024). The Eleventh Circuit instructs that "a court considering a

motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of [R]ule 9(b) with the broader policy of notice pleading." *Id.* (internal quotations and citation omitted) (alteration in original). Courts should accordingly "hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)) (internal quotations omitted). Both are present here.

There is more than enough information in the Amended Complaint to put Defendants on notice of the precise claims against them and to permit them to formulate a defense.[18]   The Amended Complaint specifically identifies (i) who participated in the alleged fraud: Napier, Castro-Walker, Hathcock, Velocity, and other non-parties operating on their behalf, such as Velocity's then-CEO David Penney; (ii) what the allegedly fraudulent activity was: repeated promises of six-to-eight figure NIL payments that Defendants never intend to abide; (iii) where the fraud took place: through specified mediums of communication, including phone

---

[18] For the same reason, the Court will not dismiss the Amended Complaint as an improper shotgun pleading.  Simply put, "this is not a situation where a failure to more precisely parcel out and identify the facts relevant to each claim materially increased the burden of understanding the factual allegations underlying each count." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1324 (11th Cir. 2015).

calls and text messages; (iv) when the fraudulent representations were made: on crescendoing, pinpointed dates between October 2022 and January 2023; and (v) how the alleged fraud occurred: an NIL scheme in which Defendants baited Rashada to flip his commitment to UF with the prospect of lucrative NIL payments—only to switch the terms of the deal after key recruiting milestones had passed—with the intention of securing a blue chip recruit on the cheap and depriving UF's rivals of Rashada's athletic prowess.

As evidenced by the detailed nature of the Amended Complaint, Rashada has extensive prediscovery evidence to ostensibly support his factual allegations. *See Gose*, 109 F.4th at 1318 n.26 ("Requiring plaintiffs to have substantial prediscovery evidence of those facts prevents plaintiffs from 'learn[ing] the complaint's bare essentials through discovery and . . . needlessly harm[ing] a defendant's goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements.'" (quoting *United States ex rel. Clausen v. Lab'y Corp. of Am., Inc.*, 290 F.3d 1301, 1313 n.24 (11th Cir. 2002))). Indeed, Rashada has pled the time, manner, and substance of each statement or action that he contends was fraudulent. Practically speaking, Rashada cannot reasonably be expected to marshal more information or enhance the specificity of his allegations without the benefit of discovery—but, in the end, he will have to prove his claims.

Defendants' efforts to splice and dice the alleged misrepresentations under the false flag of Rule 9(b) overstates Rashada's current burden and are unavailing.  *See Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1512 (11th Cir. 1988) ("Allegations of date, time or place satisfy the Rule 9(b) requirement that the *circumstances* of the alleged fraud must be pleaded with particularity") (emphasis in original); *see also Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 662–63 (11th Cir. 2015) ("The particularity requirement may be relaxed for allegations of 'prolonged multi-act schemes,'" which "permits a plaintiff to plead the overall nature of the fraud and then to allege with particularity one or more illustrative instances of the fraud." (internal citation omitted)).  So too, at this stage, are Defendants' attempts to recast Rashada's allegations as inactionable future "promise[s] not performed," *see* ECF No. 47 at 14 (quoting *Jones v. Brenco LLC*, 2024 WL 2287673, at *2 (N.D. Fla. Mar. 25, 2024)),[19] and bids to downplay Rashada's putative reliance on the alleged fraud, ECF No. 46 at 25 (asserting that any reliance interest asserted by Rashada is belied by the possibility he could refuse to enroll or transfer).

