**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | | |
|---|---|---|
| **JADEN RASHADA,** | § | |
| | § | |
| **Plaintiff,** | § | **No. 3:24-cv-219-MCR-HTC** |
| **v.** | § | |
| | § | |
| **WILLIAM "BILLY" NAPIER;** | § | |
| **MARCUS CASTRO-WALKER;** | § | |
| **HUGH HATHCOCK; and** | § | |
| **VELOCITY AUTOMOTIVE** | § | |
| **SOLUTIONS, LLC** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF JADEN RASHADA AND NON-PARTIES JTM SPORTS, LLC,
JACKSON ZAGER, AND THOMAS THOMSEN'S
RESPONSE AND INCORPORATED MEMORANDUM TO
DEFENDANT HUGH HATHCOCK'S
MOTION FOR _IN CAMERA_ REVIEW AND TO COMPEL PRODUCTION**

Plaintiff Jaden Rashada ("Rashada") and Non-Parties JTM Sports, LLC, Jackson Zager, and Thomas Thomsen (collectively "JTM") file their response and incorporated memorandum to Defendant Hugh Hathcock's ("Hathcock") Motion for _in Camera_ Review and to Compel Production.

## INTRODUCTION

Hathcock's motion seeks to compel the production of documents, and portions of documents, that have been properly withheld on the basis of attorney-client privilege, work product privilege, and confidentiality. On December 10, 2025,

Hathcock identified by Bates label and privilege log ID 99 specific documents that he is asking the Court to find discoverable. Doc. No. 108.

Of those 99 documents, 25 were partially redacted based on nonresponsive, confidential information that was contained in those text messages. Redacting nonresponsive information in confidential documents is permitted pursuant to the Confidentiality Order entered in this case. Doc. No. 85. Even though such redactions of nonresponsive information for confidentiality are permissible, Rashada and JTM have agreed to reproduce those documents without redaction for all but 4 of the documents which are the subject of Hathcock's motion. *See infra* n.10.

As to the remaining documents withheld in whole or in part on the basis of attorney-client or work product privilege, Hathcock only challenges whether they are protected from discovery on three specific grounds: (i) because the withheld communications contain underlying facts; (ii) because Rashada and JTM have waived the privileged nature of these documents through selective disclosure; and, (iii) because the withheld communications may contain information that is relevant to elements of claims and defenses that are at issue.

Rashada and JTM's response addresses the grounds on which Hathcock has challenged the privileged nature of the withheld communications. Each of those arguments fails.    Underlying facts are not discoverable through privileged communications. Rashada and JTM have not waived privilege through selective disclosure because they have not disclosed any privileged communications. The "at

issue" doctrine does not apply because Hathcock has not shown that Rashada's fraud claims are based upon, or that Rashada will necessarily use privileged communications to, prove them.

Because the issues raised in Hathcock's motion can either be addressed without Court intervention or fail as a matter of law, the motion should be denied.

## BACKGROUND AND PROCEDURAL HISTORY

### A.    Factual Background.

Relying on informal, unsworn interviews of witnesses instead of their sworn deposition testimony, Hathcock's motion spins a tale that he did not make NIL offers to Rashada and Rashada's allegations regarding him are a figment of Rashada's agents' imaginations.  Hathcock avoids discussing the actual evidence developed in this case because it refutes his story.  However, debunking Hathcock's narrative is not the purpose of this response except to the extent doing so is relevant to the issues properly before the Court.

For example, Hathcock repeatedly asserts that "neither Rashada [nor] JTM [], have produced *any information* supporting" the allegation that "Hathcock told Rashada or his representatives at JTM that he would pay Rashada $13.85 million to commit to Florida." Motion at 24 (emphasis added). Similarly, Hathcock bemoans the purported absence of any document "that explains the genesis of the amounts comprising the $13.85 million deal between Rashada and the Gator Collective." *Id.*, at 2. The evidence belies Hathcock's contentions.

Edward Rojas ("Rojas"), the CEO of The Gator Collective, LLC until it was dissolved in the spring of 2023, was deposed in this case on November 10, 2025, and the transcript of that testimony was made available to counsel for the parties on November 13, 2025. During his deposition, Rojas unequivocally testified that he was told by Defendant Marcus Castro-Walker ("Castro-Walker"), the Director of Player Engagement and NIL for the University of Florida (UF) at the time, "that Hugh Hathcock, Gator Guard and/or Velocity were funding a deal." *See* Deposition Transcript of Edward Rojas attached as **Exhibit 1**, at 70:10–18.[1] *See also*:

- "[I]t was said to me [by Castro-Walker] that Hugh [Hathcock] agreed to it and that's what I was told."[2]

- "Marcus [Castro-Walker] then reiterated to me [Rojas] over and over again that yes, he [Hathcock] did, it's not a problem . . . ."[3]

- Agreeing that "[Rojas] and Marcus [Castro-Walker] had multiple calls talking about what the number was agreed to with Hugh Hathcock" regarding Rashada's NIL deal.[4]

