UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JADEN RASHADA,

     Plaintiff,

v.                           Case No. 3:24cv219-MCR-HTC

HUGH HATHCOCK, et al.,

     Defendants.

_____/

<u>ORDER</u>

Before the Court is Defendant Hugh Hathcock's motion for *in camera* review and to compel documents from Plaintiff Jaden Rashada and non-parties JTM Sports LLC, Jackson Zager, and Thomas Thomsen (collectively, "the JTM Non-parties"), as well as their counsel, Darren Heitner and Heitner Legal P.L.L.C. (collectively, "Heitner").[1] Doc. 105. Specifically, Hathcock asks the Court to review *in camera* redactions made and documents withheld by Rashada, the JTM Non-parties, and Heitner, based on confidentiality or privilege and to compel the production of the disputed materials. After reviewing the motion, the opposition (Doc. 110), and the relevant law, and conducting an *in camera* review of the documents at issue, the

---

[1] As will be discussed below, Heitner represented the JTM Non-parties in negotiating and drafting the NIL contract at issue. He does not represent them in this action. Instead, the JTM Non-parties and Plaintiff Rashada are represented by Rusty Hardin & Associates, LLP.

Court concludes Hathcock's motion should be GRANTED IN PART, as more fully set out herein.

## I.    Background

For much of the history of college sports, student athletes were considered "amateurs" and prohibited from receiving compensation despite being the fuel behind a multi-billion industry. All of that changed in 2021, when the NCAA opened the door for athletes to profit from their name, image, and likeness ("NIL"). With the advent of NIL deals, highly recruited athletes sought to maximize their earning potential by engaging agents or other professional service providers to help build their personal brands and monetize their NIL.

NIL compensation changed the college football landscape overnight; it turned teenagers into entrepreneurs, with their eyes not on the ball, but on the promise of lucrative million dollar deals coming before they took a single snap, threw their first pitch, or made their first shot. Supporters of NIL compensation believed it was long overdue and necessary to level the playing field; critics, however, braced for the potential fraud and abuse that could occur with these new incentives, pressures, and opportunities. This case illustrates the pitfalls and risks for student-athletes and institutions alike. It is a story of promises allegedly made, money anticipated, and expectations unfulfilled.

In this action, Rashada alleges Hathcock, a University of Florida ("UF") booster,[2] former UF head football coach Billy Napier, and the Director of Player Engagement and NIL for UF, Marcus Castro-Walker, fraudulently induced him to withdraw from a $9.5 million NIL deal with a University of Miami ("UM") booster by promising to pay him $13.85 million through a NIL deal with the Gator Collective. Doc. 76. Rashada claims Defendants never intended to pay him and, instead, simply wanted to recruit him to UF and away from a rival school.

The events in this case began in June 2022, when Rashada made an official visit to UF.[3] According to Rashada, later that summer, Hathcock offered him an NIL deal worth around $11 million. However, by that time, he had already accepted an alleged $9.5 million offer from a UM booster, John Ruiz, and verbally committed to play football at UM. Rashada contends, nonetheless, Hathcock continued to pursue him in October and November, and eventually made him a $13.85 million NIL offer, which included a $500,000 "signing bonus." The initial plan was for the NIL deal to be funded by Hathcock and Velocity, as well as Hathcock's NIL collective, Gator Guard.[4] However, because Hathcock planned to sell Velocity, he ultimately declined to use it or the Gator Guard to directly fund the NIL deal. Instead, the new plan was

---

[2] Rashada has also sued Velocity Automotive Solutions, LLC, a company owned by Hathcock.
[3] Unless otherwise indicated, the information in this background is taken from Rashada's second amended complaint.
[4] Hathcock's company, Velocity, was to pay $5.35 million, which included the signing bonus, and the remainder of the $13.85 million was to be paid through the Gator Guard. Doc. 76 at 12, ¶ 32.

for the NIL deal to go through the Gator Collective.[5]  On November 10, 2022, Rashada entered into a written contract with the Gator Collective and publicly flipped his commitment away from UM to UF.

The deadline for paying the $500,000 signing bonus was December 5, 2022. However, that deadline came and went without a payment.  Additionally, on December 6, 2022, the Gator Collective sent a letter to Rashada seeking to terminate the NIL contract.  Nonetheless, the deal was not over.  According to Rashada, the Defendants continued to promise Rashada a $13.85 million NIL deal and said that it would now go through Hathcock's Gator Guard.  On December 9, Hathcock (for himself or Velocity) wired $150,000 to Rashada.  For the next couple of weeks, Castro-Walker continued to represent that he was working on assigning Rashada's contract from the Gator Collective to the Gator Guard.  However, by December 21, national signing day, no assignment had been executed, there was no personal guaranty from Hathcock, and no payment made other than the $150,000.

Rashada, however, continued to believe Hathcock would make good on his promise.  And, after additional promises by Castro-Walker and Napier, Rashada signed a National Letter of Intent on December 21.  Although no new NIL deal was inked, Defendants continued to make promises of an NIL deal over the next several

---

[5] The Gator Collective was a collective formed by an individual named Eddie Rojas.  Doc. 105 at 4.

weeks.  On January 18, 2023, however, after the promises of an NIL deal remained unfulfilled, Rashada withdrew from UF, and this suit ensued.