Rashada, however, alleges that Defendants' never intended to pay him the promised sums, and that intent formed by October 2022—before he flipped his

---

[19] A "false statement of material fact must generally go to a 'past or existing fact,'" and "[f]orward-looking statements can constitute fraud only 'if the plaintiff can demonstrate that the person promising future action does so with no intention of performing or with a positive intention not to perform.'"  *See King v. Bencie*, 752 F. App'x 881, 883–84 (11th Cir. 2018) (quoting *Prieto v. Smook, Inc.*, 97 So.3d 916, 917–18 (Fla. 4th DCA 2012)).

commitment to UF. *See* ECF No. 72 at 59:10–21, 61:14–62:9. Among other things, Rashada says that intent not to perform is evinced by the fact Gator Guard, Hathcock's NIL collective, was undercapitalized and did not exist as a registered corporation. *See* ECF No. 50 at 6; *see also* ECF No. 37 at ¶ 31 n.3 ("[N]o entity called 'Gator Guard Marketing, LLC' appears to have ever registered with the Florida Secretary of State."). Gator Guard allegedly raised only "$5 million . . . to fund UF student-athlete NIL contracts," which is two, nearly three, times lower than the "guaranteed payments," pledged to Rashada to secure his commitment to UF. *See* ECF No. 37 at ¶ 31 n.3. The Court finds these facts, taken as true, make it plausible that Gator Guard would not have been able to finance the proposed obligations to Rashada, which strongly suggests Defendants could not pay what they represented and never intended to. *See Walton Const. Co., LLC v. Corus Bank*, 2011 WL 2938366, at *8 (N.D. Fla. July 21, 2011) (Where plaintiff alleged defendants did not negotiate any work change requests or time extensions or pay "for the work it completed on" a project, "it can be reasonably inferred, and it is thus facially plausible, that" defendants did not intend to pay plaintiff for work.). Moreover, the broader context alleged in the Amended Complaint, granting all inferences in Rashada's favor, suggests that Defendants intended to string Rashada along without payment in order to deny Miami and other rival schools the prestige of signing a

highly-touted quarterback as well as, for some period of time, Rashada's talents on the gridiron.

Speaking of rivals, Rashada has adequately alleged that he relied to his detriment on Defendants' putative fraud by committing to UF in lieu of other multi-million-dollar NIL deals available to him at Miami and other schools. *See Prentice v. R.J. Reynolds Tobacco Co.*, 338 So.3d 831, 841 (Fla. 2022) ("The type of interest protected by the law of deceit is the interest in formulating business judgments without being misled by others—in short, in not being cheated.") (cleaned up). "Reliance means that a plaintiff . . . entered a transaction in whole or in part because of the defendant's fraudulent conduct," and "requires the plaintiff to have received, believed, and acted upon a misrepresentation by the defendant." *Id.* at 838 (internal quotations and citation omitted). Rashada has alleged just that, and it doesn't take a rocket scientist to understand how a purportedly fraudulent NIL deal initially valued north of $13 million could induce a teenager to choose a university he otherwise would not have. *See, e.g.*, ECF No. 37 at ¶ 10 ("Defendants used lies to secure [Rashada's] commitment to UF, only to try to re-trade the deal once [Rashada] had given up the other multi-million-dollar NIL opportunities available to him"); *id.* at ¶ 75 (alleging that Rashada "justifiably relied on representations made by [Defendants] to his detriment by decommitting from Miami and abandoning the $9.5 million NIL deal, as well as forgoing other recruitment opportunities and related NIL

deals."). Thus, as required in the context of negligent misrepresentation, the Court also finds that the facts and circumstances alleged, viewed in the light most favorable to Rashada, support an inference that Rashada's reliance was justified. *See Butler*, 44 So.3d at 105 ("[J]ustifiable reliance on a representation is not the same thing as failure to exercise due diligence."); *see also Field v. Mans*, 516 U.S. 59, 70–71 (1995) ("[J]ustifiable [reliance] . . . does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case." (internal quotations and citations omitted)); *cf. Glob. Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1028 (11th Cir. 2017) (observing that, under Florida law, a subsequent contract's merger clause does "not 'estop[]' the [plaintiff] from alleging fraud or 'make the contract incontestable because of fraud'" (quoting *Oceanic Villas, Inc. v. Godson*, 4 So.2d 689 (Fla. 1941))) (alterations added). Of course, Rashada's allegations of detrimental reliance are just that—allegations the Court is duty-bound to accept as true; at later stages of this action, Rashada will need to come forward with evidence proving his claims, including facts demonstrating his loss of NIL deals with other universities.