- Agreeing that, in entering into the $13.85 million contract between the Gator Collective and Rashada, Rojas was relying on what Castro-

---

[1] Jennifer Grosso ("Grosso"), a lawyer who worked for the Gator Collective to help administer its contracts with student athletes, similarly testified during her deposition that both Castro-Walker and Darren Heitner ("Heitner"), outside counsel for the collective, contacted her on November 10, 2022 and told her that Hathcock was funding an NIL deal for Rashada. *See* Deposition Transcript of Jennifer Grosso attached as **Exhibit 2**, at 83:23–84:25; 87:4–24 (Heitner relayed to Grosso that Rashada's NIL deal with Hathcock "had been negotiated" and sent Grosso the payment terms); 294:25–295:8 ("[T]he funding person was always to be Hugh - - from our understanding.").

[2] Ex. 1, 94:14–95:2.

[3] Ex. 1, 122:3–10.

[4] Ex. 1, 209:14–18.

Walker represented to him as the number agreed upon between other parties.[5]

- Rojas testified that "Marcus Castro-Walker told [him] that Hugh Hathcock had agreed to fund Jaden Rashada's NIL deal at $13.85 million" "[m]ore than once. Probably more than ten [times]. A lot of times."[6]

Moreover, regarding the "genesis" of the $13.85 million figure for which Rashada contracted with Rojas's Gator Collective, Rojas attributed it to a call Castro-Walker told him about in which Hathcock, Heitner, and Rashada's agents, Jackson Zager ("Zager") and Thomas Thomsen ("Thomsen") of JTM, were participants. *Id*., at 94: 14–24. Further discovery from the participants on that call will provide additional evidence pertaining to the genesis of the $13.85 million figure.

Finally, contrary to Hathcock's suggestion, there is nothing nefarious about Rashada's agents engaging in NIL discussions and proposing contractual amounts to be paid to the client they represent. *See* Motion, at 5, 9. That's what agents do. Zager and Thomsen were the principals and co-owners of the JTM agency. *See* Declaration of Jackson Zager attached as **Exhibit 3**. Zager and Thomsen were also both licensed in the State of Florida as athlete representatives in accordance with Chapter 468 of the Florida Statutes. *Id*.

---

[5] Ex. 1, 218:21–219:1.

[6] Ex. 1, 318:8–12.

In June 2022, Zager and Thomsen retained Darren Heitner and Heitner Legal, P.L.L.C. (collectively "Heitner") to act as outside legal counsel for JTM to assist with negotiating and reviewing NIL contracts. *See id*.; *see also* Motion, Ex. 5. At that time, JTM was also negotiating an NIL deal on Rashada's behalf with Hathcock, with which Heitner assisted. Ex. 3. While JTM had not yet finalized a formal representation agreement with Rashada,[7] Rashada and his father, Harlen Rashada, consented to JTM engaging in such NIL discussions on Rashada's behalf. *Id*. Hathcock was a ready and willing participant in these June 2022 discussions with JTM regarding Rashada's recruitment to UF and his NIL opportunities.[8]

On June 26, 2022, Rashada turned down Hathcock's NIL offer, and Rashada committed to the University of Miami.[9]

Later in October 2022, Zager began having discussions with Castro-Walker regarding Rashada's football and NIL opportunities at UF. Ex. 3. This again led to discussions between Hathcock and JTM regarding an NIL deal for Rashada with which Heitner assisted. *Id*. Thus, on November 8, 2022, Rashada entered into a

---

[7] Rashada entered into a formal Standard Representation Agreement with JTM on November 8, 2022. Motion, Ex. 2.

[8] *See e.g.* June 24, 2022 LinkedIn exchange between Thomsen and Hathcock (Thomsen_000302) attached as **Exhibit 4** in which Thomsen introduces himself and notes that it seems Hathcock is "largely interested in one of the Quarterbacks we are close with" to which Hathcock responds "Agreed" and sends his phone number.

[9] *See* Jeremy Crabtree, *Rashada turned down millions, will still have highest known NIL deal for recruits*, ON3, June 26, 2022, *available at* https://www.on3.com/nil/news/jaden-rashada-turned-down-millions-will-still-have-highest-known-nil-deal-for-recruits, produced as HH-SDT-NCAA-007887-90, attached as **Exhibit 5.**

Standard Representation Agreement with JTM, the terms of which specifically contemplated an NIL contract with Hathcock's company, Defendant Velocity Automotive Solutions, LLC ("Velocity"). *See* Motion, Ex. 2, Section 4. After Hathcock directed a change as to the contractual counterparty through which his funds would flow, Rashada entered into a $13.85 million contract with The Gator Collective, LLC on November 10, 2022. Ex. 3. Rashada publicly announced that he was flipping his commitment from the University of Miami to the UF on social media in the early morning hours of November 11, 2022. *Id*.

Almost immediately, Rashada began receiving demand letters and threats of litigation from the Miami-affiliated entities with whom he had entered into an NIL deal following his commitment to Miami months prior. *Id*. The Miami-affiliated entities are MSP Recovery, LLC and Cigarette Holdings, LLC, collectively referred to as the "Life Wallet Entities." *Id*. Thus, Rashada anticipated litigation with the Life Wallet Entities, stemming from the flip of his commitment from Miami to UF, as early as November 11, 2022. *Id*.