From the onset of the NIL discussions with Defendants in June 2022, Rashada was represented by two NIL agents, Thomas Thomsen and Jackson Zager, and their NIL agency, JTM Sports, LLC.[6]  In turn, JTM retained attorney Darren Heitner (of Heitner Legal P.L.L.C.) to draft, review, and advise it on the NIL contract with the Gator Collective.  Doc. 105 at 5; Doc. 110 at 6.  Inexplicably, Heitner was working both sides of the aisle, as he also represented the Gator Collective during these negotiations.  Doc. 105 at 5.

## II.    Motion for In Camera Review and to Compel

Given the roles JTM and Heitner played in Rashada's NIL deal, in May 2025, Hathcock issued third-party subpoenas to the JTM Non-parties and Heitner, seeking, among other things, communications with the Defendants and communications among themselves regarding Rashada's recruitment or NIL deals.  *See* Doc. 105, Exhibit 15.  Although Rashada, the JTM Non-parties, and Heitner produced a host of documents, they also redacted several portions of lengthy electronic messages (referred to in the production as "chats") as protected by the attorney-client privilege or work product doctrine, or as containing "confidential" or "highly sensitive

---

[6] Although Rashada authorized JTM to speak on his behalf in the summer of 2022, he did not sign a Standard Representation Agreement with JTM until November 8, 2022.  Doc. 110 at 6-7.

personal information." Rashada, the JTM Non-parties, and Heitner[7] also withheld numerous documents on the same grounds. *See* Doc. 108. In total, Hathcock has identified slightly over 100 documents he believes should be reviewed and produced. *Id.*

Hathcock argues neither the attorney-client privilege nor work product doctrine protects facts and that, regardless, any privileges have been waived through a selective waiver or because the "undisclosed communications" have been placed at issue. As discussed further below, after the motion was filed (and despite months of meet and confers), Rashada and the JTM Non-parties "agreed" to withdraw their objections on 23 documents. Thus, those documents are not discussed herein and shall be produced without redactions. *See* Exhibit A (identifying those documents).

## III. Confidential Redactions

Hathcock takes issue with redactions labeled as "confidential" or "highly sensitive personal information." Of the initial 25 documents at issue, Rashada and the JTM Non-parties have agreed to remove 21 redactions containing confidential or personal information. The Court has reviewed the four remaining documents (JTM Nos. 1345, 1600, and 1941, and Rashada No. 3017) and finds that the redactions are appropriate.

---

[7] Although Heitner provided the Court with the documents identified on his privilege log which are in dispute, he did not file a response to the motion to compel.

Although generally "parties cannot redact portions of otherwise discoverable documents based on unilateral determinations of relevance," *Roberson v. Health Career Inst. LLC*, 2024 WL 5690564, at *1 (S.D. Fla. Feb. 5, 2024); *see also ADP, LLC v. Ultimate Software Grp., Inc.*, 2017 WL 7794226, at *1 (S.D. Fla. Dec. 15, 2017) ("It is a rare document that contains only relevant information, and prohibiting the practice of unilaterally redacting irrelevant information is the only interpretation of Fed. R. Civ. P. 34 that yields just, speedy, and inexpensive determinations of every action and proceeding.") (cleaned up and citation omitted), the agreed upon Confidentiality Order in this case allows for such redactions.

Specifically, the Confidentiality Order allows "[n]onresponsive portions of a discovery document containing Confidential Information" to "be redacted by the producing party." Doc. 85 at 9-11. Here, the Court agrees the redacted information is not relevant to the claims or defenses in this case. The redactions are for pictures of a personal nature or to protect the identity of individuals who have nothing to do with this litigation and are only in the text strings for purely personal reasons. Thus, the Court will not compel the production of unredacted copies of those documents.

## IV.    The Attorney Client Privilege and the Work-Product Doctrine

Most of the documents in dispute are strings of lengthy text messages between Zager and Thomsen, Zager and Heitner, and Zager and Rashada or his father, Harlen, or emails between Zager and Heitner. Both the attorney-client and work product

privileges have been raised for 25 documents (including documents on the privilege logs). Only the attorney-client privilege has been raised for 37 documents (most of which are the documents on the privilege logs). And only the work product privilege has been raised as to 16 documents (none of which are on the privilege logs).