All things considered, Rashada's allegations supporting his fraudulent inducement (Count I) and negligent misrepresentation (Count V) claims are

particularized and plausible enough to proceed to discovery.[20] This finding extends to Rashada's aiding and abetting fraud claim (Count II), as the surrounding circumstances alleged in the Amended Complaint readily allow for the inference that each Defendant had actual knowledge of the putative fraud. *See Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012) (To state a claim for aiding and abetting a common law tort under Florida law, a plaintiff must allege: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abetter [sic]; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." (citation omitted)); *Isaiah v. JPMorgan Chase Bank, N.A.*, 2017 WL 5514370, at *3 (S.D. Fla. Nov. 15, 2017), *aff'd sub nom. Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296 (11th Cir. 2020) ("[A]iding and abetting claims must sufficiently establish—or allow the fair inference—that the defendant had actual knowledge of the underlying tort."); *see also Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014) ("[A]ctual knowledge may be shown by circumstantial evidence . . . .").

---

[20] That there may be some tension between these theories of liability is immaterial for present purposes because "[l]itigants in federal court may pursue alternative theories of recovery, regardless of their consistency." *Brookhaven Landscape & Grading Co. v. J.F. Barton Contracting Co.*, 676 F.2d 516, 523 (11th Cir. 1982); *see* Fed. R. Civ. P. 8(d)(3) (a party may set forth inconsistent or alternative claims).

### b.  Civil Conspiracy (Counts III and IV)

Counts III and IV assert claims against all Defendants for civil conspiracy to commit fraud and civil conspiracy as an independent tort, respectively.  *See* ECF No. 37 at ¶¶ 88–104.  The Court finds that the Amended Complaint's allegations are sufficient to support the former, but not the latter.

Under Florida law, the elements of a civil conspiracy are: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy."  *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009) (quoting *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So.2d 1157, 1159–60 (Fla. 3d DCA 2008)).  The allegations in the Amended Complaint, accepted as true at this stage, advance a compelling narrative that the Defendants were all marching to the beat of the same drum throughout Rashada's failed recruitment to UF, each taking interwoven and often overlapping steps designed to lure Rashada away from Miami all while knowing they would never make good on the NIL promises made and leading Rashada on until his other NIL offers dried up.  *See Cordell*, 561 F. App'x at 886 ("Each coconspirator need not act to further a conspiracy; each need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators." (internal quotations and citation omitted)).  Rashada is

not required to allege that Defendants devised the putative conspiracy in a smoke-filled room. *See Donofrio v. Matassini*, 503 So.2d 1278, 1281 (Fla. 2d DCA 1987) ("A conspirator need not take part in the planning, inception, or successful conclusion of a conspiracy . . . . to be held responsible for all of the acts of his coconspirators." (citation omitted)). And the Court is satisfied that there are ample, particularized allegations to reasonably infer that the Defendants conspired to commit the fraud described by Rashada.

The same is not true, though, for Rashada's claim that Defendants committed the independent tort of civil conspiracy. Under Florida law, the gravamen of a civil conspiracy claim is the underlying tort carried out by virtue of the conspiracy, not the conspiratorial agreement itself. *See Koch v. Royal Wine Merchants, Ltd.*, 907 F. Supp. 2d 1332, 1346 (S.D. Fla. 2012) ("Unlike a criminal conspiracy, which is an offense in itself, a civil conspiracy 'is not a separate or independent tort but is a vehicle for imputing the tortuous [sic] actions of one co-conspirator to another.'" (citation omitted)). So ordinarily, if there is no actionable underlying tort, a civil conspiracy claim will fail. *See Williams Elec. Co. v. Honeywell, Inc.*, 772 F. Supp. 1225, 1239 (N.D. Fla. 1991) (observing that an "actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor.") (collecting cases). However, a narrow exception exists where the conspirators possess a "peculiar power of coercion . . . by