A few weeks after that, on December 6, 2022, The Gator Collective, LLC terminated the $13.85 million NIL contract that it had entered into with Rashada. *Id*. Thus, Rashada anticipated litigation stemming from the wrongfully terminated Gator Collective, LLC contract, and the false promises of payment that continued for weeks thereafter, as early as December 6, 2022. *Id*.

JTM has relied on Heitner for legal services for other clients beyond Rashada. *Id*. Indeed, to this date, Heitner still provides legal services to JTM. *Id*. Additionally, Zager's father, Steven Zager, is a highly accomplished lawyer who is formerly a partner at King & Spalding, Akin Gump Strauss Hauer & Feld, Brobeck, Phleger & Harrison, and Weil Gotshal & Manges. *Id*. While Steven Zager does not specialize in NIL or sports law, he has provided legal services to JTM when requested by Zager. *Id*. This included legal advice about the terms of JTM's representation of Rashada, as well as legal advice pertaining to some of the relevant documents at issue in this case, such as the draft Velocity agreement, the Gator Collective Agreement, and the draft Assignment of the Gator Collective Agreement to Gator Guard. *Id*.

Simply stated, Hathcock's unsubstantiated and mistaken belief that properly-withheld privileged communications will support his version of the story is not a basis on which they may become discoverable.

**B. Redaction Of Nonresponsive Information Contained In Confidential Documents Is Permitted By The Confidentiality Order; Regardless, Nearly Every Redaction For Confidentiality Has Been Resolved Without The Need For Court Intervention.**

With regard to redactions for confidentiality, Hathcock's motion also inaccurately states that there is "no basis" for the redactions contained in the JTM and Rashada documents. Motion at 3. The only redactions contained in the confidential documents are redactions of nonresponsive information. This is plainly

permitted by the terms of the Confidentiality Order entered in this case. *See* Doc. No. 85, Section C., 10:

> Nonresponsive portions of a discovery document containing Confidential Information may be redacted by the producing party, and the redactions will be subject to the same designation challenge mechanism set forth in Section D below.

Most of the relevant communications in this case are in the form of text messages. Counsel for Rashada and JTM are using the e-discovery platform, Everlaw, to aid in the gathering, review, and production of thousands of text messages from numerous custodians and devices. When the cellphone data is uploaded into the Everlaw database, Everlaw breaks text conversations up into separate document segments. Some text document segments encompass the conversation between participants over a twenty-four-hour period of time. Some text document segments encompass a week or a few days' worth of communications, depending on the number of messages between participants. Thus, depending on the volume and the frequency of the participants' conversations, some text documents are nearly 30 pages long, while others are 2-3 pages long.

Rashada's agents, Zager and Thomsen, were not only the owners and principals of JTM, when the relevant events occurred in this case, but they were also best friends. And like best friends, they communicated with each other frequently via text about matters wholly unrelated to their representation of Rashada. Thus, many of the JTM documents (texts) which contain responsive information also

contain pages upon pages of nonresponsive information wholly unrelated to the facts and issues in this case. To the extent the nonresponsive information was of a highly personal nature, or potentially harmful to third parties with no connection whatsoever to this case, counsel for JTM redacted such information, as permitted pursuant to the Confidentiality Order.

Nevertheless, in the interest of judicial efficiency, counsel for Rashada and JTM has agreed to remove nearly all of the redactions of nonresponsive information on these confidential documents. To the extent any confidential redactions still remain on any document which is now the subject of Hathcock's motion, in most of those instances,[10] the redaction was not removed prior to Hathcock filing his motion because Hathcock never conferred with JTM's counsel regarding that particular document. *See e.g.* Ex. 19, JTM_1288 – 1302.

A history of the parties' conferral efforts is further set forth below.

---

[10] Hathcock did not attempt to confer about all of the documents that contained "Confidential" or "Highly Sensitive Personal Information" redactions. Hathcock's counsel provided counsel for JTM with a list of documents containing confidential redactions on November 20, 2025. Within five days, counsel for JTM reviewed those documents and reproduced the documents identified by Hathcock with substantially revised redactions. The only confidential redactions remaining, as to the documents Hathcock actually identified in the November 20, 2025 conferral email, are the names and faces of women who are not witnesses to this case and are not persons with knowledge of facts relevant to this case. *See e.g.*, JTM_1345 [Tab 17], JTM_1600 [Tab 20], JTM_1941 [Tab 25]. Counsel for Rashada also maintained the confidential redaction on RASHADA_000018 [Tab 68] which is a text between Rashada's parents and contains nonresponsive, personal information between them as spouses.