A.    **The Attorney-Client Privilege**

The attorney-client privilege is the oldest common law privilege. *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Its purpose is to encourage full and frank communications between a client and a lawyer made for the purpose of securing legal advice. *See id*. Under both Florida law and federal law, a communication between a lawyer and a client is privileged if it was intended to be confidential and is for the purpose of seeking or rendering legal advice.[8] *See Hominski v. Gusar, LLC*, 2025 WL 3028298, at *2 (S.D. Fla. Oct. 30, 2025); *see also* Fla. Stat. § 90.502(2) ("A client has a privilege to refuse to disclose, and to prevent any other person from disclosing, the contents of confidential communications when such other person learned of the communications because they were made in the rendition of legal services to the client."). A communication is "confidential" if it is

---

[8] A court sitting in diversity applies the law of the forum state when it comes to the attorney-client privilege. *See Somer v. Johnson*, 704 F.2d 1473, 1478 (11th Cir. 1983) ("State law … controls the privileged nature of material sought in discovery in a diversity action."). That distinction, however, does not matter here because federal and Florida law are similar. *See Diamond Resorts U.S. Collection Dev., LLC v. Neally*, 2021 WL 8773337, at *2 (M.D. Fla. Dec. 17, 2021) ("[T]he applicable Florida law on the issues of attorney-client privilege ... is so parallel to the applicable federal common law that it would lead the Court to the same conclusions.").

not intended to be disclosed to third persons other than: (1) those to whom disclosure is in furtherance of the rendition of legal services to the client; or (2) those reasonably necessary for the transmission of the communication.  Fla. Stat. § 90.502(1)(c). "'Privileged persons' include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation." *In re Teleglobe Commc'ns*, 493 F.3d 345, 359 (3d Cir. 2007) (quoting Restatement (Third) of the Law Governing Lawyers § 70 (2000)).

The privilege should be construed as narrowly as is consistent with its purpose – which is to facilitate the rendition of legal services. *United States v. Noreiga*, 917 F.2d 1543, 1551 (11th Cir. 1990).  Thus, not all communications between counsel and client are protected.  For example, references to the fact that an attorney has been retained, or when a meeting or discussion with counsel is to take place, particularly when the content of those discussions has not been disclosed, are generally not protected by the privilege. *See Meade v. General Motors, LLC*, 250 F. Supp. 3d 1387, 1391 (N.D. Ga. 2017) ("The fact that a client is meeting with an attorney for the purposes of obtaining legal advice, and the general subject matter of such meeting, is not necessarily privileged."); *In re Grand Jury Proceedings*, 689 F.2d 1351, 1352–53 (11th Cir. 1982) (approving subpoena that sought "records of dates, places or times of meetings and communications [between attorney and client], not the content of those communications" because the materials sought were

not "within the scope of the attorney-client privilege"); *see also Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 467 (2d Cir. 1989) ("fact and date of the consultation" with an attorney is not privileged); *Burton v. R.J. Reynolds Tobacco Co.*, 170 F.R.D. 481, 484–85 (D. Kan. 1997) *on reconsideration in part*, 175 F.R.D. 321 (D. Kan. 1997) ("The subject matter of meetings with an attorney, the persons present, the location of the meetings, or the persons arranging the meetings are not protected by the privilege.").

Likewise, communications which are unrelated to legal advice, such as emails without content that simply transmit a document, are not privileged. *See Mr. Dee's Inc. v. Inmar, Inc.*, 2021 WL 3861839, at *5 (M.D.N.C. Aug. 30, 2021) ("Regarding documents sent via email or other means, 'transmittal records that [neither] include legal advice nor disclose privileged matters are not subject to the attorney-client privilege.'") (quoting *Shaffer v. Northwestern Mut. Life Ins. Co.*, 2006 WL 2432110, at *2 (N.D.W. Va. Aug. 21, 2006)); *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 79 (S.D.N.Y. 2010) ("Transmittal documents themselves are not privileged unless they reveal the client's confidences.") (citation omitted); *Retail Brand Alliance, Inc. v. Factory Mut. Ins. Co.*, 2008 WL 622810, at *4 (S.D.N.Y. Mar. 7, 2008) ("The email itself is just a transmittal document. It does not disclose client confidences, does not seek legal advice and does not disclose any litigation strategy. It contains

nothing protectable under either the attorney-client privilege or the work-product doctrine.").

"The burden of establishing the attorney-client privilege rests on the party claiming it." *S. Bell Tel. & Tel. Co. v. Deason*, 632 So. 2d 1377, 1383 (Fla. 1994); *Wyndham Vacation Ownership, Inc. v. Reed Hein & Assoc., LLC*, 2019 WL 9091666, at *7 (M.D. Fla. Dec. 9, 2019) (noting that the burden is a heavy one). "The Court should not have to guess or speculate about the applicability of the privilege, for the party asserting it has the affirmative duty to demonstrate that it applies to each document or communication sought to be disclosed." *Purdee v. Pilot Travel Ctrs., LLC*, 2008 WL 11350099, at *1 (S.D. Ga. Feb. 21, 2008) (citing *United States v. Davis*, 636 F.2d 1028, 1044 n.20 (5th Cir. 1981)). In addition to demonstrating the elements required to initially establish the privilege, the asserting party must prove that it has not waived the privilege. *United States v. Noriega*, 917 F.2d 1543, 1550 (11th Cir. 1990); *see also Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981).

## B.    The Work Product Doctrine

Unlike the attorney-client privilege, "[t]he work product doctrine is not an evidentiary 'privilege'—rather, it is a 'procedural rule of federal law.'" *Smith v. USAA Cas. Ins. Co.*, 658 F. Supp. 3d 1054, 1058 (N.D. Fla. 2023) (quoting *In re*

*Prof'ls Direct Ins. Co.*, 578 F.3d 432, 438 (6th Cir. 2009)).  "Thus, 'federal, not state, work-product rules apply in diversity suits in federal court.'"  *Id.* (citation omitted).