virtue of their combination," which the co-conspirators would not possess on their own. *See Churruca v. Miami Jai-Alai, Inc.*, 353 So.2d 547, 550 (Fla. 1977). In those rare circumstances, a civil conspiracy constitutes an "independent tort." *Id.* "The essential elements of this tort are a malicious motive and coercion through numbers or economic influence." *Id.*; *see also Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1319 (S.D. Fla. 2014) (describing the "'rigorous requirement that the combination must result in a peculiar power of coercion which any individual standing in a like relation to the plaintiff would not have had'" (citation omitted)). Rashada argues that the combination of (i) Napier's and Castro-Walker's clout as football coaches at UF; and (ii) Hathcock's and Velocity's deep pocketbooks created such a profound power imbalance during their negotiations with him, a teenager, that it amounted to Defendants exercising a "peculiar power of coercion." *See Churruca*, 353 So.2d at 550. Yet, no court has adopted such an expansive interpretation of this exception. *Cf. Hvide v. Holt Fin. Ltd.*, 2021 WL 8154846, at *11 (S.D. Fla. Sept. 13, 2021) (dismissing standalone conspiracy claim where plaintiff merely alleged that the defendants "exercised control and dominion over his life in dramatic and significant ways"). A conspiracy is only actionable as an independent tort when a several parties band together to blacklist another from an industry or analogous instances of group boycotts, not when certain parties allegedly possess vastly superior negotiating leverage. *See Liappas v. Augoustis*, 47 So.2d 582, 583 (Fla.

1950) ("Outside of this and related or similar fields, instances of conspiracy which is in itself an independent tort are rare and should be added to with caution."); *see also Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1263 (11th Cir. 1998) (observing that "[g]roup boycotts which have been deemed illegal per se [under the federal antitrust laws] 'have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'" (internal quotations and citations omitted)).  Since there is no allegation that Defendants joined together to blacklist or boycott Rashada, Count IV must be dismissed.

### c.  Tortious Interference (Counts VI and VII)

Counts VI and VII assert that Defendants tortiously interfered with Rashada's business relationship and $9.5 million NIL deal with Miami and that each Defendant aided and abetted that interference.  *See* ECF No. 37 at ¶¶ 109–117.  Tortious interference occurs under Florida law when the defendant "(1) has knowledge of (2) an enforceable contract between the plaintiff and a third party and (3) intentionally and (4) unjustifiably interferes with the plaintiff's rights under that contract, (5) thereby causing the plaintiff injury." *Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 847 (11th Cir. 2017) (citing *Mariscotti v. Merco Grp. at Akoya, Inc.*, 917 So.2d 890, 892 (Fla. 3d DCA 2005)); *see also Landmark Bank, N.A. v.*

*Cmty. Choice Fin., Inc.*, 2017 WL 4310754, at *20 (S.D. Fla. Sept. 28, 2017) ("Florida courts have determined tortious interference with a business relationship and tortious interference with a contract are nearly identical causes of action, with the 'only material difference' being 'in one there is a contract and in the other there is only a business relationship.'" (citation omitted)).

The somewhat novel question presented here is whether, under Florida law, Rashada can sue for tortious interference when *he was the one* that allegedly withdrew from the Miami relationship to pursue an NIL deal represented by Defendants to be $4 million richer. Put differently, can Rashada sue Defendants for inducing him to interfere with his own business relationship? The parties agree that this question turns largely on whether Florida courts have adopted, or would adopt, § 766A of the Restatement (Second) of Torts, which provides for a tortious interference claim when performing one's own contract. *See KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1323 (11th Cir. 2004); Restatement (Second) of Torts § 766A (1979) ("One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.").

Although the Florida Supreme Court has previously embraced a related provision of the Restatement, *Gossard v. Adia Services, Inc.*, 723 So.2d 182, 183–85 (Fla. 1998) (adopting § 766 of the Restatement (Second) of Torts), it has never adopted § 766A. Where a state's highest court has not ruled on a point of state law, "federal courts are bound by decisions of a state's intermediate appellate courts unless there is persuasive evidence that the highest state court would rule otherwise." *Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009) (quoting *King v. Order of United Com. Travelers of Am.*, 333 U.S. 153, 158 (1948)).