**C.      The Conferral History Reveals Good Faith Efforts To Resolve The Issues.**

Counsel for Hathcock first raised concerns about privileged communications between JTM and Heitner during discovery conferral calls in July 2025. In response to those concerns, counsel for JTM and Rashada agreed to provide a privilege log of JTM and Heitner communications by August 1, 2025, which it did. *See* Motion, Ex. 17.[11]

On September 22, 2025, counsel for Hathcock sent a discovery conferral email to counsel for Rashada and JTM. A copy of the email conferral correspondence is attached as **Exhibit 7**. This was the first time that the issues raised in Hathcock's motion were specifically explained in writing to counsel for Rashada and JTM.   The parties scheduled a call to discuss the issues further two days later on September 24, 2025. In advance of the conferral call, counsel for Rashada and JTM asked Hathcock to: (i) clarify which withheld documents Hathcock intended to challenge as privileged; and (ii) identify documents which had been produced that Hathcock contends resulted in the waiver of privilege for other documents that were withheld. *See id*. In advance of the conferral call, Hathcock answered the first question, but not the second. *Id*. On September 30, 2025, counsel for Rashada and JTM wrote a lengthy follow-up email explaining Rashada/JTM's disagreement with

---

[11] Counsel for Rashada and JTM later amended and supplemented that privilege log on October 1, 2025. *See* Amended and Supplemental JTM Privilege Logs attached as **Exhibit 6.**

Hathcock's legal arguments and again asked Hathcock to identify which privileged documents he contended had been selectively disclosed. *Id*.

There were no further conferrals pertaining to Hathcock's issues until November 20, 2025. *See* email correspondence attached as **Exhibit 8**. In that correspondence, Hathcock acknowledged that the privilege issues were still outstanding, and for the first time, raised an issue pertaining to redactions for confidentiality in the documents Rashada and JTM produced. *Id*. Counsel for Rashada/JTM promptly responded and again requested clarification as to the outstanding issues. *Id*. Later that day, counsel for Hathcock sent a list of 27 JTM documents that contained redactions for confidentiality, 7 Rashada documents that contained redactions for confidentiality, and 25 JTM documents that contained redactions for work product or attorney-client privilege. *Id*.[12] By November 25, 2025, Rashada and JTM Sports revised the redactions and reproduced nearly all of the 34 documents on the confidential redaction list. Counsel for JTM was still in the process of reviewing and considering the 25 JTM documents on the privileged redaction list when Hathcock filed his Motion.[13]

---

[12] This list is not the same list of documents that Hathcock provided to the Court on December 10, 2025 because the issues pertaining to most of these documents were resolved. *Compare* Ex. 8 *with* Doc. No. 108.

[13] As set forth in the *In Camera* Review Document Index provided to the Court on December 11, 2025, JTM Sports has agreed to revise the privilege redactions for the following documents: JTM_00811 [Tab 10] and JTM_001495 [Tab 19].

In accordance with the Court's Order, Doc. No. 107, Hathcock provided a list of documents for which he is seeking the Court's *in camera* review and to compel production. Hathcock's list contains seventy (70) documents that were produced by Rashada and/or JTM with redactions. *See* Doc. No. 108, Ex. 1. As to thirty-six of those documents—more than half—counsel for Rashada/JTM did not know Hathcock had any issue pertaining to those documents until Hathcock filed his list on December 10, 2025.[14] As explained in the Index provided to the Court, many of the redactions for confidentiality that were contained in those documents can be resolved amongst the parties without the need for Court intervention.

## ARGUMENT & AUTHORITIES

Hathcock's motion to compel is limited to three grounds: (I) communications between JTM and its lawyer, Heitner, contain underlying facts that are not privileged; (II) JTM has waived the attorney-client privilege protecting some communications from disclosure by selectively disclosing other communications; and (III) JTM has withheld communications that contain information at issue. *See* Motion at 23-28. As explained below, Hathcock's motion to compel should be denied because: (I) the underlying facts which Hathcock contends were communicated between JTM and Heitner must be discovered from sources that do

---

[14] Local Rule 7.1(B) provides that "[b]efore filing a motion raising an issue, an attorney for the moving party must attempt in good faith to resolve the issue through a meaningful conference with an attorney for the adverse party." N.D. FLA. LOC. R. 7.1(B); *see also* FED. R. CIV. P. 37(a)(1). As to 36 of the documents on Hathcock's list, Hathcock did not confer or attempt to confer with counsel for Rashada and JTM. Had such conference occurred, it would have been productive.

not invade JTM Sport's attorney-client privilege; (II) JTM has not selectively disclosed any privileged communications; and (III) the "at issue" doctrine does not apply because none of Rashada's claims are based on privileged communications and Rashada need not use any privileged communications to prove his claims.[15]

## I.    Underlying Facts Communicated Between JTM And Heitner Are Privileged.

Hathcock states that no documents evidencing his misrepresentations or the source of the $13.85 million number have been produced. Motion at 24. He reasons that "if the information at issue contains non-privileged materials or otherwise discoverable underlying facts, [he] should be able to discover them." Motion at 24.[16] The legal basis for his conclusion: "Underlying facts known to a client are not privileged." *Id.* at 23 (citing *Dominguez v. Citizens Property Ins. Corp.*, 269 So. 3d 623, 628 (Fla. 2d DCA 2019)).