The work product doctrine "provides a qualified immunity for materials prepared in anticipation of litigation by a party, an attorney, or other representatives of the party."  *Spirit Master Funding, LLC v. Pike Nurseries Acquisition, LLC*, 287 F.R.D. 680, 684 (N.D. Ga. 2012) (citing *Hickman v. Taylor*, 329 U.S. 495 (1947)); *see also* Fed. R. Civ. P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative[.]").  The purpose of the work product doctrine "is to protect the integrity of the adversary process by allowing a lawyer to work 'with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.'"  *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1335 (11th Cir. 2018) (quoting *Hickman*, 329 U.S. at 510).

"[I]n determining whether a document was made in anticipation of litigation, the primary focus is the reason or purpose for creating the document."  *Place St. Michel, Inc. v. Travelers Prop. Cas. Co. of Am.*, 2007 WL 1059561, at *2 (S.D. Fla. Apr. 4, 2007) (quoting *Guidry v. Jen Marine LLC*, 2003 WL 22038377, at *2 (E.D. La. Aug. 22, 2003)).  Courts within the Eleventh Circuit "have mostly either used the primary purpose or dual purpose test."  *Goosby v. Branch Banking & Tr. Co.*, 309 F. Supp. 3d 1223, 1234 (S.D. Fla. 2018) (noting "the Eleventh Circuit has not

established a definitive test for courts to follow"). "Under the primary purpose test, a document is deserving of work product protection 'as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation.'" *Id.* at 1233 (quoting *Davis*, 636 F.2d at 1040). "Under the dual purpose test, dual-purpose documents are protected from disclosure if, taking into account the facts surrounding their creation, their litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole." *Id.* (quotation marks and citation omitted).

The party invoking the protection of the doctrine bears the burden of establishing its applicability by a preponderance of the evidence. *Spirit Master*, 287 F.R.D. at 684; *MapleWood Partners, LP v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 584 (SD. Fla. 2013) (citing *Daubert v Merrell Dow Pharms*, 509 U.S. 579 (1993) (discussing Fed. R. Evid. 104(a))). In other words, for work product protection to apply, the asserting party must prove that it anticipated litigation at the time *each document or communication* was created. *Holladay v. Royal Caribbean Cruises, Ltd.*, 333 F.R.D. 588, 592 (S.D. Fla. 2019).

To meet its burden, the proponent of the work product privilege must provide the Court with underlying facts demonstrating the existence of the privilege, which may be accomplished by affidavit. *Diamond Resorts U.S. Collection Dev., LLC v. US Consumer Attorneys, P.A.*, 519 F.Supp.3d 1184, 1200 (S.D. Fla. 2021). In other

words, "the onus is on the party claiming immunity to provide competent *evidence* that the materials in question were created in anticipation of litigation." *Id.* (citing *Holladay*, 333 F.R.D. at 592). However, an affidavit, alone, particularly one based on conclusory assertions, is not determinative. *See, e.g.*, *Fid. Nat'l Title Ins. Co. v. Wells Fargo Bank, N.A.*, 2013 WL 12138558, at *2 (S.D. Fla. July 19, 2013). Moreover, "[a] party [does not] satisfy its burden by simply asking that the court conduct an *in camera* review of documents which the party hopes to keep confidential—instead, the party first must present some evidence to convince the court that the privilege might apply." *MapleWood Partners, L.P.*, 295 F.R.D. at 585; *Int'l Paper Co. v. Fibreboard Corp.*, 63 FR.D. 88 (D. Del. 1974) (nothing that submitting a batch of documents for *in camera* review, alone, is not sufficient "because the Court is often without information of what the document concerns or how it came into being or other relevant information which would enable it to determine whether the documents are privileged").

## C.    Waivers

Both the attorney-client and work product privileges can be waived by the holder. For example, waiver of the attorney-client privilege can occur if persons not necessary to the rendition of legal advice are included in the communication. *See* Fla. Stat. § 90.507. "A party seeking to pierce the privilege need only establish a *prima facie case* that the client's privilege was waived. If a waiver has been

sufficiently alleged, the party seeking the benefit of the privilege must establish—by a preponderance of the evidence—that the privilege was not waived, as the burden always rests in the final analysis with the party seeking the protection of the privilege." *MapleWood Partners, L.P.*, 295 F.R.D. at 584.

Here, Hathcock argues Rashada and the JTM Non-parties have waived these privileges by: (1) selectively disclosing some privileged material, rendering other privileged material on the same subject matter discoverable; and (2) putting the privileged material "at issue."