At least one Florida state appellate decision, *McKinney-Green, Inc. v. Davis*, 606 So.2d 393 (Fla. 1st DCA 1992), strongly suggests that Florida courts would decline to adopt § 766A—despite not referencing the provision explicitly. In that case, the court held that the plaintiff failed to state a cause of action for tortious interference where the *plaintiff himself* was induced by the defendant "to act in contravention of the agreement" with a non-party. *Id.* at 398. Those same facts are present here, and Rashada has not supplied any "persuasive evidence" that the Florida Supreme Court would reach a contrary conclusion. *Bravo,* 577 F.3d at 1325.[21]

---

[21] The fact that *McKinney-Green* is a decision from the First District Court of Appeal carries particular importance because, as the "[Florida] appellate court that would have had jurisdiction over an appeal in [the] case had it been filed in state court," *Bravo v. United States*, 532 F.3d 1154, 1164 (11th Cir. 2008), the Court is bound by its rulings on matters of Florida state

Rashada simply asserts that "[the] Court should predict that Florida courts would adopt section 766A because other Florida courts have already applied numerous Restatement sections addressing tortious interference," ECF No. 50 at 34–35 (collecting cases). Rashada analogizes his case to *Redies v. Nationwide Mut. Ins. Co.*, 711 F. Supp. 570 (D. Colo. 1989), where the District of Colorado "predicted that Colorado courts would adopt [§ 766A] because they already applied other Restatement sections addressing tortious interference," ECF No. 50 at 34.

But when making an "educated guess" on matters of state law, *Smigiel v. Aetna Cas. & Sur. Co.*, 785 F.2d 922, 925 (11th Cir. 1986), "district courts must attempt to predict state law, not to create or modify it," *Anderson v. Mosaic Fertilizer LLC*, 2021 WL 4762421, at *5–7 (M.D. Fla. Sept. 7, 2021) (citing *Salinero v. Johnson & Johnson*, 995 F.3d 959, 968 (11th Cir. 2021)). *See Alexander Proudfoot Co. World Headquarters v. Thayer*, 877 F.2d 912, 916 (11th Cir. 1989) (explaining that a federal court sitting in diversity must apply the law of the state so that "federal decisions mirror those of a court in the forum state"); *see also Nicolaci v. Anapol*, 387 F.3d 21, 27 (1st Cir. 2004) ("Federal courts sitting in diversity should be cautious about pushing state law to new frontiers."). The Court will not drag Florida's tortious interference law to a place that at least one Florida appellate court

law when the Florida Supreme Court has not definitively resolved an issue and there is no "persuasive evidence," *Bravo*, 577 F.3d at 1325, that it would view the matter differently.

has all but rejected, *see McKinney-Green*, 606 So.2d at 398, especially where there is barely any evidence that the Florida Supreme Court (or any other state appellate court for that matter) would ultimately bless Rashada's novel application.[22]

The Court accordingly concludes that Rashada's tortious inference claim, Count VI, must be dismissed. Rashada's claim for aiding and abetting tortious interference, Count VII, falls with it. *See Lawrence*, 455 F. App'x at 906 (observing that, under Florida law, aiding and abetting requires an underlying tort to be actionable).