---

[15] Additionally, with regard to Hathcock's work product arguments, he cites the wrong law. Hathcock cites and argues Florida state law exclusively in seeking to defeat the work product assertions of JTM Sports. *See* Motion at 20-22. (citing Florida law). But "federal, not state, work-product rules apply in diversity suits in federal court." *Ford v. Gov't Emps. Ins. Co.*, No. 1:14cv180, 2015 WL 11109374, at *1-2 (N.D. Fla. June 11, 2015). "The work product doctrine is not an evidentiary 'privilege'—rather, it is a 'procedural rule of federal law.'" *Id.* (quoting *In re Pros. Direct Ins. Co.*, 578 F.3d 432, 438 (6th Cir. 2009)). Accordingly, to the extent the Court addresses any work-product issues in resolving Hathcock's motion, the Court should apply the federal work product rule, Federal Rule of Civil Procedure 26(b)(3)(A).

[16] Hathcock does not identify or define "the information at issue." *Id.* It presumably is the withheld documents and the redacted portions of produced documents identified in his list provided to the Court on December 10, 2025.

While underlying facts may be *discovered*, they cannot—as Hathcock argues—be discovered by invading the attorney-client privilege. *Dominguez*, 269 So. 3d at 628. Hathcock's primary authority defeats his own argument:

> [W]hat the [Plaintiffs] said to their law firm is covered [by attorney-client privilege], regardless of whether they might have been talking about facts that themselves could be the subject of inquiry during discovery. In other words, the prospect that some or all of the facts discussed by the attorney and the client might ultimately have been [disclosed by the attorney and client in making a claim] itself does not vitiate the privilege of what would be otherwise protected communications that relate to those facts.

*Id.*; *see also Mobley v. Homestead Hosp., Inc.*, 202 So. 3d 868, 870-71 (Fla. 3d DCA 2016) ("The *contents* of confidential communications between the attorney and client are privileged and not discoverable…") (emphasis added); 1 Fla. Prac., Evidence § 507.1 (2025 ed.) ("The privilege attaches to the communications with counsel, not to the underlying facts").

Hathcock's other authority is completely off-point,[17] or confirms the general rule that communicating discoverable facts between lawyer and client does not render them privileged. *See Dominguez*, 269 So. 3d at 628 ("[Plaintiffs] cannot tell the law firm facts about the [claim] 'in confidence,' and then refuse to disclose them when [deposed]"); *see also Coffey-Garcia v. South Miami Hosp., Inc.*, 194 So. 3d

---

[17] Hathcock cites *Genovese v. Provident Life & Accident Ins. Co.*, 74 So. 3d 1064, 1068 (Fla. 2011). Motion at 23-24. Its holding—that the attorney-client privilege applies in first-party bad faith insurance claims under Florida law—is irrelevant. Hathcock cites it to encourage this Court to conduct an *in camera* review. *Id.* (citing *Genovese*, 74 So. 3d at 1068).

533, 537 (Fla. 3d DCA 2016) ("The privilege . . . does not protect facts known by the client independent of any communication with the lawyer, even if the client later tells the fact to the lawyer[.]").

The fact that Hathcock cannot discover the factual basis for the allegations against him from attorney-client privileged communications is no impediment to discovering that information in a way and from a source not protected by privilege. It certainly does not allow him to invade the attorney-client privilege now in search of that information.

## II. JTM Has Not Selectively Disclosed Any Privileged Communications.

Citing *Coates v. Akerman, Senterfitt & Eidson, P.A.*, 940 So. 2d 504, 511 (Fla. 2d DCA 2006), Hathcock invokes the "selective disclosure" doctrine, arguing that "JTM has selectively used the attorney-client privilege by disclosing or discussing some communications in this critical period where it benefits their version of events while withholding others that may be damaging." Motion at 24-26. Hathcock's assertion is false. JTM did no such thing. Instead, JTM has done what it is required to do: it produced nonprivileged communications and withheld and logged privileged communications. Doing so does not invoke the "selective disclosure" doctrine, as *Coates* itself shows.

In *Coates*, a legal malpractice action between the defendant lawyers and their former clients, the defendant lawyers sought the production of attorney-client communications between the former clients and other lawyers regarding a tax plan

and joint venture because the former clients had waived accountant-client privilege and disclosed a privileged communication on those subjects with yet another lawyer, Smooke. *Coates*, 940 So. 2d at 505-08. The lawyers argued that the clients waived the attorney-client privilege as to the communications between the former clients and the other lawyers under the "at issue" doctrine and the "selective disclosure" doctrine. *Id*. at 507. The trial court compelled the production of the communications under the "at issue" doctrine. *Id*. at 508. The clients sought certiorari review of the trial court's order compelling production. *Id*. at 506. The district court of appeals held that neither the "at issue" doctrine nor the "selective disclosure" doctrine supported the trial court's order compelling production of the privileged communications between the former clients and the other lawyers regarding the tax plan and joint venture, granted certiorari relief because the order "constitute[d] a departure from the essential requirements of law," and quashed the order. *Id*. at 506, 508, 512.