### 1. Selective Waiver

Under Florida law, "[a] person who has a privilege against the disclosure of a confidential matter or communication waives the privilege if the person … voluntarily discloses or makes the communication when he or she does not have a reasonable expectation of privacy, or consents to disclosure of, any significant part of the matter or communication." Fla. Stat. § 90.507. The attorney-client privilege cannot be used as both a shield and a sword: "a party may not insist upon the protection of the privilege for damaging communications *while disclosing other selected communications* because they are self-serving." *Coates v. Akerman, Senterfitt & Eidson, P.A.*, 940 So. 2d 504, 511 (Fla. 2d DCA 2006) (citation omitted); *see also id.* ("The client does not waive the privilege by testifying generally in the case or testifying as to facts that were the subject of the consultation with his or her

attorney, but if the client or attorney testifies as to privileged communications in part, this serves as 'a waiver as to the remainder of the privileged consultation or consultations about the same subject.'").

Hathcock cites several communications to support his selective disclosure argument. First, he claims JTM Sports should be compelled to produce communications regarding the June 2022 NIL negotiations based on its production of chats between Zager and Thomsen during that period. Specifically, Hathcock notes: (1) JTM Sports produced three text messages Zager sent to Thomsen in rapid succession on June 26, 2022, at 6:18 p.m. that state: "Hugh already would do 800knup front"; "earlier"; and "I texted [Heitner]"[9] (Doc. 105-8, JTM No. 3111); and (2) JTM Sports produced June 25, 2022 messages between Zager and Thomsen regarding Rashada's potential NIL deal, but redacted nine portions based on the attorney client privilege (Doc. 105-6, JTM Nos. 1495-1507). Doc. 105 at 25-26. Second, Hathcock asserts all communications regarding the November 2022 NIL negotiations should be produced because JTM Sports produced two sets of November 2022 messages between Zager and Thomsen regarding a draft of an NIL agreement between Rashada and Hathcock's company Velocity. Doc. 105-12, JTM

---

[9] In their response, the JTM Non-parties argue the messages Zager sent at 7:20 p.m. cannot support Hathcock's selective disclosure argument because those messages were recently clawed back under Fed. R. Civ. P. 26(b)(5)(B). Doc. 110 at 19. However, Hathcock's argument appears to be based entirely on the 6:18 p.m. messages.

Nos. 434-438; Doc. 105-13, JTM Nos. 1947-1954.  Third, Hathcock says JTM Sports produced January 2023 messages between Zager, Heitner, and a reporter named Pete Nakos, but redacted some portions as work product.  Doc. 105-41, JTM Nos. 2367-2378.

The Court finds selective waiver to be inapplicable.  First, with regard to the June 2022 chats cited by Hathcock, those messages are not protected by the attorney client privilege because they are general statements about a potential contract which do not reveal a client's confidences, and the disclosure of non-privileged information does not result in a selective waiver of privileged information.  *See Markel Am. Ins. Co. v. Baker*, 152 So. 3d 86, 92 (Fla. 5th DCA 2014) ("In Florida, waiver of the attorney-client privilege is not favored" and is inappropriate where "the record does not show a clear, intentional waiver of the privilege[.]").  Likewise, Hathcock has not pointed to privileged information that was disclosed in the November 2022 chats or the January 2023 chats.  Furthermore, although Hathcock argues the transmission of the draft NIL agreement from Zager to "Steve" waived the privilege, Steve refers to Steve Zager, Zager's father who is also an attorney.[10]  *See* Doc. 110-3 at 4; Fla.

---

[10] Although there is no indication JTM Sports formally retained Steve Zager, the attorney client privilege nevertheless protects communications between Zager and his father related to legal advice.  *See* Fla. Stat. 90.502(1)(b) (defining a "client" as any person or entity "who consults a lawyer with the purpose of obtaining legal services or who is rendered legal services by a lawyer").

Stat. § 90.507 (explaining the selective disclosure doctrine "is not applicable when the disclosure is itself a privileged communication").

### 2.    At-Issue Waiver

Hathcock also argues Rashada has placed undisclosed communications between the JTM principals and Heitner about Rashada's NIL deal at issue by alleging the Defendants fraudulently induced him to commit to the UF.  Specifically, because Rashada must show he reasonably relied on the Defendants' misrepresentations, Hathcock asserts he "should be permitted to discover what information Rashada had to rely on, through JTM and Heitner, and how and where that information originated."  Doc. 105 at 28.  Indeed, as part of his defense in this case, Hathcock contends that Rashada's "damages were the result of the negligence of nonparties Harlen Rashada, Jackson Zager, Tommy Thomsen, JTM Sports, Darren Heitner, and Heitner Legal, PLLC" in advising him regarding the NIL deal.  *See* Doc. 80 at 14.  Thus, Hathcock argues the "at issue" doctrine justifies disclosure of the disputed documents.