### d. Vicarious Liability (Count VIII)

Rashada's last claim, Count VIII, is for vicarious liability against Velocity based on Hathcock's conduct. ECF No. 37 at ¶ 120 ("Velocity Automotive is vicariously responsible for the acts, errors, and/or omissions of Hathcock as previously set forth herein."). For the reasons set forth above, the Court will permit this claim to proceed to the extent it pertains to Counts I, II, III, and V, but will be

---

[22] Novel issues of state law are best resolved by the state's supreme court. *McMahan v. Toto,* 311 F.3d 1077, 1079 (11th Cir. 2002) ("[W]hen [federal courts] write to a state law issue, we write in faint and disappearing ink." (internal quotation marks omitted)). For that reason, the Eleventh Circuit has repeatedly stated that "[w]hen substantial doubt exists about the answer to a material state law question upon which the case turns, a federal court should certify that question to the state supreme court in order to avoid making unnecessary state law guesses and to offer the state court the opportunity to explicate state law." *Forgione v. Dennis Pirtle Agency, Inc.,* 93 F.3d 758, 761 (11th Cir. 1996). However, Florida's Constitution does not permit this Court to send certified questions to the Florida Supreme Court. *See* Fla. Const., art. V, § 3(b)(6) (allowing only the United States Supreme Court and Eleventh Circuit to send certified questions to the Florida Supreme Court).

dismissed to the extent it is premised on Counts IV, VI, and VII.  *See supra* Sections III(a)–(c).

### e. Sovereign Immunity

Finally, there's an 800-pound gorilla lurking in this case: sovereign immunity. Both Napier and Castro-Walker argue that the claims against them must be dismissed because they are entitled to immunity under Fla. Stat. § 768.28(9)(a), which protects "officer[s], employee[s], or agent[s] of the state or of any of its subdivisions" from tort suits stemming from "any act, event, or omission of action in the scope of her or his employment or function," save for when individuals "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  *See* ECF No. 45 at 3–11; ECF No. 48 at 29–33.  Specifically, Napier claims he is an agent of two supposedly covered entities, UF and the University Athletic Association, *see* ECF No. 48 at 31, while Castro-Walker avers he was employed by the University Athletic Association at all relevant times, *see* ECF No. 45 at 5.  Those arguments will have to wait for another day.

Under Florida law, "[s]overeign immunity is an affirmative defense that is not properly asserted in a motion to dismiss unless 'the complaint itself conclusively establishes its applicability.'"  *City of Tampa v. Fredrick*, 369 So.3d 1197, 1199 (Fla. 2d DCA 2023) (quoting *Sierra v. Associated Marine Insts., Inc.*, 850 So.2d 582, 590

(Fla. 2d DCA 2003)).   The Amended Complaint alone does not establish that sovereign immunity is at play here—and certainly does not do so conclusively.  *Id.* Nor is there a record currently before the Court that could support a reasoned analysis of Napier's and Castro-Walker's blanket assertions of immunity; Napier and Castro-Walker did not attach any documentation to back up their claims.  The Court cannot resolve the competing allegations proffered by the two sides at this juncture, and Napier's and Castro-Walker's motions to dismiss on this ground will therefore be denied.

## IV.   Conclusion

Defendants' Motions to Dismiss, ECF Nos. 45, 46, 47, and 48, are **GRANTED in part and DENIED in part** as follows:

> 1. Counts IV, VI, and VII are **DISMISSED** without prejudice.  Count VIII is **DISMISSED** without prejudice to the extent premised on Counts IV, VI, and VII.  Rashada may file a second amended complaint within fourteen (14) days after the date of this Order.
>
> 2. Defendants' Motions are **DENIED** in all other respects.[23]

---

[23] Hathcock's embedded motion for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e) is denied, too.  "A motion for more definite statement is appropriate where, upon a reading of a plaintiff's pleadings, it is virtually impossible to know which allegations of fact are intended to support which claims for relief."  *Typhoon Media Corp. v. CVS Pharmacy, Inc.*, 2012 WL 12862797, at *9 (S.D. Fla. June 19, 2012) (citing *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)).  For all the reasons stated above, that is not the case here.  *See Foster v. Dead River Causeway, LLC*, 2014 WL 4059899, at *2 n.2 (M.D.

A Rule 16 conference will be scheduled by separate order.  *See* ECF No. 15.

　　　**DONE AND ORDERED** this 8th day of April, 2025.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

Fla. Aug. 15, 2014) (""[I]n the federal system, . . . motions for a more definite statement are not favored'" and "should rarely be granted." (internal citation omitted)).