With regard to the "selective disclosure" doctrine, the district court of appeals repeatedly made clear that the doctrine only applies when the communications "selectively disclosed" are privileged communications:

> The client does not waive the privilege by testifying generally in the case or testifying as to facts that were the subject of the consultation with his or her attorney, but if the client or attorney testifies as to ***privileged communications*** in part, this serves as a waiver as to the remainder of the privileged consultation or consultations about the same subject. *Id*. at 511 (emphasis added).

When **attorney client communications** are disclosed regarding a certain matter, there exists a limited waiver with respect to communications on that same, specific matter. *Id*. (emphasis added).

[T]he lawyers have not identified any disclosure of any **privileged communications** between the clients and [the other lawyers] . . . . Accordingly, the lawyers have not established that production of the Smooke memorandum or the client's waiver of the accountant-client privilege . . . served as a waiver of all privileged communications with other professionals that relate to the plan and the joint venture.

*Id*. at 511–12 (internal citations omitted).

Hathcock cites five exhibits to his motion that purportedly contain "selective disclosures" of communications entitling Hathcock to the production of undisclosed privileged communications. *See* Motion at 25-26 (citing Exhibits 6, 8, 12, 13, and 41). However, none of the communications disclosed in Exhibits 6, 12, 13 or 41 are protected from disclosure as attorney-client communications or work product. *See* Motion, Exs. 6, 12, 13, 41. **Hathcock has not argued otherwise.** *See* Motion at 24-26. Because Hathcock has not shown that any of the communications disclosed in Exhibits 6, 12, 13, and 41 are privileged, their disclosure cannot serve as the foundation for Hathcock's "selective disclosure" argument. *See Coates*, 940 So. 2d at 511-12 ("selectively disclosed" communications must be privileged).

Contrary to Hathcock's suggestion, there is nothing improper or dubious about disclosing nonprivileged communications in a text string while withholding the privileged communications in that same text string. Doing so as JTM has done is not "selective disclosure;" it's required by the Federal Rules of Civil Procedure.

Just as the rules do not permit JTM to withhold nonprivileged communications in a text string because other communications in that text string are privileged, the rules do not require JTM to produce the privileged communications in a text string because that text string also contains nonprivileged communications that must be produced.

The only communication disclosed in any of the exhibits that is arguably privileged is Zager's two communications with Thomsen on June 26, 2022 at 7:20 p.m. in Exhibit 8, which relay to Thomsen what Heitner said to Zager. *See* Motion, Ex. 8, at JTM_003112. However, JTM has clawed back those communications pursuant to Federal Rule of Civil Procedure 26(b)(5)(B) so there is no longer a disclosure of privileged communications to serve as the foundation of a "selective disclosure" argument.[18] To the extent the Court reviews those two communications,

---

[18] During the meet and confer process, counsel for JTM twice asked counsel for Hathcock which privileged communications JTM disclosed that formed the basis of Hathcock's selective-disclosure argument.

> Could you also please identify which documents have been produced that you contend resulted in the waiver of the privilege for the documents that have been withheld?

> \* \* \*

> Second, Team Hathcock asserts that 'the privilege has been waived by selective disclosure.' As noted on our call, we cannot evaluate the strength of this argument absent additional information. As requested on our call, please provide us with a list by Bates-number of any privileged documents produced that form the basis of Team Hathcock's selective-disclosure argument.

Ex. 7 (9-22-25 5:43p.m. email between Kendall Speer and Andrew Spencer and 9-30-25 5:05p.m. email between Joe Roden and Andrew Spencer).

Despite representations that it would provide the requested information before it moved to compel, Hathcock's counsel did not do so. Hathcock first identified the documents that formed the basis of its selective disclosure argument when it filed its motion to compel. In response, out of an abundance of caution, JTM has clawed back the only communication in Exhibit 8 that is arguably privileged. *See* email request to claw back the only arguable privileged portion of Exhibit 8 to the motion attached to this response as **Exhibit 9**.

and concludes they are not privileged and should not have been clawed back, then the disclosure of such nonprivileged communications cannot serve as the foundation of Hathcock's selective disclosure argument. *See Coates*, 940 So. 2d at 511-12 ("selectively disclosed" communications must be privileged).

Hathcock asserts he is entitled to disclosure of the privileged communications in Exhibits 12 and 13 because some communications therein were shared with "Steve," "someone outside the potential privilege between JTM and Heitner," according to Hathcock. *See* Motion at 26. Hathcock's shot in the dark misses the mark.

"Steve" is Steven Zager, a highly accomplished lawyer who is formerly a partner at King & Spalding, Akin Gump Strauss Hauer & Feld, Brobeck, Phleger & Harrison, and Weil Gotshal & Manges. Ex. 3. He is also Jackson Zager's father. *Id*. Steven Zager provided legal advice to JTM when requested by Jackson Zager, including legal advice about the draft Velocity agreement referenced in Exhibits 12 and 13. *Id*. Because JTM's privileged communications with Steven Zager have not been disclosed,[19] they cannot serve as the foundation of a "selective disclosure" argument. *See Coates*, 940 So. 2d at 511-12.