The Florida Supreme Court has explained the "at issue" doctrine as follows: "[W]hen a party has filed a claim, based upon a matter ordinarily privileged, the proof of which will necessarily require that the privileged matter be offered in evidence, we think that he has waived his right to insist, in pretrial discovery proceedings, that the matter is privileged."  *Savino v. Luciano*, 92 So. 2d 817, 819

(Fla. 1957). But "[a] party does not waive the attorney-client privilege merely by bringing or defending a lawsuit." *Coates*, 940 So. 2d at 508. As with selective waiver, the "at issue" waiver is intended to prevent parties from using privilege unfairly. Thus, a privilege may be impliedly waived where a party "asserts a claim that in fairness requires examination of protected communications." *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir. 1991). Common examples of such waivers are when a defendant asserts an advice-of-counsel defense or a good-faith defense which places at issue whether his attorney made him aware that his acts were illegal or otherwise improper. *Tribune Co. v. Purcigliotti*, 1997 WL 10924, at *5 (S.D.N.Y. Jan. 10, 1997), *modified,* 1998 WL 175933 (S.D.N.Y. Apr. 14, 1998).

However, the "at-issue" waiver doctrine is not as broad as Hathcock suggests. Simply pleading a claim of fraud does not make the undisclosed communications between and among the JTM principals and Heitner "at issue." *See Tribune Co.*, 1997 WL 10924, at *7 ("What was said between client and counsel may be useful for an adversary to know, but may not be particularly relevant, no less essential, to proving or disproving a claim of fraud. Rather, what is relevant is what the client knew or reasonably should have been expected to know."). "[T]the mere allegation of reliance does not constitute a wholesale waiver of the privilege as to all attorney-client communications that evidence or disprove a connection between the

misrepresentation and plaintiff's conduct in reliance." *Mattel, Inc. v. MGA Entm't, Inc.,* 2011 WL 13128608, at *2-3 (C.D. Cal. Jan. 17, 2011).

Based on the chats this Court has reviewed, discussions would occur between one more of the Defendants and Zager, alone, or in conjunction with Heitner. Thomsen was also involved in those discussions, but to a lesser extent. Depending on who had the communication with a Defendant, those communications would then be relayed to one or both of the others. A few of the chats may have also referenced or involved Rashada or his father.

Presumably, when Defendants depose Rashada, his father Harlen, Heitner, and the JTM Non-parties, they will ask those individuals about all the communications each had with any of the Defendants and the content of those communications. Defendants, likewise, will presumably ask Rashada and, possibly, his father, for the basis of their reliance or belief that Hathcock, individually or through Velocity, promised or agreed to fund a $13.85 million NIL deal when Rashada signed the contract with the Gator Collective and withdrew his commitment from UM. Because the answers to those questions involve the disclosure of facts, they should not be privileged. However, how Zager or Thomsen characterized any communications they may have had with any of the Defendants in their communications with Heitner is privileged.

As the Supreme Court explained, "[t]he protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney."[11] *Upjohn Co.*, 449 U.S. at 395–96. Thus, "[e]ven where a party's state of knowledge is particularly at issue, such as in a case involving claims of laches or justifiable reliance, waiver of the privilege should not be implied because the relevant question is not what legal advice was given or what information was conveyed to counsel, but what facts the party knew and when. Invasion of the attorney-client privilege is not necessary; rather, the discovering party should simply inquire directly of the other party as to its knowledge of relevant facts, which must be disclosed." *Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 1994 WL 510043, at *12 (S.D.N.Y. Sept. 16, 1994).

Based on the limited record before the Court, the Court cannot say that Rashada or the JTM Non-parties have placed the communications Zager or Thomsen had with Heitner about the Rashada NIL deal "at issue." *See Long v. Murphy*, 663

---

[11] Given the parties' and counsel's Rule 11 obligations, the Court presumes the deponents' testimonies will be consistent with the facts contained in the privileged communications.

So. 2d 1370, 1372 (Fla. 5th DCA 1995) ("Proof of privileged communications to dispute reasonable reliance may well be relevant to the defense in this case, but that alone does not waive the privilege.  Long must do something more than sue on the alleged misrepresentations made to him by Murphy and the other defendants before it can properly be held that Long waived his privilege for communications with his attorneys during the negotiations for buying and terminating his interest in the dealership.").   To the contrary, Rashada represents he intends to "prove that Hathcock's false promises were relayed to him through nonprivileged communications and that he acted in reliance on them."  Doc. 110 at 24.  And because Defendants have not yet deposed Rashada or the JTM principals, the Court must accept Rashada's representations.

If, however, that representation turns out to be false, then a waiver applies. *See Arkwright Mut. Ins. Co.*, 1994 WL 510043, at *12 ("Invasion of the privilege may, however, be warranted where the specific content of legal advice received must be shown to prove a claim or a defense.").  For example, if during their depositions Rashada, the JTM principals, or Rashada's father refuse to answer questions about what Heitner told them about Heitner's communications with any of the Defendants, then they would have placed the withheld emails and chats at issue.[12]  *See Tribune*

---

[12] While the parties should not take this as an open invitation, to ensure there are no disturbances of the current scheduling order, the undersigned will make herself available to address any issues

*Co.*, 1997 WL 10924, at *8 (finding waiver of work product protection where plaintiff had minimal involvement in the discussions and the attorney's agent was the person who discussed the claim with the defendants; thus, "if anyone was misled by any purported fraud or misrepresentation of the defendants," it would have been the agent" and "in this respect, plaintiffs' claims directly and significantly implicate [the agent's] knowledge, thought processes and conduct, rather than those of plaintiffs, which is more often the case where fraud is alleged").