Moreover, to the extent Hathcock asserts that JTM /Zager/Thomsen somehow waived privileged communications between themselves and Heitner by sharing them

---

[19] JTM logged its privileged communications with Steven Zager. *See* Ex. 6.

with Steven Zager, that argument also fails because the communication of privileged information to Steven Zager was also privileged. *See* FLA. STAT. § 90.507 (a privilege against the disclosure of a confidential communication is not waived by the disclosure of the communication "when the disclosure is itself a privileged communication").

### III.  Hathcock's "At Issue" Argument Fails Because None Of Rashada's Claims Are Based On Privileged Communications And Rashada Need Not Use Any Privileged Communications To Prove His Claims.

Again relying on *Coates* as his primary authority, Hathcock argues that Rashada "affirmatively placed the contemporaneous communications at issue by bringing this case." Motion at 26-28. Relatedly, Hathcock asserts that Rashada's fraud claim places Rashada's reliance at issue and entitles Hathcock "to discover what information Rashada had to rely on, through JTM and Heitner, and how and where that information originated." *Id.* at 28. Hathcock's arguments lack merit because he misapprehends the "at issue" doctrine and the nature of Rashada's claims.

As previously noted, *Coates* quashed a trial court's order granting discovery of privileged communications pursuant to the "at issue" doctrine, a result directly at odds with the relief Hathcock seeks. *See Coates*, 940 So. 2d at 506. Therefore, at the outset, Hathcock's reliance on *Coates* is misplaced.

*Coates* began its analysis of the "at issue" doctrine by noting that "[a] party does not waive the attorney-client privilege merely by bringing or defending a

lawsuit." *Id.*; *accord Lee v. Progressive Express Ins. Co.*, 909 So. 2d 475, 477 (Fla. 4th DCA 2005) ("[T]he attorney-client privilege is not waived by bringing or defending a lawsuit."). Thus, *Coates* flatly rejects Hathcock's argument that Rashada "affirmatively placed the contemporaneous communications at issue by bringing this case." Motion at 26-28.

Quoting the Florida Supreme Court case of *Savino v. Luciano*, 92 So. 2d 817 (Fla. 1957), *Coates* then described the test for the "at issue" doctrine as follows:

> When a party has filed a claim, *based upon a matter ordinarily privileged, the proof of which will necessarily require that the privileged matter be offered in evidence*, we think that he has waived his right to insist, in pretrial discovery proceedings, that the matter is privileged.

*Coates*, 940 So. 2d at 508 (emphasis in original). Later in the opinion, *Coates* again described the "at issue" test similarly:

> [F]or waiver to occur under the at issue doctrine, the proponent of a privilege must make a claim or raise a defense based upon the privileged matter and the proponent must necessarily use the privileged information in order to establish its claim or defense.

*Id.* at 510. Thus, the elements of the "at issue" doctrine include: (1) a claim or defense by the privilege proponent that is "based upon" a privileged communication; and (2) the privilege proponent must "necessarily use" the privileged communication to establish its claim or defense. *See Coates*, 940 So. 2d at 508-11.

The burden rests on the party invoking the "at issue" doctrine to prove its application. *See Coates*, 940 So. 2d at 508 ("The [defendants] have not shown that

the [plaintiffs] must necessarily offer the disputed documents at trial to prove their claims."); 511 ("[T]he lawyers have not shown that the clients must necessarily introduce communications with other counsel to prove their claims against the lawyers.").

The possibility that the disputed documents may be relevant to or may assist Hathcock in his defense or may perhaps assist him in his efforts to impeach Rashada, Zager, Thomsen or Heitner, does not create a waiver of JTM's attorney-client privilege or work product protection by invoking the "at issue" doctrine. *See id*. at 509 ("The possibility that the disputed documents may be relevant to or may assist the lawyers in their defense or in their third-party claims, or may perhaps assist in the lawyers' efforts to impeach the clients, does not create a waiver of the privilege.").

Here, Rashada has not asserted any claim that is "based upon" a privileged communication as required for the "at issue" doctrine to apply. *See Coates*, 940 So. 2d at 508, 510. And Hathcock has not asserted or proved otherwise. *See* Motion at 26-28. Consequently, Hathcock has not borne his burden of proving the applicability of the "at issue" doctrine. *See Coates*, 940 So. 2d at 508 (the party invoking the "at issue" doctrine bears the burden of proving its application); 511 (same).

Moreover, Hathcock has not shown that Rashada must "necessarily use" a privileged communication to prove any of his claims as required for the "at issue" doctrine to apply. *See Coates*, 940 So. 2d at 508, 511. Again, Hathcock has not

asserted or proved otherwise. *See* Motion at 26-28. Consequently, Hathcock has not borne his burden of proving the applicability of the "at issue" doctrine. *See Coates*, 940 So. 2d at 508 (the party invoking the "at issue" doctrine bears the burden of proving its application); 511 (same).