Similarly, Rashada will place the undisclosed communications at issue if discovery shows that he relied on any representation made by Heitner, including any representation that may have been conveyed to him from JTM which originated with Heitner. *See Minebea Co. v. Papst*, 355 F. Supp. 2d 518, 524 (D.D.C. 2005) (finding "at issue" waiver because although "[plaintiff] has represented that it has disclosed documents and will disclose all information reflecting 'facts' and '[plaintiff]'s understandings,' regardless of the source of such facts or understandings," "one can easily foresee [plaintiff]'s witnesses invoking privilege to withhold what would, in essence, be their understanding of the patents and licensing rights in question by

---

related to this Order that may arise during the depositions that the parties cannot otherwise resolve among themselves *first*. The Court will also consider the imposition of sanctions against any party, deponent, or counsel who fails to exercise good faith in raising a claim of privilege or invoking a waiver.

claiming that it was 'legal advice' because the 'understanding' came from [plaintiff's] lawyer or the 'fact' involved was a lawyer's opinion.").

## V.    In Camera Review

### A.    Documents and Redactions Based on the Attorney Client Privilege

Most of the documents remaining in dispute are text messages, described as "chats," between Zager and Thomsen, Zager and Heitner, or Zager and Rashada or his father, Harlen. The remaining documents are emails between Zager and Heitner.

Hathcock takes issue with approximately 29 chats or emails that the JTM Non-parties listed on their privilege log as having been withheld based on the attorney-client privilege (four of those are also based on work product). *See* Doc. 108. All the chats and emails identified on the JTM privilege log are between Heitner and Zager or Thomsen. There is no dispute that Heitner represented JTM in the Rashada deal. Also, those communications did not involve any unnecessary third parties. Additionally, based on the Court's *in camera* review, with the exception of four (4) emails, all the chats and emails identified were arguably for the rendition of legal advice or otherwise contained irrelevant and non-responsive information. Thus, unless the privilege has been waived as to those communications, those communications have been properly withheld. The four emails which contain no privileged communications, but merely forward documents, are JTM Privilege Log ID Nos. 95, 120, 123 and 124, and should be PRODUCED.

Hathcock also takes issue with six documents (4 emails and 2 text message strings[13]) that were identified on Heitner's privilege log. *See* Doc. 108. Based on the Court's *in camera* review, the Court finds that DOC007, DOC010, DOC011, DOC014, and DOC015 are protected by the attorney-client privilege because they are communications between a client and counsel for the rendition of legal services which were intended to be kept confidential. DOC006, however, shall be PRODUCED because it contains no confidential information and simply forwards a document.

In addition to documents identified on the privilege logs, Hathcock also takes issue with approximately 43 documents, consisting of electronic chats and emails, that the JTM Non-parties redacted based on the attorney-client or work product privileges. The Court has reviewed each of the disputed redactions and its determinations are set forth in Exhibit B, attached hereto.

### B.    Documents and Redactions Based on the Work Product Doctrine

As stated above, it is the JTM Non-parties' burden to prove, as to each and every text message they seek to protect, that the communication was created in anticipation of litigation. Thus, when litigation was reasonably anticipated is a critical part of this analysis. Here, the chats at issue fall into two distinct time periods—the summer of 2022, when Rashada contends the JTM Non-parties first

---

[13] These "strings" appear to be screenshots of multiple text messages spanning over multiple days.

began discussions with the Defendants, and October 2022 to January 2023, when those discussions resumed and then terminated. As an initial matter, the Court finds that neither Rashada nor the JTM Non-parties have met their burden of showing that they reasonably anticipated litigation during the summer of 2022. At that point in Rashada's relationship with Defendants, JTM and Heitner were attempting to negotiate an NIL deal with Hathcock and although an offer was purportedly made, there is no dispute Rashada declined the offer because he had already committed to UM. Thus, to the extent Rashada or the JTM Non-parties seek work product protection for *any* documents or tangible things created in the summer of 2022, that objection to production is overruled.

The second time period, from October 2022 to January 2023, warrants more scrutiny. In their response, Rashada and the JTM Non-parties argue that "Rashada" anticipated litigation from certain Miami-affiliated entities, collectively referred to as the Life Wallet Entities, "as early as November 11, 2022," when Rashada flipped his commitment from UM to UF. Doc. 110 at 7. They also argue that "Rashada" anticipated litigation arising from the Gator Collective contract "and the false promises of payment" as early as December 6, 2022. *Id.* In support of this argument, Rashada and the JTM Non-parties rely on a declaration from Zager. *See* Doc. 110, Exhibit 3.

There are several problems with these arguments.  First, it is questionable whether Zager can attest to what Rashada anticipated.  Second, even accepting those dates as when Rashada reasonably anticipated litigation, there is no evidence the text messages between Zager and Thomsen were created in anticipation of litigation as opposed to business purposes.  *See Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir. 1983) ("[T]he threshold determination in any case involving an assertion of the work product privilege, including this case, is whether the materials sought to be protected from disclosure were in fact prepared in anticipation of litigation.  The mere fact that litigation does eventually ensue does not, by itself, cloak materials prepared by an attorney with the protection of the work product privilege; the privilege is not that broad.").