Hathcock asserts that the reliance element of ***Rashada's*** fraud claim is "at issue," warranting intrusion into the privileged communications between ***JTM*** and ***Heitner***. *See* Motion at 28. At least three flaws infect Hathcock's argument. One, Hathcock offers no explanation or authority for the proposition that the fraud claim of a party like Rashada justifies invading the attorney-client privilege of a non-party like JTM. Two, Hathcock identifies no privileged communication between JTM and Heitner upon which Rashada's fraud claim or its reliance element is based. *See Coates*, 940 So. 2d at 508, 510 ("at issue" doctrine requires a claim "based upon" a privileged communication). Three, Hathcock does not argue that Rashada must "necessarily use" a privileged communication to prove his fraud claim or its reliance element. *See Coates*, 940 So. 2d at 508, 510 ("at issue" doctrine requires that a privileged communication be "necessarily used" to prove a claim).

Rashada will prove that Hathcock made false promises about his intent to fund an NIL deal for Rashada to Castro-Walker, Zager, Thomsen, Heitner, and David Penney, Hathcock's former business partner. Rashada will also prove that Hathcock's false promises were relayed to him through nonprivileged communications and that he acted in reliance on them. Thus, Rashada's fraud claim

and its reliance element do not depend on privileged communications, and they will not be used to prove the claim.

Finally, Hathcock cites two other cases that are easily distinguished. Unlike here, the claim filed in the first case, *First. S. Baptist Church of Mandarin, Fla., Inc. v. First Nat'l Bank of Amarillo*, 610 So. 2d 452, 454 (Fla. 1st DCA 1992), was "based upon" privileged material. In the second, *Rocket Real Estate, LLC v. Maestres*, 2016 WL 11503947, at *2 (S.D. Fla. June 8, 2016), and as in *Coates*, the court rejected the application of the "at issue" doctrine.

Based on the foregoing, any attempt to compel the production of privileged communications based on the "at issue" doctrine should be denied.

## **PRAYER**

Plaintiff Jaden Rashada and Non-Parties JTM Sports, LLC, Jackson Zager, and Thomas Thomsen respectfully request that this Court deny Defendant Hugh Hathcock's Motion for *In Camera* Review and to Compel Production, and grant all other relief to which Rashada and JTM are entitled.

Respectfully submitted,

**RUSTY HARDIN & ASSOCIATES, LLP**

 */s/Kendall Valenti Speer*
RUSTY HARDIN, ESQ.
Attorney in Charge
Texas State Bar No. 08972800
*Admitted Pro Hac Vice*
JOE RODEN, ESQ.

Texas State Bar No. 00794549
*Admitted Pro Hac Vice*
DANIEL DUTKO, ESQ.
Texas State Bar No. 24054206
*Admitted Pro Hac Vice*
JOHN MACVANE, ESQ.
Texas State Bar No. 24085444
*Admitted Pro Hac Vice*
LEAH GRAHAM, ESQ.
Texas State Bar No. 24073454
*Admitted Pro Hac Vice*
KENDALL SPEER, ESQ.
Texas State Bar No. 24077954
*Admitted Pro Hac Vice*
1401 McKinney Street, Suite 2250
Houston, Texas 77010
Telephone:  (713) 652-9000
Facsimile:  (713) 652-9800
rhardin@rustyhardin.com
jroden@rustyhardin.com
ddutko@rustyhardin.com
jmacvane@rustyhardin.com
lgraham@rustyhardin.com
kspeer@rustyhardin.com

*-and-*

**PAUL TRIAL GROUP**

DAVID A. PAUL, ESQ.
Florida Bar No. 21385
1560 North Orange Avenue, Suite 300
Winter Park, Florida  32789
Telephone:  (407) 622-2111
Facsimile:  (407) 622-2112
Primary:  Dave@paultrialgroup.com
Secondary:  kelly@paultrialgroup.com

***Counsel for Plaintiff Jaden Rashada and Non-Parties JTM Sports, LLC, Jackson Zager, and Thomas Thomsen***

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that Plaintiff Jaden Rashada and Non-Parties JTM Sports, LLC, Jackson Zager, and Thomas Thomsen's Response and Incorporated Memorandum to Defendant Hugh Hathcock's Motion for *In Camera* Review and to Compel Production complies with Local Rule 5.1(C) regarding formatting and also certify that 14-point font in Times New Roman was utilized. This response also complies with Local Rule 7.1(F) and contains a word count of 7,240, exclusive of case style, certificates of compliance and service, and the signature block.

*/s/ Kendall Valenti Speer*
Kendall Valenti Speer

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Plaintiff Jaden Rashada and Non-Parties JTM Sports, LLC, Jackson Zager, and Thomas Thomsen's Response and Incorporated Memorandum to Defendant Hugh Hathcock's Motion for *In Camera* Review and to Compel Production has been electronically filed with the Clerk of the Court and served electronically on all counsel of record by CM/ECF E-filing on this 16th day of December, 2025.

*/s/ Kendall Valenti Speer*
Kendall Valenti Speer