Third, Zager's declaration is inconsistent with Rashada's allegations, which indicate that even after the Gator Collective contract was terminated, Defendants continued to promise that a deal would be done, even paying $150,000 a few days later, and, relying on the promises of a deal (as opposed to litigation), Rashada executed the letter of intent on December 21.  According to Rashada's allegations, he continued to believe that the deal would get done and was working toward that end, even after December 21.  Thus, neither Rashada nor the JTM Non-parties could have "reasonably" anticipated litigation by December 6.  *See Binks Mfg. Co.*, 709 F.2d at 1118 (holding that because the parties were actively pursuing settlement

negotiations when the memoranda were prepared and neither party threatened suit, there was an insufficient anticipation of litigation to invoke the work product rule); *see also, GMO Gamecenter USA, Inc. v. Whinstone US, Corp.*, 2025 WL 1763262 at *8 (S.D.N.Y. June 25, 2025) (finding that defendant offered "nothing except generalized, blanket assertions … seeming to suggest that merely because there was a dispute about the acquisition price, litigation was therefore inevitable").

Moreover, regardless of when litigation was reasonably anticipated, a review of the text messages at issue shows that most do not qualify as work product because they do not contain any litigation strategy, legal theory, or mental impressions of counsel. *See In re Grand Jury Subpoena Dated Oct. 22, 2001*, 282 F.3d 156, 161 (2d Cir. 2002) (unlike the attorney-client privilege, which protects communications, the work product doctrine protects documents and tangible things containing the ruminations by an attorney or party concerning the strategy to be followed in a litigation); *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 394 (S.D.N.Y. 2015) (to qualify as work product, "the materials must result from the conduct of 'investigative or analytical tasks to aid counsel in preparing for litigation'") (citation omitted).

Instead, most are chats containing Thomsen and Zager's thoughts and opinions about how to get Rashada's purported NIL deal to the finish line and what to do to make sure it gets there. *Cf. Pogorzelska v. VanderCook College of Music*, 2021 WL 2660268, at *4 (N.D. Ill. June 29, 2021) (concluding portions of text

messages from plaintiff's mother to plaintiff which did not reveal attorney's opinions but rather the mother's personal view about her daughter's feelings were not work product). They are conversations between Thomsen and Zager drafted and sent in the ordinary course and for a business purpose – consummating what would have been the largest NIL deal for a player in the 2023 class. *See United States ex rel. Bibby v. Wells Fargo Bank, N.A.*, 165 F. Supp. 3d 1319, 1330 (N.D. Ga. 2015) ("An initial communication involving no attorneys, seeking no specific legal advice, primarily concerning business purposes, and which discloses no theory of the case or other critical mental impressions of an attorney's agent is not protected by the work product doctrine."); *Bridgewater v. Carnival Corp.*, 286 F.R.D. 636, 644 (S.D. Fla. 2011) (concluding emails were not protected by work product doctrine because they "offer no hint that the parties were communicating for the primary purpose of preparing for litigation" and instead "document an ordinary and factual exchange of information").

Likewise, Thomsen's or Zager's opinions about the strength or weakness of filing suit or threatening to file suit are not work product. *See Smith v. Int'l Bus. Machines Corp.*, 2019 WL 13413410, at *2 (N.D. Ga. Mar. 6, 2019) ("Plaintiff's Facebook communications with her former coworkers do not contain material protected by the work-product privilege. Each Facebook message exchange begins with Plaintiff's brief description of her lawsuit against IBM. Beyond that simple

description of the case, those exchanges are composed of innocuous dialogue surrounding whether the coworkers would be willing to answer further questions over email."); *see also, Spencer-Smith v. Ehrlich*, 2024 WL 4416581, at *9 (S.D.N.Y. Oct. 4, 2024) (concluding plaintiff and her partner's personal views regarding the defendant, even when expressed at a time when litigation was anticipated, were not work product because "their production reveals nothing about the mental impressions or thoughts of counsel or the theory of [plaintiff's] claims or the strategy for prosecuting them"); *Bell v. Pension Comm. Of ATH Holding Co., LLC*, 330 F.R.D. 517, 524 (S.D. Ind. 2018) (concluding private Facebook communication between two plaintiffs about "being a little nervous, wanting the deposition over with, and wanting to be a good representative" were not work product "given that there is no evidence that the communication related to the legal strategies, theories, and mental impressions related to the furtherance of Plaintiffs' case").

The Court has reviewed the redacted documents at issue and its findings, based on that review and the discussion above, are set out in Exhibit B, attached hereto.

Accordingly, it is ORDERED:

1.    Defendant Hathcock's motion for *in camera* review and to compel production (Doc. 105) is GRANTED to the extent set forth herein and in Exhibits A and B.

2.    Rashada, the JTM Non-parties, and Heitner will amend their production

as set forth in this Order by no later than close of business on **December 29, 2025**.

DONE AND ORDERED this 25th day of December, 2025.

/s/ Hope Thai Cannon

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**